1   JEFFRY BUTLER (Bar No. 180936)
    jeffry.butler@dentons.com
2   PAULA M. YOST (Bar No. 156843)
    paula.yost@dentons.com
3   DENTONS US LLP
    One Market Plaza, Spear Tower, 24th Floor
4   San Francisco, California  94105
    Telephone:      (415) 267-4000
5   Facsimile:      (415) 267-4198

6   Attorneys for Plaintiff
    YOCHA DEHE WINTUN NATION
7
    TUARI N. BIGKNIFE (Bar No. 200625)
8   tbigknife@viejas-nsn.gov
    OFFICE OF THE ATTORNEY GENERAL
9   VIEJAS BAND OF KUMEYAAY INDIANS
    5000 Willows Road
10  Alpine, CA 91901
    Telephone:      (619) 659-1710
11  Facsimile:      (619) 659-1970

12  Attorney for Plaintiff
    VIEJAS BAND OF KUMEYAAY INDIANS
13
    MARK A. RADOFF (Bar No. 119311)
14  OFFICE OF THE GENERAL COUNSEL
    SYCUAN BAND OF THE KUMEYAAY NATION
15  mradoff@sycuan-nsn.gov
    2 Kwaaypaay Court
16  El Cajon, CA 92019
    Telephone:      (619) 659-1022
17  Facsimile:      (619) 445-0238

18  Attorney for Plaintiff
    SYCUAN BAND OF THE KUMEYAAY NATION
19

20              UNITED STATES DISTRICT COURT

21              EASTERN DISTRICT OF CALIFORNIA

22  YOCHA DEHE WINTUN NATION; VIEJAS BAND      Case No.
    OF KUMEYAAY INDIANS; and SYCUAN BAND OF
23  THE KUMEYAAY NATION,                        **COMPLAINT FOR:**

24                        Plaintiffs,           **(1)  BREACH OF COMPACT**
                  v.                            **(2)  BREACH OF IMPLIED**
25                                              **      COVENANT OF GOOD FAITH**
    EDMUND G. BROWN, GOVERNOR OF                **      AND FAIR DEALING**
26  CALIFORNIA; STATE OF CALIFORNIA,

27                        Defendants.

28

DENTONS US LLP
ONE MARKET PLAZA, SPEAR TOWER, 24TH FLOOR
SAN FRANCISCO, CALIFORNIA  94105
(415) 267-4000

Plaintiffs the Yocha Dehe Wintun Nation, the Viejas Band of Kumeyaay Indians, and the Sycuan Band of the Kumeyaay Nation allege:

1.     California law, as enshrined in the California Constitution, prohibits "banking games," including banked card games such as twenty-one (i.e., blackjack) and baccarat, where one or more players wager against a banker who collects losing bets and pays winnings.  Banked card games are legal within California only where offered by sovereign Indian nations in accordance with approved tribal-state gaming compacts.  Over time, however, California's cardrooms have devised an ingenious four-prong system by which, under the guise of "player-dealer" games, they offer banked card games like those played at Indian casinos, in violation of the California Constitution and California Penal Code.  Rather than enforcing the laws plainly prohibiting the cardrooms' scheme and essential to holding up the State's bargain with Indian nations in California, the State has been complicit in permitting, and at times even encouraging, the cardrooms' unlawful conduct.  This lawsuit asks the Court to require the State to uphold California law and fulfill its legal duty to California voters and contractual obligations to sovereign Indian nations.

## PARTIES

2.     Plaintiff Yocha Dehe Wintun Nation is a sovereign Indian nation, recognized by the United States.  In 1907, Yocha Dehe was forced off its ancestral lands and onto a federally created Rancheria, land the United States holds in trust for Yocha Dehe's use and benefit in the Capay Valley of Yolo County near Brooks, California.  Yocha Dehe remains on this trust land today.

3.     Plaintiff Viejas Band of Kumeyaay Indians is a sovereign Indian nation, officially recognized by the United States, with its reservation located in Alpine, California.

4.     Plaintiff Sycuan Band of the Kumeyaay Nation is a federally recognized tribe and a sovereign Indian nation, that was officially recognized by Executive Order of Ulysses S. Grant in 1875, and whose reservation is located in El Cajon, California.

5.     Defendant Edmund G. Brown is the Governor of the state of California and is sued here in his official capacity.

DENTONS US LLP
ONE MARKET PLAZA, SPEAR TOWER, 24TH FLOOR
SAN FRANCISCO, CALIFORNIA  94105
(415) 267-4000

DENTONS US LLP
ONE MARKET PLAZA, SPEAR TOWER, 24TH FLOOR
SAN FRANCISCO, CALIFORNIA  94105
(415) 267-4000

6.      Defendant State of California is the 31st state of the Union, and a dependent political and governmental body within the constitutional framework of the United States of America.

**JURISDICTION AND VENUE**

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. sections 1331, 1362, and 1367(a).

8.      Venue in this District is proper under section 13.1(e) of the Compacts between Plaintiffs and the State, and under 28 U.S.C. section 1391, because the State is located in this District, a substantial part of the events or omissions giving rise to this action occurred in this District, a substantial part of property that is the subject of the action is situated in this District, and the State is subject to personal jurisdiction within this District.

9.      The State has waived Eleventh Amendment Immunity from suit under the Compacts, and under California Government Code section 98005.

**GENERAL ALLEGATIONS**

A.      **CALIFORNIA'S GAMBLING PROHIBITION**

10.      California became a state in 1850.  Since 1855, the California Legislature has prohibited certain types of gambling.  *See* 1855 Cal. Stat. ch. 103.  When the California Penal Code was enacted in 1872, Penal Code section 330 ("Section 330") incorporated the list of prohibited activities, then existing games of chance and banked games.  *See* 1872 Cal. Stat. ch. 278.  In 1891, Section 330's list of prohibited games was amended to include the popular game known as "twenty-one."  1891 Stats. ch. 62, p. 57.

11.      The game "twenty-one" is also commonly known as "blackjack."  *Oliver v. Los Angeles County*, 66 Cal. App. 4th 1397, 1401 n.1 (1998) ("'Blackjack' is another name for the game of '21.'"); *Kelly v. First Astri Corp.*, 72 Cal. App. 4th 462, 466 n.1 (1999) ("Blackjack is defined as, 'a card game the object of which is to be dealt cards having a higher count than those of the dealer up to but not exceeding 21– called also *twenty-one, vingt-et-un*.'").

12.      Section 330 today exposes to criminal liability "[e]very person who deals, plays, or carries on, opens, or causes to be opened, or who conducts, either as owner or employee,

COMPLAINT

whether for hire or not, any game of . . . twenty-one . . . or any banking or percentage game played with cards . . ., for money, checks, credit, or other representative of value . . . ."

13.     A "banking game," in turn, "has come to have a fixed and accepted meaning:  the 'house' or 'bank' is a participant in the game, taking on all comers, paying all winners, and collecting from all losers." *Sullivan v. Fox*, 189 Cal. App. 3d 673, 678 (1987).  "[A] game will be determined to be a banking game if under the rules of that game, it is possible that the house, another entity, a player, or an observer can maintain a bank or operate as a bank during the play of the game."

14.     In 1984, California voters amended the State's Constitution to give Section 330 constitutional effect, providing that "[t]he Legislature has no power to authorize, and shall prohibit, casinos of the type currently operating in Nevada and New Jersey."  Cal. Const. art. IV, § 19(e); *Hotel Employees & Rest. Employees Int'l Union v. Davis*, 21 Cal. 4th 585, 605-06 (1999) (1984 amendment to the California Constitution "was designed, precisely, to elevate statutory prohibitions on a set of gambling activities to a constitutional level.")

15.     Thus, anyone (other than an Indian tribe, as explained below) who plays either blackjack or a banked card game engages in illegal activity under the Penal Code and the Constitution.

**B.     BACKGROUND ON TRIBAL GAMING**

16.     The history of Indian tribes in California is sobering.  Many California Indian nations, including the ancestors of the plaintiffs here, were decimated by the Gold Rush, as well as state and federal policies that sanctioned genocide, forced enslavement and Indian people's removal from the lands upon which they depended to live.  As a result the people of those Indian nations were relegated to living in grinding poverty, depending on the United States for survival.

17.     The Supreme Court's decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), began to change the outlook for the tribes.  The factual predicate for that decision was the attempts by the Cabazon Band of Mission Indians and the Morongo Band of Mission Indians to provide for their impoverished communities by running bingo halls in the early 1980s (just as Yocha Dehe, the Viejas Band, and the Sycuan Band did).  The State and

DENTONS US LLP
ONE MARKET PLAZA, SPEAR TOWER, 24TH FLOOR
SAN FRANCISCO, CALIFORNIA  94105
(415) 267-4000

1    county sued to shut down those bingo halls as unlawful under California Penal Code section

2    326.5 and a county ordinance.  Those lawsuits eventually made their way to the United States

3    Supreme Court, which invalidated the State's attempt to enforce section 326.5 against the tribes'

4    bingo halls.  The Supreme Court held that because California permitted a substantial amount of

5    gaming activity, including lotteries and bingo, the bingo statute could not be enforced on Indian

6    lands.  *Id.* at 209.

7        18.    In 1988, in response to the Supreme Court's *Cabazon* decision, Congress enacted

8    the Indian Gaming Regulatory Act (the "IGRA").  Pub. L. No. 100-497, 102 Stat. 2467 (1988)

9    (codified at 25 U.S.C. §§ 2701-21).  The IGRA allowed those tribes that negotiated compacts

10   with the State (a "Tribal-State Compact") to play the types of games usually associated with

11   casino-style gambling, such as slot machines and banked card games, including blackjack and

12   baccarat.

13       **C.    HISTORY OF CALIFORNIA COMPACTS**

14       19.    Following the IGRA's enactment, the State of California and various California

15   Indian tribes, including Yocha Dehe, the Viejas Band and the Sycuan Band, attempted to

16   negotiate Tribal-State Compacts.  Governor Gray Davis received requests from thirty-nine Indian

17   tribes to enter a standard "Tribal-State Gaming Compact" approved by the Proposition 5 ballot

18   initiative, which permitted tribes to operate slot machines and banked card games.  But

19   Proposition 5 faced an immediate legal challenge in the California Supreme Court alleging it

20   violated California's Constitutional prohibition on Nevada-style casinos.  *See Hotel Employees*,

21   21 Cal. 4th 585.

22       20.    In August 1999, while the Supreme Court's decision was pending, Governor Gray

23   Davis proposed an amendment to Section 19 of Article IV of the California Constitution that

24   would exempt tribal gaming from the prohibition on Nevada-style casinos, "effectively granting

25   tribes a constitutionally-protected monopoly on most types of class III games in California." *In*

26   *re Indian Gaming Related Cases*, 331 F.3d 1094, 1103 (9th Cir. 2003).  This amendment became

27   Proposition 1A.  Although voters did not consider Proposition 1A until March of 2000, Governor

28   Davis and tribes continued negotiating compacts, conditioned upon passage of the proposition.

DENTONS US LLP
ONE MARKET PLAZA, SPEAR TOWER, 24TH FLOOR
SAN FRANCISCO, CALIFORNIA  94105
(415) 267-4000

21. On September 10, 1999, Governor Davis approved fifty-seven Class III gaming compacts (the "1999 Compacts"), which the Legislature ratified. The core of the negotiated compacts was that California granted tribes the exclusive right to conduct Class III gaming, free from non-tribal competition in the State, in exchange for a number of restrictions and obligations on tribal gaming enterprises.

22. The 1999 Compacts recognized that "[t]he exclusive rights that Indian tribes in California, including the Tribe, will enjoy under this Compact create a unique opportunity for the Tribe to operate its Gaming Facility in an economic environment free of competition from the Class III gaming referred to in Section 4.0 of this Compact on non-Indian lands in California." Section 4.0 of the 1999 Compacts, in turn, authorized the operation of "Gaming Devices" and "[a]ny banking or percentage card game."

23. On March 7, 2000, California voters approved Proposition 1A, which amended the California Constitution to provide:

> Notwithstanding subdivisions (a) and (e), and any other provision of state law, the Governor is authorized to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes on Indian lands in California in accordance with federal law. Accordingly, slot machines, lottery games, and banking and percentage card games are hereby permitted to be conducted and operated on tribal lands subject to those compacts.

Cal. Const. art. IV, § 19(f).

24. In 2015, the Sycuan Band entered into a new Tribal-State Compact with the State of California, and Yocha Dehe and the Viejas Band each did the same in 2016 (the "2015-16 Compacts"). As was the case with the 1999 Compacts, the preamble to the 2015-16 Compacts recognized the tribes' right to offer banked card games exclusively: "the State and the Tribe recognize the *exclusive rights the Tribe will enjoy under this Compact* create a unique opportunity for the Tribe to operate a Gaming Facility in an economic environment *free of competition from the operation of* slot machines and *banked card games on non-Indian lands* in California and that this unique economic environment is of great value to the Tribe." That section of the 2015-16 Compacts also acknowledged that "in consideration" of the tribes' "exclusive rights . . . to engage

DENTONS US LLP
ONE MARKET PLAZA, SPEAR TOWER, 24TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105
(415) 267-4000

COMPLAINT

DENTONS US LLP
ONE MARKET PLAZA, SPEAR TOWER, 24TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105
(415) 267-4000

in the Gaming Activities" specified in the compacts (which activities include the play of "[a]ny banking or percentage card game"), the tribes committed, "on a sovereign-to-sovereign basis" to pay the State "fair cost reimbursement and mitigation."

25.     The 2015-16 Compacts' final preamble recital provides that the State and the tribes agree that all terms and provisions of the Compacts are intended to be binding and enforceable.  This is a point further confirmed by Section 1.0 of the 2015-16 Compacts, which provides, among other things, that a purpose of the Compacts is to "[a]chieve the objectives set forth in the preamble."

26.     The effects of Indian gaming are profound, far beyond the sovereign nations' ability to provide for the future of their people.  A 2016 economic impact study prepared on behalf of the California Nations Indian Gaming Association ("CNIGA") found that in 2014, Indian gaming generated $7.8 billion in economic output in the State, supported 63,000 jobs statewide, provided $3.3 billion in worker earnings, and produced nearly $400 million in state and local revenue.

### D.     TRADITIONAL GAMING AT CALIFORNIA CARDROOMS

27.     Cardrooms have existed in California for many years.  Traditionally, cardrooms made money by charging each player a per-hand fee – called a "collection" – for the privilege of using the cardroom's facilities, usually playing "round" games such as poker, where there is no bank or house against which players bet.  The deal would continuously rotate among the players, with the cardroom having no interest in the results of any hand or the winnings of any player dealer.

28.     To bolster their business, the cardrooms developed the concept of a "proposition player," an individual paid by the cardroom to sit at the tables and reinvigorate games with dwindling action and thereby stimulate additional revenue for the cardroom in the form of per-hand fees collected from every player.  While the proposition players were paid to sit at the tables, they were required to gamble with their own money – a key point.

29.     Over time, the California Legislature has developed various statutory schemes to regulate gaming in cardrooms.  Each legislative scheme was required to be in harmony with the

constitutional prohibition on the play of specific games such as blackjack, or, generally, the play of banked games.

30.     For example, in 1997, the Legislature enacted the Gambling Control Act, which, among other things, created the California Gambling Control Commission (the "Commission"), which is vested with primary jurisdiction and supervision "over gambling establishments in this state and over all persons or things having to do with the operations of gambling establishments." Cal. Bus. & Prof. Code § 19811.  The Gambling Control Act also required regulation by the Division of Gambling Control, an agency within the Attorney General's Office, which is now known as the Bureau of Gambling Control (the "Bureau").  The Bureau regulates the gambling industry in California, in cooperation with the Commission.

31.     In terms of the play of games in cardrooms, the Gambling Control Act addressed regulation of proposition players, including licensing and contracting.  One example is Business & Professions Code section 19984, which specifically allows cardrooms to "contract with a third party for the purpose of providing proposition player services," subject to certain conditions.  A principal condition is that the contracts with these so-called third-party proposition players (known in short hand as "TPPs") may not give the cardroom "any interest, whether direct or indirect, in funds wagered, lost, or won."  Bus & Prof. Code § 19984(a).

32.     Another concern about the play in cardrooms over the years has been the "player-dealer" position.  Any player at a table, including the TPP, can be the player-dealer, that is, the person who is dealing the hand and against whom the other players bet.  If it is possible for one person to maintain that player-dealer position, however, the game effectively becomes "banked," and therefore illegal under Section 330.

33.     Various decisions have analyzed the legality of specific games at California cardrooms.  In *Huntington Park Club v. Los Angeles County*, 206 Cal. App. 3d 241 (1988), the court found that Pai Gow was not a banking game where "the dealer position continually and systematically rotates among each of the participants."

34.     By contrast, the court in *Oliver v. Los Angeles County*, 66 Cal. App. 4th 1397 (1999), found a game called "Newjack" illegal under Section 330.  As the *Oliver* court explained,

COMPLAINT

"a game will be determined to be a banking game if under the rules of that game, it is possible that the house, another entity, a player, or an observer can maintain a bank or operate as a bank during the play of the game." *Id.*, at 1408.  While Newjack permitted a player to serve as player-dealer for two consecutive hands before the option to deal passed to other players, it did not *require* the rotation of the deal "if all the other players at the table decline to be player-dealer." *Id*, at 1407.  The court concluded Newjack violated Section 330 because, "in Newjack, the player-dealer position does not *have* to rotate among the players.  If the other players decline to accept the player-dealer position, one player can act as a player-dealer for repeated hands and such a player need not go broke after a few hands." *Id.* at 1408-09.  Therefore, "[a] player with a significant amount of money to bet can hold the position of player-dealer for a long time, and thus keep the inherent playing advantage for him or herself." *Id.* at 1409.

35.     Following *Oliver*, the Legislature enacted Penal Code section 330.11 ("Section 330.11"), to make clear what constitutes a banking game for purposes of Section 330.  As the statute explains:

> "Banking game" or "banked game" does not include a controlled game if the published rules of the game feature a player-dealer position and provide that this position must be continuously and systematically rotated amongst each of the participants during the play of the game, ensure that the player-dealer is able to win or lose only a fixed and limited wager during the play of the game, and preclude the house, another entity, a player, or an observer from maintaining or operating as a bank during the course of the game. For purposes of this section it is not the intent of the Legislature to mandate acceptance of the deal by every player if the division finds that the rules of the game render the maintenance of or operation of a bank impossible by other means.  The house shall not occupy the player-dealer position.

36.     The legislative history of Section 330.11 confirms its narrow scope:

> This bill attempts to clarify that card clubs may offer games that feature a player-dealer position, so long as the rules of the game require a continuous and systematic rotation of the player-dealer position . . . . This bill clarifies that these games are not "banked games."  Moreover, this bill does not legalize 21 or any other new card game.

Chapter 1023, AB 1416 (1999-2000 Session), Author's Senate floor sponsor's statement and notes, Feb. 26, 1999 (Assembly Member Herb Wesson).

DENTONS US LLP
ONE MARKET PLAZA, SPEAR TOWER, 24TH FLOOR
SAN FRANCISCO, CALIFORNIA  94105
(415) 267-4000

COMPLAINT

37.     From the tribes' perspective, both *Oliver* and Section 330.11 were flawed in one respect:  ***No amount of rotation*** could legitimize the play of constitutionally-prohibited games such as blackjack.  Stated otherwise, banking even a ***single hand*** of blackjack is still playing an impermissible banked game.

38.     In any event, to comply with Section 330.11 and the *Oliver* decision, California's cardrooms voluntarily submitted, and the Bureau approved, rules providing that the player-dealer position cannot be occupied by one person for more than two consecutive hands.  This two-hand rotation requirement became the industry standard.  Consistent with this industry standard to which the Bureau and cardrooms tacitly agreed, a 2016 review of cardroom rules on the (prohibited) game of blackjack on the Bureau's website revealed that 98 percent of them (204 out of 208 sets of rules) expressly set out the two-hand rotation mandate.  The following is a typical example of the rotation language in one set of rules for a cardroom:

> **LEGAL**
>
> The Player-Dealer position must rotate in a continuous and systematic fashion, and cannot be occupied by one person for more than two consecutive hands. There must be an intervening player-dealer so that no single player can continually occupy the player-dealer position within the meaning of *Oliver v. County of Los Angeles* (1998) 66 Cal. App. 4[th] 1397, 1408-1409.  If there is not an intervening person occupying the Player-Dealer's position, the game will be "broke" or stopped, as required by the California Penal Code.

39.     With respect to the (also prohibited) game of baccarat, the results are just as remarkable.  Out of the 122 approved game rules on the Bureau's website in 2016, 104 (or 85 percent) explicitly required two-hand rotation and the rest stated that rotation of the banker position is "the same as industry standard games and complies with 330.11 of the California Penal Code."  To ensure there was no doubt about what that standard is, a number of the 104 game rules requiring rotation every two hands *also* contained the "industry standard" provision. The following is an example of the relevant language from a game of EZ Baccarat:

DENTONS US LLP
ONE MARKET PLAZA, SPEAR TOWER, 24TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105
(415) 267-4000

COMPLAINT

1

2

3

4

5

6

7

8

9

> **Standards of Play**
>
> The game features a rotating player/dealer position that collects from all losers and pays all winners to the extent that their wager covers the action. The rotation of the Player/Dealer position is the same of industry standard games and complies with 330.11 of the California Penal Code. The object of the game is to form a hand that equals nine (9) or as close to it as possible. The player's hand is compared with the player/dealer's hand. The hand closest to "9" wins.
>
> * * *
>
> **PLAYER-DEALER & DEAL**
>
> The player/dealer position rotates in a systematic and continuous way so that the opportunity to act as the player/dealer does not constantly remain with a single person for many hands. The person in player/dealer position may not act as player/dealer position more than two consecutive hands or rounds of play. The opportunity to act as the player/dealer must be offered to all seated players after two hands or rounds of play so that a single player cannot repeatedly act as the player/dealer within the meaning of *Oliver v. County of Los Angeles*, (1998) 66 Cal.App.4th 1397, 1408-09 or section 330.11 of the California Penal Code, relating to gambling establishments and any future regulatory guideline from the California Bureau of Gambling Control or the California Gambling Control Commission with respect to the operation of controlled games featuring a player/dealer position.

10    40.    Consistent with the dictates of Section 330.11 and the two-hand rotation industry

11   standard the Bureau and cardrooms established, the Bureau created (and maintained on its

12   website) a "Gambling Establishment Compliance Inspection Checklist" that required its agents,

13   when inspecting a cardroom, to, among other things, verify that "the player-dealer position [is]

14   continuously and systematically routed amongst each player during the play of CA/Asian games."

15   (**Exhibit A, p. 13**.)

16    41.    Collections have also been the subject of legislative focus. Penal Code section

17   337j(f) ("Section 337j(f)") "is intended to be dispositive of the law relating to the collection of

18   player fees in gambling establishments." It sets forth limited grounds for waiving collection of a

19   per-hand fee, providing that "the gambling establishment may waive collection of the fee or

20   portion of the fee in any hand or round of play after the hand or round has begun pursuant to the

21   published rules of the game and the notice provided to the public." The legislative history of

22   Assembly Bill 278, which added Section 337j(f)'s collection fee waiver language, explained the

23   use of the collection fee waiver in particular hands or rounds of play:

24            The bill also will clarify the law relating to the collection of fees in
             in card clubs by allowing the club to waive specified fees, a
25            "player-friendly" change benefiting those players who do not
             receive action on their wager, or where a hand folds and there is no
26            betting.

27   Thus, the Legislature envisioned allowing a cardroom to waive the collection fee only in limited

28   circumstances, namely, where a player received no action on his wager or where the entire hand

DENTONS US LLP
ONE MARKET PLAZA, SPEAR TOWER, 24TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105
(415) 267-4000

folds with no betting at all.

42.     Moreover, the Commission promulgated regulations governing contracts between TPPs and cardrooms.  Consistent with the language and history of Section 337j(f), those regulations specifically provide "[t]hat collection fees charged by the house for participation in any controlled game shall be the same as those charged to other participants during the play of the game." Cal. Code Regs. tit. 4, § 12200.7(b)(12).  This necessarily means that TPPs and other players in any game must pay the same collection rate.

### E.     ILLEGAL GAMING IN CALIFORNIA CARDROOMS

43.     There was an inescapable problem for cardroom operators adhering to the legal requirements described above:  They wanted to make more money.  In short, they wanted what the tribes had – the ability to play popular games such as blackjack, and to do so in a banked format.  To that end, beginning around the early-2000s, California cardrooms dramatically restructured how they operated player-dealer card games.  There are four inter-connected aspects to this restructuring:  (1) cardrooms fail to rotate the "banker" position at their tables, (2) they routinely waive per-hand collection fees for all but the TPPs, (3) they obtain an improper interest in the funds wagered in their establishments through the use of TPPs, and (4) they play (and boldly advertise the play of) expressly prohibited card games.

#### i.     FAILURE TO ROTATE THE BANKER POSITION

44.     As a preliminary matter, the tribes contend that rotation of the banker position is irrelevant, because banking even a single hand of a game makes that an illegal banked game.  The cardrooms, however, fail to rotate the banker position *at all*.

45.     As noted above, consistent with the *Oliver* decision and Section 330.11, the cardrooms and Bureau implemented a two-hand industry standard for the rotation of the banker or player-dealer position.  That rotation standard, however, had a significant drawback for the cardrooms, because it forced the players at their tables to take that banker position or the game would have to stop.  Because tribal casinos (like those in Las Vegas or New Jersey) did not have to rotate the banker position, customers preferred to go there rather than the cardrooms.

46.     The cardrooms, however, devised a way to avoid the straightforward requirement

COMPLAINT

that the banker position rotate:  The infamous "Lytle Letter."

47.     In 2003, Robert Lytle became the Director of the Bureau (then still known as the Division of Gambling Control).  In this position, Lytle was responsible for overseeing regulation of California cardrooms.

48.     On December 20, 2007, Lytle, in his official capacity, wrote to the presidents of the Southern California Cardroom Association and the Golden State Gaming Association, two groups lobbying for California cardrooms.  (**Exhibit B**.)  The Lytle Letter opined on "the inspection practice of the Bureau of Gambling Control" regarding rotation of the deal in a game with a player-dealer position.  The Lytle Letter cited Section 330.11's requirement that the "player-dealer position . . . must be continuously and systematically rotated amongst each of the participants during the play of the game," but instead of committing the Bureau to enforce that statute as written, it stated that "the Bureau of Gambling Control has mandated that all game rules include a provision that the player-dealer position must continuously and systematically ***be offered*** to all seated players."  (Emphasis added.)  The Lytle Letter further stated that, "[i]f, after a player acts as the player-dealer for two consecutive hands, the casino ***offers*** this opportunity to all other seated players . . . the requirement that the opportunity to act as the player-dealer be continuously and systematically offered to all seated players has been satisfied."  (Emphasis added.)  Thus, the Lytle Letter purported to wipe out the statutory requirement and long-established industry standard of ***actual*** rotation of the player-dealer position and instituted a system by which that position only had to be ***offered*** to the other players, and if they did not want to take it – which they never did – the play would continue without rotation.

49.     The problem with the Lytle Letter – aside from the fact it contradicted the law – is that it was patently self-interested and improper.  At the end of 2007, just a few days after sending his letter to the cardroom associations, Lytle left the Bureau to work as a representative of a San Jose cardroom.  In December 2014, the Bureau, Lytle's former employer, filed with the Commission a formal accusation (the "Accusation") against Lytle seeking to revoke his state-issued gaming licenses because of improper conduct.  A copy of the Accusation is attached as **Exhibit C**.  In the Accusation the Bureau concluded that, among other bad acts, "prior to

DENTONS US LLP
ONE MARKET PLAZA, SPEAR TOWER, 24TH FLOOR
SAN FRANCISCO, CALIFORNIA  94105
(415) 267-4000

COMPLAINT

December 4, 2007" – that is, a few days before he sent the letter to the cardroom associations – Lytle entered into "negotiations with [the San Jose cardroom] concerning prospective engagement as its compliance director." Thus, Lytle negotiated for employment at a cardroom while still the Bureau's Director, then issued the letter providing cardrooms the ability to skirt the law on game rotation, and a few days later left to work at a cardroom.

50.     Not surprisingly, the Bureau concluded in the Accusation that Lytle acted "for personal gain and the gain of those whom he came to represent, he abandoned the basic principles of the state agency, and the general public, that he served" and that he "is not a person of good character, honesty, and integrity." In a July 2016 stipulated settlement, Lytle admitted wrongdoing, admitted that he was unqualified for Bureau licensure, consented to revocation of his temporary state gambling licenses and denial of pending applications, agreed to sell any ownership in a gambling establishment or enterprise, agreed to pay a fine of at least $75,000, and agreed to a lifetime ban from licensure by the Commission, Bureau, or any successor agency.

51.     Armed with the Lytle Letter – which they evidently bought from Lytle – the cardrooms ceased rotating the player-dealer position "continuously and systematically" as the Penal Code requires. Instead, cardrooms began a farcical practice of merely offering the deal to players other than the TPPs. The other players, seeking the experience of playing a banked game "against the house" without traveling to Nevada or an Indian reservation, virtually never accept the offer to bank a game themselves.

52.     Despite its decidedly illegitimate origin, the Bureau left the Lytle Letter in effect for nearly a decade, and, as explained below, after "suspending" it briefly, has once again allowed cardrooms to return to the non-rotation standard it created.

### ii.     THE WHOLESALE WAIVER OF COLLECTIONS

53.     Playing banked games by not rotating the player-dealer position was only one aspect of the cardrooms' illegal scheme. To achieve their goal – offering Nevada casino-style gaming – the cardrooms had to eliminate the collection. After all, the collection put the cardrooms at a distinct economic disadvantage, because their customers could not use all their funds to gamble – they had to dedicate a portion of those funds to paying the collection.

DENTONS US LLP
ONE MARKET PLAZA, SPEAR TOWER, 24TH FLOOR
SAN FRANCISCO, CALIFORNIA  94105
(415) 267-4000

54. While nothing in California law requires a collection in the first place, the cardrooms historically had no choice but to impose it. The collection was the only way the cardrooms made money from the gambling at their establishments. Thus, in the context of traditional cardroom play, not charging a collection would be akin to running a non-profit business.

55. The cardrooms thus waived the collection for all players other than the TPP, and many submitted to the Bureau game rules to that effect, which the Bureau approved. This waiver of collections contravenes California law and as a consequence, Plaintiffs' exclusivity rights. As explained above, Section 337j(f), the "dispositive" statute on collections allows for the waiver of collections, but only for a particular "hand or round of play" in a game, not in a wholesale manner, as the cardrooms do now. Moreover, as the legislative history of that statute demonstrates, that waiver is supposed to occur *only* where a player received no action on his wager or where the entire hand folds with no betting at all. Further, section 12200.7(b)(12) of the Commission's regulations prohibits a differential in collection fees charged to players at a table. Thus, the Commission's regulations do not allow the cardrooms to charge the TPPs (who act only as player-dealers in cardrooms) a different rate than the rest of the players in the game, though that is just what they are doing.

### iii. THE FUNDAMENTAL MORPHING OF THE TPP ROLE

56. If the cardrooms abandoned their traditional form of income, a natural question arises: How do the cardrooms make money now? The answer is through the TPPs.

57. A by-product of the cardrooms illegally reshaping their games to match those banked card games played in Nevada and Indian casinos, is the redefinition of the TPP role in very fundamental ways. Whereas the cardrooms used to pay the TPPs to maintain interest in their poker games, the TPPs now pay the cardrooms for the privilege of banking the games, and the TPPs make the money for those payments by permanently occupying the lucrative banker position (which explains the failure to rotate the bank, as the TPPs need to maximize the inherent advantage that results from acting as the "house"). Because the TPPs make 100% of their revenue from the "funds wagered, lost, or won," paying any of that money back to the cardrooms

COMPLAINT

necessarily means the cardrooms have an "interest" in those funds in violation of Business & Professions Code section 19984.

58.     While the cardrooms claim the contracts between them and the TPPs allow the latter to pay only for the goods and services the TPP employees use while on the property, this justification is misleading, because those goods and services are for such things such as equipment (surveillance cameras and monitors, cards, and shuffling machines), rent and advertising.  These items are all among the customary incidents of running a business.  The TPPs, then, have become a form of partner with the cardrooms and thus, the "house."  In any event, because the TPPs' income is derived solely from "funds wagered, lost, or won," paying any portion of those funds to the cardrooms is illegal.

### iv.    THE PLAY OF ILLEGAL GAMES

59.     A critical aspect of the cardroom's scheme was the play of banked card games such as blackjack and baccarat.  To compete with Nevada and tribal casinos, the cardrooms had to offer the same games offered there.  The fact that blackjack and baccarat are played in Nevada and New Jersey, however, means it is constitutionally impermissible for anyone other than an Indian tribe with a negotiated tribal-state compact to play those games in California.  If that were not enough, blackjack is specifically prohibited (as "twenty-one") by Section 330.

60.     As for baccarat, the game *does not have* a "player-dealer position."  Rather, the players at the table simply make wagers based on a single shared set of cards.  The dealer, who has no hand in the game, acts as nothing but a bank.  Consequently, Section 330.11's exemption for games where the player-dealer position rotates cannot apply to this game.  By definition, baccarat cannot be played *other* than as a "house-banked" game.

61.     Aware of the prohibition on playing these games, the cardrooms devised a misguided (but profitable) scheme to circumvent the law, which the Bureau enabled when approving game rules.  For example, the cardrooms created, and the Bureau approved, a game known as Pure 21.5 Blackjack.  The sole difference between Pure 21.5 Blackjack and standard blackjack (also known as 21) is that the face and ten cards have a value of 10.5 when dealt with an ace, rather than the standard value of 10.  Thus, when paired with an ace, these cards add up to

21.5, rather than 21.  Not surprisingly, when cardroom guests ask a dealer how to play the game, they are told it plays just the same as regular blackjack.  Further, some cardrooms, like Casino M8trix in San Jose and Lucky Chances in Colma, until recently, advertised this game on their websites as "Vegas style Blackjack."  Along the same lines, the cardrooms created another game called "21st Century Blackjack," the object of which, as some cardrooms explain, is "the same as standard Blackjack – to get as close to 21 as possible without going over."

62.     The cardrooms also recognized that to lure customers to their doors and away from tribal casinos they needed to advertise their play of these illegal games on their websites and on billboards lining major freeways.  One particularly egregious example, from the Hollywood Park Casino website, unabashedly admitted the play of blackjack and went so far as to call it by its prohibited name:



63.     There is an important, and ironic, point to note with respect to the cardrooms' illegal gaming.  The Indian tribes bargained, and pay for, the exclusive right to offer Las Vegas-style banking games.  The tribes, however, can game only on their reservations, which are in most cases remote and therefore not near the urban centers from which they draw their customers.  The cardrooms, by contrast, are not limited geographically.  Thus, they violate the tribes' exclusivity by playing their illegal games, and get to do so much closer to where many Indian casino customers live.

F.    **THE STATE ABETS THE CARDROOM'S ILLEGAL GAMING**

64.    The State (through its Bureau and Commission representatives) had to know it was allowing illegal gaming when that gaming began.  After all, at a minimum:

- Robert Lytle was the head of the Bureau when he issued to the two associations the letter that allowed the cardrooms to stop rotating the player-dealer position in direct violation of Section 330.11;

- The Bureau approved rules allowing the cardrooms to waive collections for all but one player, the TPP, in violation of Section 337j(f) and section 12200.7(b)(12) of the Commission's regulations;

- The Bureau approved cardrooms playing games such as Pure 21.5 Blackjack and baccarat, both of which are prohibited by the Constitution as games played in Nevada and New Jersey, and the former of which is specifically prohibited – as "twenty-one" – by Section 330; and

- The Commission approved the regulations which morphed the TPP position, allowing the TPPs to contract with the cardrooms to obtain an illegal interest in the "funds wagered, lost, or won" at their facilities.

65.    The tribes did not recognize the cardrooms' illegal gaming until late 2011, at which time they began investigating the concern.  At an April 12, 2012 meeting of the Tribal-State Association (a group formed by the Tribal-State Compacts and made up of tribal and state gaming regulators) Yocha Dehe representatives for the first time informed the Bureau and Commission officials present (including Martin Horan, then the acting Bureau Chief, and Stephanie Shimazu, the Commission's Chairwoman) that the cardrooms were playing illegal banked games at their facilities.

66.    By April 2012, then, the State was unquestionably on notice of the cardrooms' blatant violation of California law to the tribes' detriment.  Rather than do what the tribes requested – enforce the laws as they exist and thereby protect the exclusivity for which tribes bargained – the State began a multi-year campaign of promising action, but doing little.  Worse, while the State has conceded the tribes are correct on the law, the little the State has done further

1   ***enabled*** the cardrooms' illegal gaming scheme.

2   67.   Over the months following the April 2012 Association meeting, tribal

3   representatives discussed and met on several occasions (including June 19, August 2, and October

4   9, 2012) with staff from the Bureau and Commission to explain the illegal gaming concerns,

5   including providing tutorials at blackjack and baccarat tables.  From the tribes' perspective, the

6   position was – and continues to be – the same:  Enforce the laws and respect the tribes'

7   exclusivity.  The State representatives' response to these early communications was that they

8   were investigating the tribes' claims, though they acknowledged the existence of a "problem."

9   While the Bureau refused to commit to any particular action or timeline, by the October 9

10  meeting, its representatives agreed to begin a review of the cardroom game rules it had approved,

11  and stated such review might result in changes to the collection fee and game rotation issues.  As

12  for the Commission, it acknowledged the need to "clean up" its TPP regulations and agreed to

13  schedule workshops to begin that process.

14  68.   In an October 2012 letter Yocha Dehe wrote to the Bureau and the Commission

15  for the first time detailing its concerns with illegal gaming at cardrooms.  (**Exhibit D**.) As the

16  letter explained, the point was relatively simple:  "The cardrooms have, over time, manipulated

17  the system the State put in place and have been allowed to advertise and play illegal games in a

18  way that is indistinguishable from those played at Indian casinos."  With this in mind, Yocha

19  Dehe asked the State to describe, with specificity, the steps it intended to take to remedy the

20  situation and the timeframe involved.

21  69.   On December 10, 2012, the Viejas Band also wrote to the Bureau and Commission

22  to memorialize the concerns its representatives had raised at the October 9, 2012 meeting, and to

23  confirm the Bureau's and Commission's commitments at that meeting to combat the illegal

24  gambling.  (**Exhibit E**.)

25  70.   On December 27, 2012, more than two months after Yocha Dehe sent its October

26  2012 letter, the Bureau's then-Chief, Wayne Quint, wrote back offering no concrete actions, but

27  simply expressing the Bureau's appreciation for bringing these "serious issues" to the Bureau's

28  attention and stating that the Bureau was "investigating and evaluating these allegations as

DENTONS US LLP
ONE MARKET PLAZA, SPEAR TOWER, 24TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105
(415) 267-4000

COMPLAINT

appropriate." This untimely letter typified the State's response to the illegal gaming problem over the years: Assurances of investigation and action, but ultimately nothing concrete, at least for the tribes.

71.     In a November 6, 2013 letter, Yocha Dehe elevated to the Attorney General, Kamala Harris, its concerns about the illegal gaming at cardrooms. In that letter, Yocha Dehe requested a meeting with Harris out of "frustration with the Bureau of Gambling Control's failure to address these issues, which [the tribes had] raised with Bureau representatives multiple times over the past eighteen months." Yocha Dehe then set out a brief history of the problem and attached a copy of its more detailed October 25, 2012 letter. (**Exhibit F** (without attachment).) Around the same time, CNIGA reached out to the Attorney General on behalf of its 35 member tribes to express its concerns regarding the illegal gaming practices at cardrooms. (**Exhibit G**.)

72.     The Attorney General's office did not bother to respond to Yocha Dehe's November 2013 letter. As a result, Yocha Dehe followed up on March 25, 2014. In the new letter, Yocha Dehe explained that other tribes had contacted the Attorney General seeking resolution to the illegal gaming but had also received no response to their inquiry. As Yocha Dehe explained, the tribes' concern over illegal gaming at the cardrooms "will not disappear by ignoring it." As before, Yocha Dehe requested that the Attorney General meet with the tribes to address that concern. (**Exhibit H**.)

73.     The tribes were individually unsuccessful in persuading the Attorney General to meet. To take a different approach, on February 20, 2015, elected leaders of the Agua Caliente Band of Cahuilla Indians, Pechanga Band of Luiseño Indians, the Sycuan Band, Table Mountain Rancheria, the Viejas Band, and Yocha Dehe (the "Coalition Tribes," which later also included the Barona Band of Mission Indians), wrote the Attorney General. (**Exhibit I**.) As some of the tribes had done individually, the Coalition Tribes requested a meeting to discuss the three issues of illegal gaming within the Bureau's purview (bank rotation, collection fees, and the play of illegal games). While the Coalition Tribes acknowledged some work by the Bureau on the issue of collections, they decried the Bureau's insistence that it would do nothing on the other aspects of illegal gaming while it was focused on collections. As the tribes explained, there was no

COMPLAINT

"reason why the Bureau should shrug off its obligation to enforce the law until it is convenient for the Bureau to do so, particularly where the problem is of the Bureau's own making."

74.     As described in more detail below, the Coalition Tribes finally met with representatives from the Department of Justice, and eventually, with Attorney General Harris and later her successor, Xavier Becerra.  Those meetings produced nothing of substance beyond some "guidelines" by the Bureau whereby it officially sanctioned illegal banked card gaming in breach of Plaintiffs' Compacts.

75.     The following summarizes how the State has abetted the cardrooms as to each of the four illegal gaming issues.

**i.     THE COMMISSION TACKLES, BUT THEN DROPS, THE TPP ISSUE**

76.     As noted above, the Commission early on recognized that its regulations – which, among other things, set forth the specific requirements for the contracts between the TPPs and cardrooms – required substantial revision.  As such, the Commission began a regulatory review process in which all interested stakeholders participated.

77.     To that end, on June 19, 2013, the Commission held an initial roundtable to discuss potential revisions to its regulations on TPP contracts, as well as a follow up workshop on August 27, 2013.  Following the workshop, a number of tribes, including Yocha Dehe, wrote to the Commission's then-Chairman, Richard Lopes, to suggest particular regulations requiring revision to remedy the illegal gaming problem (a copy of Yocha Dehe's September 16, 2013 letter is attached as **Exhibit J**.)

78.     The Commission followed up with additional meetings, including formal hearings, and prepared more than one set of proposed revised regulations to incorporate input from the various stakeholders.  The tribes' position never wavered – the Commission's regulations should, at a minimum, preclude payments from the TPPs to the cardrooms, because those payments necessarily violate the Gambling Control Act's prohibition on the cardrooms having an "interest, whether direct or indirect, in funds wagered, lost, or won."  Moreover, in no circumstance could the TPP bank a card game.

79.     The Bureau representatives who attended the Commission's regulation workshops

COMPLAINT

DENTONS US LLP
ONE MARKET PLAZA, SPEAR TOWER, 24TH FLOOR
SAN FRANCISCO, CALIFORNIA  94105
(415) 267-4000

and hearings in effect supported the tribes' position.  While the Commission's regulations set the parameters and requirements for contracts between TPPs and cardrooms generally, the Bureau is charged with approving the terms of the particular contracts between specific entities.  The Bureau, however, has acknowledged that the regulations effectively place no limitations on what the TPPs can pay to the cardrooms.  For example, at the June 19, 2013 roundtable, the Bureau's Marty Horan explained to the commissioners that the regulations were written so broadly they "allowed everything but the kitchen sink to be thrown" into the contracts between the TPPs and the cardrooms and he noted the Bureau's concern "about how much of the actual cost of the day-to-day operations of the cardrooms are being passed on to the third-party provider."

80.     In response to an inquiry by the Commission's Chairman at an August 18, 2015 hearing, a Bureau Senior Manager wrote to the Commission explaining the types of cardroom expenses a TPP could cover and the concerns those payments created.  (**Exhibit K**.)  As the Bureau's Manager explained in her September 25, 2015 letter, "[t]here are currently no specific expenses that are prohibited.  As currently written, the regulations allow for nearly all expenses that can be categorized as services, facilities, advertising, or equipment to be paid for by the TPPPS company."  The Manager then explained that the "largest issue for the Bureau is the debate with the industry as to what can be placed in these categories."  While the Bureau believes that some items should not be included as they provide "no value to the TPPPS company," the "industry" – that is, the cardrooms – argued that the Bureau may not have "the authority to make these determinations."

81.     The Bureau Manager's letter explained that "[a]dvertising is another issue."  The cardrooms argued "that <u>any</u> advertisement of the Cardroom benefits the TPPPS company and they should therefore share that expense (this would include poker advertisements)."  The Bureau, on the other hand, believes that under the regulations, the TPPs should "only share in the cost of advertisement for games in which the TPPPS company participates," which does not include poker.  The cardrooms, however, "rarely separate this expense and the Bureau has a difficult time discerning the TPPPS company's reasonable share."

82.     The Bureau Manager's letter also lists 15 types of expenses which the cardrooms

COMPLAINT

1  routinely try to share with the TPPs but which the Bureau believes "create a conflict" that

2  "enhances the dangers of unsuitable practices."  The list includes items such as cardroom "Payroll

3  Processing Fees," "Taxes," "Cardroom Charitable Donations," "Cardroom Employee Recruiting

4  and Hiring," and "Other Expenses Relating Specifically to Poker."

5        83.     The Bureau's September 25, 2015 letter is hardly the only evidence from the

6  Bureau of the problems created by the fundamental up-ending of the TPP role in cardrooms.  At

7  more than one of the Commission's regulation review gatherings, Bureau representatives present

8  admitted they lacked the ability and manpower to adequately evaluate the propriety of the

9  payments the TPPs make to the cardrooms.  As just one example, Bureau representatives

10 explained that they had inadequate knowledge and resources to accurately value the claimed rent

11 payments the TPPs make to the cardrooms.  Moreover, sometimes those rent payments were for

12 only a portion of the cardrooms' facilities (presumably the portion the TPPs claimed to occupy)

13 and thus there was no viable market comparisons even *if* the Bureau *had* the requisite real estate

14 knowledge and resources.

15       84.     The Bureau's own comments prove that the Commission's regulatory scheme,

16 which allows the TPPs to pay the cardrooms (instead of the other way around) is untenable.  Not

17 only does that scheme give the cardrooms an "interest" in the "funds wagered, lost, or won" (the

18 only funds the TPPs get from their work in cardrooms) in violation of the Gambling Control Act,

19 the Bureau has repeatedly admitted it has no viable way to adequately police the exchange of

20 those funds.  This was a point with which at least one of the Commission's commissioners,

21 Richard Schuetz, agreed.  During the August 27, 2013 workshop, he referred to California's

22 system as "almost a caricature of a gambling environment" and explained that "[i]f you allow

23 money to transfer [between TPPs and cardrooms] because of marketing, because of office space

24 agreements, because of this, because of that . . . you have blurred the distinction between those

25 two entities in a very difficult fashion, and there is no bureau in the entire world that can, in a true

26 sense, audit that so as to come to a conclusion as to whether it makes sense or not.  They just

27 can't."

28

DENTONS US LLP
ONE MARKET PLAZA, SPEAR TOWER, 24TH FLOOR
SAN FRANCISCO, CALIFORNIA  94105
(415) 267-4000

COMPLAINT

85.     Thus, the only way to ensure compliance with the law is a prohibition on the TPPs paying **anything at all** to the cardrooms.  Moreover, the current system means the TPPs are effectively the cardrooms' partners by paying for virtually every type of expense the cardrooms incur, thereby making the TPPs part of the "house" which means the games they run are house-banked in violation of the California Constitution.  To quote Commissioner Schuetz at an August 18, 2015 regulatory hearing, the current system "does seem to put [the TPPs] into the gambling business."

86.     The Commission held its last meeting regarding the TPP contracts on December 9, 2015.  The tribes have asked on several occasions when the regulatory review process will commence again.  While the Commission has acknowledged the need to re-start that process, it has yet to commit to any dates.

### ii.     THE BUREAU BEGINS, BUT THEN DROPS, COLLECTION REFORM

87.     In response to the tribes' push for action with respect to the illegal gaming problem, the Bureau announced on March 21, 2014 that it was "proposing amendments to its existing regulations pertaining to gaming activity authorization, . . . specifically to the approval of collection rates associated with Bureau authorized gaming activities."  This announcement, however, set no date for the beginning of this regulatory review.

88.     The Bureau eventually set a roundtable meeting for stakeholders to occur on May 6, 2014.  The Bureau's notice of the roundtable explained that the "discussion will focus solely on the parameters for which the licensee may waive the collection fee, pursuant to Penal Code section 337j(f)."

89.     On May 15, 2014, Yocha Dehe wrote to the Bureau's Chief, Wayne Quint, to provide its comments regarding the discussion at the roundtable.  (**Exhibit L**.)  Specifically, Yocha Dehe's letter concluded that "allowing cardrooms to waive collections the way they currently do is inconsistent with both that statute [Section 337j(f)], and also violates applicable regulations."  The letter went on to explain the particular reasons why the cardrooms could neither waive on a wholesale basis the collection fees for all but one player at the table – the TPP – nor charge the TPPs a different rate than the rest of the players in the game.

COMPLAINT

DENTONS US LLP
ONE MARKET PLAZA, SPEAR TOWER, 24TH FLOOR
SAN FRANCISCO, CALIFORNIA  94105
(415) 267-4000

90.     On October 31, 2014, the Bureau issued three different versions of proposed regulations based on the comments the Bureau received.  In response, on November 20, 2014, Yocha Dehe again wrote to the Bureau to comment on the three proposals and to emphasize that any regulation must spell out the narrow circumstances in which fees can be waived, must prohibit the wholesale waiver of fees, and must require the payment of fees from a player's own funds.

91.     On January 23, 2015, the Bureau held a workshop on the regulation amendments proposed in October 2014.  At the outset of the workshop, moderator and Bureau representative Susanne George gave a brief overview of the process.  In doing so, she essentially echoed the input the tribes had provided regarding the entire illegal gaming scheme.  For example, George explained that "[t]he proposed rules relating to collection rates are intended to encourage *actual rotation and the acceptance* of the player/dealer position *as a means to prevent unlawful de facto banking* from occurring."  She further stated that "[c]ollection rates and *continuous and systematic rotation of the bank to avoid prohibited sole source banking of games* do go hand in hand."  Further, George reported that, based on the Bureau's meetings with members of the cardroom industry, changes to collection fees were "a reasonable means to encourage the *legally required actual rotation* of the player/dealer position in a manner that is the least disruptive to current card room operational practices."

92.     The January 2015 workshop was remarkable for another reason – the disparity in the positions articulated by the tribal and cardroom representatives present.  Only two tribal representatives spoke at the workshop – one attorney for Yocha Dehe and one for the United Auburn Indian Community and the Pala Band of Mission Indians.  Both addressed the specifics of the three regulatory versions and explained the need to enforce Section 337j(f) as it exists.  The cardrooms, by contrast, bussed in several hundred employees, and also brought in an economist, representatives from various municipalities, and even former San Francisco Mayor Willie Brown.  Many of these individuals spoke at the workshop, but none addressed a single aspect of the three regulatory options the Bureau presented.  Rather, *every* presenter had a single theme:  Any proposed collections fix would cause the loss of many cardroom jobs, and would therefore harm

COMPLAINT

DENTONS US LLP
ONE MARKET PLAZA, SPEAR TOWER, 24TH FLOOR
SAN FRANCISCO, CALIFORNIA  94105
(415) 267-4000

the economy.  The economist, Mike Bracken from Development Management Group, even claimed to have prepared an "economic impact analysis" of the cardroom industry.  As Yocha Dehe's attorney explained to the Bureau personnel present, however, the Bureau is a *law enforcement agency*, and that should be its focus regarding collections.  Whether enforcing the law and thereby honoring the requirements of negotiated Tribal-State Compacts results in the loss of jobs and an economic impact in the State is an issue for the Legislature to consider.

93.     The Bureau never held another meeting regarding collections.  At an Association meeting on April 2, 2015, the tribes asked the Bureau the status of the collections review process.  To the tribes' surprise, the Bureau representatives said the unsupported comments by the economist at the January workshop required the Bureau to conduct an economic impact study because the proposed collections regulation might qualify as a "major regulation" – that is one with an economic impact of $50 million or more.  The tribes explained the following points to the Bureau:

- A regulation was not necessary to apply the law as reflected in Section 337j(f).  Stated otherwise, there is no need for a regulation to provide what the law already requires;

- The statements by the cardrooms' economist were unsupported by any research or analysis;

- The Bureau was already taking whatever actions it felt necessary – albeit ones which fostered the illegal gaming – without the proposed regulation and thus there was no need for that regulation; and

- The economic impact study would take years to finalize.

94.     The Bureau representatives present at the Association meeting, including Chief Wayne Quint, rejected each of these arguments and specifically said the economic impact study could be done in months and they would begin right away.  As far as the tribes know, the Bureau has never commissioned the economic impact study and, as noted above, has held no further meetings about regulatory review.  Worse, at one of the meetings between the tribes and Attorney General Harris and her staff, the tribes asked about the progress on the collections issue.  The response was that the Bureau was focusing on other aspects of illegal gaming and thus could not

COMPLAINT

1  address collections.  This is a theme the Bureau echoed at an August 30, 2018 meeting with tribal

2  representatives, where Bureau Chief Stephanie Shimazu (formerly the Commission's

3  Chairwoman, but later replaced Wayne Quint at the Bureau) advised those present that the Bureau

4  would not address collections for the foreseeable future.  As noted in the Coalition Tribes'

5  February 20, 2015 letter, however, the Bureau had told the tribes it was focusing on collections

6  and thus could not work on the other issues.

7              **iii.    THE STATE ALLOWS THE CARDROOMS TO HOUSE BANK THEIR GAMES**

8  95.    From the very beginning – April 2012 – the tribes have explained to the State that

9  the failure to rotate the banker position is the easiest aspect of illegal gaming to understand.  After

10  all, (1) the Penal Code (and Constitution) prohibit "any banking or percentage game played with

11  cards," (2) a banking game is where one person maintains the banking position as is the case at

12  Indian casinos and those in Nevada and New Jersey, and (3) the TPPs maintain the banker

13  position at cardrooms (because they need to keep the inherent advantage that results from acting

14  as the "house" so they can pay under the contracts with the cardrooms).  The State has never

15  argued that this situation is proper.  To the contrary, state officials have repeatedly admitted it is

16  not.  For example, in an April 26, 2016 email, Chief Deputy Attorney General Nathan Barankin

17  admitted there is "little room for debate regarding whether an individual can operate as the bank

18  in a card room game for an indefinite period of time."

19  96.    From the tribes' perspective, the concern has been not only that the Department of

20  Justice failed to stop the cardrooms' illegal gaming, but that it actually ***created*** that illegal gaming,

21  because even the Bureau's own agents acknowledge they approved games allowing the mere

22  offer of rotation – rather than the actual rotation Section 330.11 requires – based on the letter their

23  own Chief, Robert Lytle, issued in 2007.

24  97.    On February 12, 2016, tribal leaders met with Attorney General Harris (this was

25  the second meeting with her) to discuss the rotation practices the Lytle Letter authorized.  No one

26  disputed the impropriety of that letter or its troubling origin.  Rather, the Attorney General and

27  her staff claimed the lack of a definition for the word "continuously" in Section 330.11 meant

28  there was no guidance on how often the banker position needed to rotate to avoid a game

DENTONS US LLP
ONE MARKET PLAZA, SPEAR TOWER, 24TH FLOOR
SAN FRANCISCO, CALIFORNIA  94105
(415) 267-4000

becoming banked and therefore prohibited.  Thus, at that meeting, the Attorney General said her office would "suspend" – but not revoke or disavow – the Lytle Letter and then follow up with guidelines to establish appropriate rotation standards.  She also said her office would hold meetings with all the interested stakeholders to obtain input on the meaning of the term "continuous and systematic" in Section 330.11, the very thing the guidelines were to elucidate.

98.     Three days later, Bureau Chief Wayne Quint issued the Lytle Letter suspension notice and announced that, "effective immediately, the Bureau will not approve any new game rules if they permit only offering the player-dealer position."  The notice explained that, "[b]y June 30, 2016, the Bureau will issue a notification of the revised enforcement and game approval practice relating to the rotation of the player dealer position in a controlled game."

99.     Because the Bureau's notice said nothing about the promised meetings to get stakeholder input, on February 22, 2016, Yocha Dehe's attorney wrote to Deputy Attorney General Barankin asking whether the Bureau intended to hold those meetings, if so how many and when, and whether the stakeholders would be allowed to submit written comments.

100.    Representatives of the Coalition Tribes met with Bureau Chief Wayne Quint on March 21, 2016, to discuss how cardrooms could comply with Section 330.11's requirement that the player-dealer position be "continuously and systematically rotated."  At that meeting, the tribal representatives explained that the Oxford English Dictionary defines "continuously" as "in a continuous manner; uninterruptedly, without break; continually, constantly," and thus rotation of the banker position in cardrooms had to occur in that fashion to be legal.  Further, the tribes explained that there was no need to define the term, since the cardrooms and Bureau themselves had done so by creating the two-hand industry standard.  While two-hand rotation was not in fact "continuous," it was better than the existing no-rotation practice.

101.    In response, Chief Quint said it would be unfair to force the cardrooms to adhere to a two-hand rotation, because for nine years – that is, since his predecessor Robert Lytle issued his improper December 2007 letter – they had been allowed to avoid that standard.  The tribal representatives present at the meeting pointed out that Quint's statement ignored three important facts:  (1) The tribes had complained about the conduct since early 2012, (2) the conduct was still

COMPLAINT

1   illegal and the Bureau was charged with enforcing the law, and (3) the Lytle Letter was an

2   obvious fraud from the inception and thus could not legitimize illegal conduct.  As one tribal

3   representative at the meeting explained, if Chief Quint's observation were a guide for law

4   enforcement, drug dealers who had plied their trade for a few years would also be immune from

5   prosecution, because it would be "unfair" to stop them.

6   　　　　102.　　The Bureau representatives committed themselves to no rotation standard at the

7   March 21 meeting, but said they were working on the issue.  They also asked the tribal

8   representatives about their view of a "game break" should the player-banker position fail to rotate.

9   　　　　103.　　On April 15, 2016, the Coalition Tribes wrote to the Bureau providing their

10   detailed comments on the rotation issue.  (**Exhibit M**.)  The letter also addressed the question the

11   Bureau posed at the March 21 meeting:  What happens when the banker position at a cardroom

12   fails to rotate?  The answer, the tribes asserted, was that "[a]fter the TPP at a California cardroom

13   has held the banker position for two hands, the game must stop, and cannot begin again, unless

14   and until another player who has no business relationship with the cardroom or a TPP takes the

15   banker position."

16   　　　　104.　　The Coalition Tribes are not the only ones to weigh in on the issue of the

17   cardrooms' banked games.  On April 20, 2016, the Santa Ynez Band of Chumash Indians wrote

18   to the Bureau and Commission to express approval of the Coalition Tribes' position, but also to

19   explain that the agencies "have lost sight of the State Constitutional mandate that precludes any

20   law that allows for banked card games to operate on non-Indian lands."  (**Exhibit N**.)  The

21   Chumash letter also explained a significant point:  Before the passage of Proposition 1A in 2000,

22   the tribes had tried to do something akin to what the cardrooms are doing now, but were shut

23   down by the State.  Thus, the Chumash letter argued, the "card rooms face the same fate, unless

24   the State believes that "*casinos of the type currently operating in Nevada and New Jersey*" means

25   one thing when dealing with Tribes in 1999 and another when dealing with card rooms in 2016."

26   (Emphasis in original.)

27

28

COMPLAINT

105.    On May 24, 2016, the Bureau acknowledged the Coalition Tribes' April 15 submission and claimed the "Bureau is taking every step to evaluate and address your various issues." (**Exhibit O**.)  The Bureau identified no single step it was actually taking.

106.    On June 21, 2016, the Coalition Tribes again wrote to Chief Quint.  (**Exhibit P**.) They explained their "serious concerns" about the Bureau's efforts regarding game rotation practice reform, because with just over a week before the Bureau was to release the June 30 revised rotation guidelines, there had been none of the promised "robust, open, transparent and participatory process" to "stop the illegal gaming in cardrooms which the so-called 'Lytle letter' created."  The tribes asked for very specific information about the status of the Bureau's work.

107.    The Bureau did not respond to the Coalition Tribes' June 21 letter.  Instead, on June 30, 2016, the Bureau released its new rotation guidelines.  (**Exhibit Q**.)  Though the Attorney General assured the tribes that the guidelines' express purpose was to define the word "continuously" in Section 330.11, the guidelines did not even mention that word.  Moreover, far from eliminating the Lytle Letter's offensive offer of rotation every two hands, the first point in the guidelines specifically endorsed that practice.  Further, while the guidelines did require actual rotation of the banker position, that rotation need happen only once every 60 minutes and if the cardrooms failed to mind that requirement, the penalty would be that they had to stop play at the table for two minutes.

108.    In December 2016 the Coalition Tribes wrote to Chief Quint and CNIGA wrote to the Attorney General to express their deep disappointment in the rotation guidelines.  (**Exhibits R** (without attachment) **and S**.)  As the Coalition Tribes explained, between "fifty and sixty hands of blackjack and forty and fifty hands of baccarat can be dealt per hour at a table.  Thus, the Bureau has effectively converted a long-standing cardroom industry standard of rotation every two hands into a new standard of rotation every fifty hands.  There is no justification for this radical change (other than to put the State's seal of approval on the cardrooms' continued violation of California law)."  The Coalition Tribes also argued that the remedy for the cardrooms' failure to comply with the rotation requirement was illusory.  All the cardrooms had to do was stop dealing cards for two minutes, and then "the very same third party proposition player who

DENTONS US LLP
ONE MARKET PLAZA, SPEAR TOWER, 24TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105
(415) 267-4000

held the banker position during the prior hour and violated the once-an-hour rotation requirement can go back to doing exactly that for the next hour, and so on indefinitely.  This is no remedy and these are still banked games."  As the Coalition Tribes noted, the State, by virtue of the Lytle Letter, effectively created the illegal gaming scheme the cardrooms enjoy.  While the Bureau could originally deny it knew of the letter's less-than-respectable origin, that "defense is no longer available to the Bureau.  Now, the Bureau has officially enabled and sanctioned the cardrooms' play of plainly illegal banked games."

109.    The June 2016 guidelines never really took effect, because soon after the Bureau issued them, they were challenged administratively by cardroom interests.  During this period, and until now, the Bureau has allowed the cardrooms to operate without rotating the player-dealer position.  At the August 30, 2018 meeting, Chief Shimazu acknowledged the June 2016 guidelines would not become effective and said the Bureau would undertake a rule-making process to determine the meaning of "continuous" rotation.  While this seems a step forward, it is, again, illusory.  As Yocha Dehe explained in a September 12, 2018 letter to Chief Shimazu, the Bureau's chosen approach suffers from several problems, including that it will take years to complete and is unnecessary.  (**Exhibit T**.)  Worst of all, at the meeting, Chief Shimazu expressly admitted that while this lengthy process takes place, the Bureau will allow the cardrooms to revert to the Lytle Letter "standard" of never rotating the player-dealer position.  As Yocha Dehe put the matter, "[b]ecause *no one* can argue the Lytle letter standard is proper or legal, it leaves us to wonder how the Bureau can justify returning to it and allowing the cardrooms to continue benefiting from the very conduct the Bureau now appears to admit is illegal."

### iv.    THE STATE ALLOWS THE PLAY OF EXPRESSLY PROHIBITED GAMES

110.    At one of the early meetings with Bureau representatives – and after tribal regulators provided them a full tutorial – the Bureau told the tribes at an Association meeting that it had looked at the play of baccarat in cardrooms and concluded it was legal.  Though the tribes requested that the Bureau provide them the research supporting that conclusion, the Bureau never did.  The Bureau's failure to do so was understandable.  After all, there simply is no way to refute that baccarat has no player-dealer position and thus there is nothing to rotate – baccarat cannot be

DENTONS US LLP
ONE MARKET PLAZA, SPEAR TOWER, 24TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105
(415) 267-4000

1   played as anything but a banked game and is thus constitutionally prohibited.  Of course, even if

2   the game had a player-dealer position to rotate, the cardrooms fail to do that, as described above.

3         111.   The history of the discussions between the tribes and State about blackjack is more

4   involved.  As mentioned before, Section 330 specifically prohibits the game of "twenty-one," as

5   well as any banked game, and that prohibition has been raised to a constitutional level.  The tribes

6   complained about the play of this game from the beginning and the State's agents continually

7   assured the tribes they were researching the matter.

8         112.   On May 29, 2015, representatives of the Coalition Tribes met with various

9   representatives from the California Department of Justice, including Chief Deputy Attorney

10   General Barankin, Division of Law Enforcement Director Larry Wallace, Indian Gaming Law

11   Section Deputy Attorney General Timothy Muscat, and Bureau Chief Quint, to discuss the

12   various illegal gaming issues.  When blackjack came up, Barankin confidently asserted that the

13   prohibited game – "twenty-one" – and blackjack were not the same.  Prepared for this argument,

14   the tribes cited the cases identified in paragraph 11 of this complaint, which expressly contradict

15   Barankin's statement.  Barankin held steady on his assertion, claiming his agency had research to

16   support it.  Naturally, the tribes asked for that research.

17         113.   On July 24, 2015, Barankin wrote an email providing "some sources for your

18   consideration."  The first of those "sources" purportedly supporting the notion that the games

19   were different was a section of a book called "Scarne's New Complete Guide to Gambling" by

20   John Scarne, an American magician.  According to Barankin, that section of Scarne's book

21   "[d]escribes the games of 21 and the development of blackjack."  As it turns out, no State agent,

22   including Barankin, could have actually read the Scarne citation, because it directly *contradicts*

23   the State's position.  Indeed, the chapter discussing the game begins with the following heading:

DENTONS US LLP
ONE MARKET PLAZA, SPEAR TOWER, 24TH FLOOR
SAN FRANCISCO, CALIFORNIA  94105
(415) 267-4000

COMPLAINT

# 12.
# Black Jack,
# or Twenty-One:
# Casino Style

114.    In case that heading left any doubt that the two games are the same, the first sentence of the chapter reads as follows:  "Black Jack or Twenty-One, is the most widely played banking card game in the world today."

115.    As described above, the State's failure to remedy the tribes' concerns led to the meetings with Attorney General Harris.  At the second meeting with her (on February 12, 2016), the tribes again addressed the play of illegal games.  From the tribes' perspective, the concern was simple – the cardrooms were either playing blackjack or they were falsely advertising they were doing so.  Either way, their conduct was illegal.  Attorney General Harris agreed, saying they had looked into the matter and concluded the cardrooms were engaging in the latter, but not the former.  She then said advertising was not the Department of Justice's concern, but, rather is an issue in the Commission's purview and therefore that body (which is not part of the Department of Justice) would revise its regulations on the topic of advertising.

116.    As they had done at the May 2015 meeting with Barankin, the tribes asked for the research to support the position that the games of blackjack played in cardrooms were different than those played in Nevada or New Jersey.  The Attorney General said the tribes would have that research the following week (which began on February 15, 2016).  The Attorney General's office failed to provide the research as promised.  After many emails and phone calls from tribal representatives, on April 26, 2016 (more than ten weeks after the meeting) Barankin provided "the answer to your question."  That "answer" was that the "games that have been approved by the Bureau (many of which include the name 'Blackjack') utilize different rules and, therefore,

DENTONS US LLP
ONE MARKET PLAZA, SPEAR TOWER, 24TH FLOOR
SAN FRANCISCO, CALIFORNIA  94105
(415) 267-4000

COMPLAINT

have different probabilities than the statutorily prohibited game of 'twenty-one' and the Nevada/New Jersey game of Blackjack.  As a result, our current conclusion is that these are not prohibited games."  This facile "answer" identified no single specific difference between the rules of the standard game of blackjack and the games by the same name played in the cardrooms. This "answer" also failed to explain why the cardrooms themselves tell their customers that the games they play are just like blackjack played anywhere else.  Thus, this "answer" highlighted the State's apparent intent to protect the illegal gaming occurring in cardrooms.

117.    The Commission has only recently (December 2018) begun any regulatory review with respect to the admitted false advertisement by the cardrooms, but even then, the Commission has refused to discuss any *specific* false advertisement, including that of blackjack.  Nevertheless, and contrary to the Attorney General's assertion in February 2016 that the Department of Justice had no control over the illegal advertising, at the August 30, 2018 meeting, Chief Shimazu said the Bureau would take action against this conduct, but only after it allows the cardrooms to come into voluntary compliance.

118.    With respect to the play of blackjack, the Bureau again changed course at the August 30 meeting.  There, Chief Shimazu (again contradicting the Attorney General's express statements in February 2016) admitted that at least some of the games played at the cardrooms (she specifically named Pure 21.5 Blackjack and 21st Century Blackjack) *are* in fact illegal and therefore would be shut down.  Chief Shimazu, however, said it would take no action against these games for several months to allow the cardrooms the opportunity to come up with other games to take their place.  As Yocha Dehe explained in its September 12, 2018 letter, it "failed to see why the agency in charge of enforcement should allow the cardrooms to continue playing games the agency has finally conceded are illegal.  This appears to be yet another example of the State ignoring its own laws to accommodate the cardroom industry."

119.    As for baccarat, Chief Shimazu said at the August 30 meeting that the Bureau would take no action to stop the cardrooms from playing that game.

**G.      THE TRIBES COMPLIED WITH THE COMPACT DISPUTE RESOLUTION PROCESS**

120.    On November 8, 2018 Yocha Dehe and the Viejas Band gave the State written

COMPLAINT

notice setting forth the facts giving rise to this dispute and the issues to be resolved, pursuant to the requirements of each Plaintiff's Tribal-State Compact.  On November 14, 2018 Defendants responded to Plaintiffs' letter.   On December 3, 2018, the parties met and conferred to attempt to resolve this dispute through negotiation, pursuant to the requirements of the applicable Tribal-State Compacts.  However, the parties did not resolve the dispute.

121.   On December 14, 2018 the Sycuan Band gave the State written notice setting forth the facts giving rise to this dispute and the issues to be resolved, pursuant to the requirements of each the Sycuan Band's Tribal-State Compact.  On January 2, 2019, the Sycuan Band and the State met and conferred to attempt to resolve this dispute through negotiation, pursuant to the requirements of the Sycuan Band's Tribal-State Compact.  However, the parties did not resolve the dispute.

122.   Under each of the Tribal-State Compacts, neither party is required to submit unresolved disputes to arbitration.

123.   As a result, Plaintiffs commenced this suit to seek resolution in this Court, consistent with the requirements of each Tribal-State Compact.

## FIRST CLAIM FOR RELIEF

### (BREACH OF COMPACT)

124.   Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 123 by this reference.

125.   On September 2, 2015, the Sycuan Band and the State of California entered into the 2015 Compact.  On August 2, 2016, Yocha Dehe and the State of California entered into the 2016 Compact.  On June 28, 2016, the Viejas Band and the State of California entered into the 2016 Compact.

126.   Pursuant to the Tribal-State Compacts, the State promised Plaintiffs the rights to conduct certain Class III games, specifically including any banking or percentage card game, exclusive of non-Indian competition.

127.   The promise of exclusivity was a material and essential asset of the bargain between Plaintiffs and the State.

128.    Contrary to the agreements of the parties as set forth in the Tribal-State Compacts, the State has breached its promise in the Tribal-State Compacts of providing Plaintiffs the exclusive right to offer banking or percentage card games exclusive of non-Indian competition. Specifically, the State has permitted and failed to prevent non-Indian persons from offering banking card games, including twenty-one, even though California law only permits Indian tribes to offer such games.  These are ongoing acts and omissions by the State that continue to this day.

129.    As a direct, proximate, and foreseeable result the State's breach, Plaintiffs have been denied the benefit of their bargain.

<u>**SECOND CLAIM FOR RELIEF**</u>

**(<u>BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING</u>)**

130.    Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 129 by this reference.

131.    Plaintiffs have duly performed all conditions, covenants, obligations, and promises under the Tribal-State Compacts.  In addition to express conditions, covenants, obligations, representations and warranties, the Tribal-State Compacts contains an implied covenant of good faith and fair dealing, which obligated the State to perform its responsibilities fairly and in good faith, and to refrain from committing or omitting any act that would deprive Plaintiffs of the fruits and benefits of their bargain under the Tribal-State Compacts.

132.    The State has engaged in conduct in bad faith and with the intent to deprive Plaintiffs of their benefits and rights under the Tribal-State Compacts, as set forth here.  More specifically, the State has not only failed to enforce California law that prohibits banked games played with cards and prohibits the game of twenty-one, in some respects it even helped facilitate such banked gaming in violation of California law and in breach of its contractual obligations under the 2015-16 Compacts.  These are ongoing acts and omissions by the State that continue to this day.

133.     These actions were undertaken in bad faith and had the effect of depriving Plaintiff of their benefits and rights under the Tribal-State Compacts.

134.    By the acts described above, the State has breached the covenant of good faith and

COMPLAINT

DENTONS US LLP
ONE MARKET PLAZA, SPEAR TOWER, 24TH FLOOR
SAN FRANCISCO, CALIFORNIA  94105
(415) 267-4000

fair dealing implicit in Tribal-State Compacts.

135.    As a direct, proximate, and foreseeable result of the State's violations of the implied covenant of good faith and fair dealing, Plaintiffs have been denied the benefits of their bargain.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment in their favor and against Defendants, and each of them, as follows:

1.    For an injunction directing the State to enforce its laws prohibiting the play in cardrooms of banking card games and twenty-one in violation of the terms of the Tribal-State Compacts.

2.    For a declaration that the State has breached, and continues to breach, the Tribal-State Compacts by failing to enforce against California cardrooms its laws prohibiting the play of banking card games, including twenty-one.

3.    For a decree requiring specific performance of the State's obligation with respect to the gaming exclusivity promised in the Tribal-State Compacts.

4.    For judgment for costs of suit; and

DENTONS US LLP
ONE MARKET PLAZA, SPEAR TOWER, 24TH FLOOR
SAN FRANCISCO, CALIFORNIA  94105
(415) 267-4000

COMPLAINT

5.     For such other relief as is fair, just, and equitable.

Dated: January 3, 2019                    DENTONS US LLP

By: _____
     Jeffry Butler
     Attorneys for Plaintiff
     YOCHA DEHE WINTUN NATION


Dated: January 3, 2019                    OFFICE OF THE ATTORNEY GENERAL
                                          VIEJAS BAND OF KUMEYAAY INDIANS


By:  /s/ (as authorized on 1/3/19)
     Tuari N. Bigknife
     Attorney for Plaintiff
     VIEJAS BAND OF KUMEYAAY INDIANS


Dated: January 3, 2019                    OFFICE OF THE GENERAL COUNSEL
                                          SYCUAN BAND OF THE KUMEYAAY NATION


By:  /s/ (as authorized on 1/3/19)
     Mark A. Radoff
     Attorneys for Plaintiff
     SYCUAN BAND OF THE KUMEYAAY
     NATION

DENTONS US LLP
ONE MARKET PLAZA, SPEAR TOWER, 24TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105
(415) 267-4000

COMPLAINT