# EXHIBIT A

# GAMBLING ESTABLISHMENT
# COMPLIANCE INSPECTION CHECKLIST

## CALIFORNIA DEPARTMENT OF JUSTICE
## DIVISION OF LAW ENFORCEMENT / BUREAU OF GAMBLING CONTROL
## COMPLIANCE AND ENFORCEMENT SECTION / LICENSING SECTION

Authority References:

- Gambling Control Act-Business and Professions Code, Division 8, Chapter 5
- California Code of Regulations, Title 11, Division 3 (CGCC initiated)
- California Code of Regulations, Title 4, Division 18 (DOJ/BGC initiated)
- California Penal Code (PC)
- Local Ordinance or Municipal Codes

EXHIBIT A

## LOCAL ORDINANCE / MUNICIPAL CODE

| Authority | Description | Circle One |
|---|---|---|
| B&P 19803(a)(b) | • Name of local ordinance jurisdiction: _____<br>• Date of ordinance used: _____ | |
| B&P 19923 | • Source of ordinance used: _____ | |

| | | |
|---|---|---|
| | • Maximum number of card tables permitted in the city: _____ | |
| | • Maximum number of GEs permitted in the jurisdiction: _____ | |
| | • Maximum number of tables permitted in each GE: _____ | |
| | • Maximum number of players at table, if limited by local ordinance: _____ | |
| | • Restriction of employee and/or owner gambling while on duty: _____ | |
| | • Limitations on hours of operation: _____ | |
| | • Limitations on wagering limits:_____ | |
| | • Limitations on games or gaming activities played or offered:<br><br>_____<br>_____ | |
| | • Specifics regarding the Patron Security and Safety Plan in and around the GE:<br><br>_____<br>_____<br>_____ | |
| | • What signs are required to be posted, and where?<br><br>_____<br>_____ | |
| | • Is consumption of alcohol permitted on the premises? | Yes / No |
| | • Does the bar/lounge need to be separate from the GE? | Yes / No |
| | • Does the ordinance govern the issuance of work permits? | Yes / No |
| | • Are all employees required to have work permits? (including TPPPS) | Yes / No |
| | • Does the ordinance address the renewal cycle for work permits? | Yes / No |
| | • Can a temporary work permit be issued? | Yes / No |
| | • Are employees required to wear their work permits on duty? | Yes / No |

**Additional Notes:**

**EXHIBIT A**

## PHYSICAL INSPECTION / LICENSES

| Authority | Description | Circle One |
|---|---|---|
| | **Document the Following:** | |
| | • Hours of Operation: _____ | |
| | • Total tables on floor:_____ | |
| | • Number of tables in use:_____ | |
| | • Temporary tables covered:_____ | |
| | • Number of players per table:_____ | |
| **Reg 12388(j)** | • Is the ATM accessible to seated players? | Yes / No |
| **Reg 12388(k)** | • Does the ATM restrict the use of Electronic Benefit Transfer Cards (EBTs)? | Yes / No |
| **B&P 19850**<br><br>**PC 337j**<br>**B&P 19875** | **State Gambling License (SGL)**<br><br>SGL Number:_____<br><br>SGL Expiration Date:_____<br>Location of SGL:_____<br>• Are there conditions associated with the SGL?<br>If yes, list:_____<br>_____<br>_____ | <br><br><br><br><br><br>Yes / No |
| **B&P 19964**<br><br>**PC 337j** | **Local Business License**<br>License Number: _____<br>Expiration Date: _____<br>Location of License:_____ | |
| | **Local Special License**<br>License Number: _____<br>Expiration Date: _____<br>Type of License: _____<br>Location of License: _____ | |
| **B&P 24046**<br>**(ABC Act)** | **Alcoholic Beverage Control (ABC) License**<br>License Number: _____<br>Expiration Date: _____<br>Location of License: _____ | |

**Additional Notes:**

EXHIBIT A

## EMPLOYEES / WORK PERMITS / BADGES

| Authority | Description | Circle one |
|---|---|---|
| B&P 19911 | Are employees that have work permits 21 years or older? | Yes / No |
| | If no, explain: _____ | |
| | _____ | |
| | _____ | |
| | _____ | |
| | _____ | |

| Authority | Description | Circle one |
|---|---|---|
| B&P 19921 | Does any person under the age of 21 have access to the gaming area? | Yes / No |
| | If yes, explain: _____ | |
| | _____ | |
| | _____ | |
| | _____ | |

| Authority | Description | Circle one |
|---|---|---|
| B&P 19912(a) | **Work Permits** | |
| | • Who issues the employee work permits?_____ | |
| | • Do all employees have a work permit? | Yes / No |
| Reg 12120(a) | • At any time do your employees have temporary permits? | Yes / No |
| Local Ordinance | • Can they work while their work permit is being renewed? | Yes / No |
| | • Are the employees required to wear work permits on duty? | Yes / No |
| | If not worn, where are the work permits displayed/stored? _____ | |
| | _____ | |

| Authority | Description | Circle one |
|---|---|---|
| Reg 2050 | **Key Employees** | |
| 2050(a) | • Is the GE required to have Key Employees? | Yes / No |
| 2050(b) | If no, is there a Contact Plan available? | Yes / No |
| 12353(c) | • Are Key Employees wearing their badge while on duty? | Yes / No |
| 12354(a) | • Have any employees requested an Interim Key Employee license? | Yes / No |
| | If yes, has application been submitted within ten days? | Yes / No |
| 12350(a) | • Do you have any Key Employees that have a portable license? | Yes / No |

| Authority | Description | Circle one |
|---|---|---|
| Reg 2060(a) | • Can the GE supply a list of all employees/job classifications/descriptions? | Yes / No |
| 2060(b) | • Can the GE supply a current organization chart? | Yes / No |

EXHIBIT A

## PROBLEM GAMBLING PROGRAM

| Authority | Description | Circle One |
|---|---|---|
| **Reg 12463** | **Self-Restriction Program** | |
| | • Are there Policies and Procedures (P&P's) in place? | Yes / No |
| | Do the P&P's include the following: | |
| 12463(a)(1) | • Development of written material available to patrons that explain the program? | Yes / No |
| 12463(a)(3) | • Maintenance and updates to the list of self-restricted patrons? | Yes / No |
| | • Employee access to the list? | Yes / No |
| 12463(a)(4) | • Patron exclusion from entering the gambling area? | Yes / No |
| 12463(a)(4)(A) | • Removing a patron from the gambling establishment? | Yes / No |
| 12463(a)(4)(C) | • The forfeiture of any money or prizes won, or losses recovered? | Yes / No |
| 12463(a)(5) | • Excluded from check cashing and issuance of credit? | Yes / No |
| 12463(a)(6) | • Excluded from customer marketing lists? | Yes / No |

| Authority | Description | Circle One |
|---|---|---|
| **Reg 12464** | **Self-Exclusion Program** | |
| | • Are there Policies and Procedures (P&P's) in place? | Yes / No |
| | Do the P&P's include the following: | |
| 12464(a)(2) | • Maintenance and updates to the list of self-excluded patrons? | Yes / No |
| | • Employee access to the list? | Yes / No |
| 12464(a)(3) | • Patron exclusion from entering the gambling area? | Yes / No |
| 12464(a)(4) | • The forfeiture of any money or prized won, or losses recovered? | Yes / No |
| 12464(a)(5) | • Removal from customer marketing lists? | Yes / No |
| 12464(a)(6) | • Removal from check cashing and issuance of credit? | Yes / No |

| Authority | Description | Circle One |
|---|---|---|
| **12362(a)** | **Statewide Involuntary Exclusion List** | |
| | • Does the GE have a Statewide Involuntary Exclusion List? | Yes / No |

| Authority | Description | Circle One |
|---|---|---|
| **12464** | **Exclusion Management System (EMS)** | |
| | • Does the GE use the EMS database? | Yes / No |
| | • Who has access to the EMS database/computer? | Yes / No |
| | • Is the computer with access to the EMS database in a secure location? | Yes / No |

| Authority | Description | Circle One |
|---|---|---|
| **12362(a)** | **Internal GE List of Excluded Persons** | |
| | • Does the GE have an Internal Removal List? | Yes / No |
| | If yes, is the excluded/ejected list available for review? | Yes / No |
| | Where is the list stored?_____ | |
| | Who has access to the list? _____ | |

**EXHIBIT A**

## PROBLEM GAMBLING PROGRAM, CONT.

| Authority | Description | Circle One |
|---|---|---|
| **Reg 12461** | **Problem Gambling Material** | |
| **12461(a)** | Are there Problem Gambling signs posted or written material available? | Yes / No |
| **12461(b)** | If yes, are the posted signs or written material available near: | |
| | __Entrance/Exit   __ATM(s)   __Advertisements   __Radio   __Gaming Area   ___TV | |
| | __Billboards   __Cage   __ Flyers   __ Website (message & link to OPG-12461(b))   __ Other: | |
| **12461(c)** | Does the advertising material contain a responsible gambling message **AND** the 1-800-GAMBLER number or the website? (www.problemgambling.ca.gov) | Yes / No |

| Authority | Description | Circle One |
|---|---|---|
| **Reg 12462** | **Problem Gambling Training** | |
| **12462(a)** | ● Is there a new employee orientation? | Yes / No |
| **12462(b)** | ● Is there annual training? | Yes / No |
| | Is there documentation showing: | |
| **12462(b)** | ● Employee names and signatures? | Yes / No |
| **12462(b)** | ● Date and length of training? | Yes / No |
| **12462(b)** | ● Name of trainer and signature? | Yes / No |
| **12462(b)** | ● Are the documents kept for five years? | Yes / No |
| **12462(d)** | ● Name and title of personnel responsible for maintaining program: | |

EXHIBIT A

## MINIMUM INTERNAL CONTROL STANDARDS (MICS)

| Authority | Description | Circle One |
|---|---|---|
| **Reg 12380(d)** | **Definition of Tier Licensee** | |
| **12380(d)(1)** | Tier I = Owner licensee authorized to operate one to file tables (1-5) | |
| **12380(d)(2)** | Tier II = Owner licensee authorized to operate six to ten tables (6-10) | |
| **12380(d)(3)** | Tier III = Owner licensee authorized to operate eleven to thirty tables (11-30) | |
| **12380(d)(4)** | Tier IV = Owner licensee authorized to operate thirty-one to sixty tables (31-60) | |
| **12380(d)(5)** | Tier V = Owner licensee authorized to operate sixty-one or more tables (61 plus) | |

| Authority | Description | Circle One |
|---|---|---|
| **Reg 12381** | **Minimum Internal Control Standards (MICS) - All Tiers** | |
| **12381(a)** | ● Does the GE have written Policies and Procedures (P&P) for the following MICS: | |
| **12384(a)** | Drop and Drop Collection | Yes / No |
| **12385(a)** | Count / Count Room Functions | Yes / No |
| **12386(a)** | Cage Functions | Yes / No |
| **12381(b)** | ● Are the employees trained on the MICS P&P (New Hires? Review?) | Yes / No |
| **12381(d)** | ● Can the GE produce copies of the MICS P&P? | Yes / No |
| **12381(e)** | ● Are all forms, books, records, logs, lists maintained: | |
| **12381(e)(1)** | Recorded in English | Yes / No |
| **12381(e)(2)** | Recorded in a permanent form or media | Yes / No |
| **12381(e)(3)** | Maintained for 3 years | Yes / No |

| Authority | Description | Circle One |
|---|---|---|
| **12381(f)** | **Tiers II through V** *(in addition to above)* | |
| | Are there periodic reviews, monitoring, and testing of the MICS conducted annually? Documentation of results? | Yes / No |

**EXHIBIT A**

## DROP / DROP COLLECTION

| Authority | Description | Circle One |
|---|---|---|
| **Reg 12384** | **Drop and Drop Collection - All Tiers** | |
| **12384(a)(1)** | • Are drop collections deposited in a secure container attached to table? (called a "drop box") | Yes / No |
| **12384(a)(2)** | • Are jackpots kept in a separate drop box or otherwise segregated & accounted for separately? | Yes / No |
| **12384(a)(3)(A)** | • Is there a lock security the contents of the drop box? | Yes / No |
| **12384(a)(3)(B)** | • Is there a separate lock securing the box to the table? | Yes / No |
| **12384(a)(3)(B)** | • Is the lock to the drop box keyed differently than the lock to the table? | Yes / No |
| **12384(a)(3)(C)** | • Does the table and drop box have visible individual identifiers? | Yes / No |
| **12384(a)(5)** | • Are the drop boxes removed from the table to secure area? Stored? | Yes / No |
| **12384(a)(7)** | • What is the established time for the drop box collection/count? | Yes / No |
| **12384(a)(7)** | • Is the entire drop box collection recorded by video surveillance? | Yes / No |
| **12384(a)(8)** | • Is there at least one licensed/permitted person conducting the drop collection? | Yes / No |

| Authority | Description | Circle One |
|---|---|---|
| **Reg 12384(b)** | **Drop and Drop Collection - Tiers III through IV** (*in addition to above*) | |
| **12384(b)(1)** | Are the drop boxes removed by one licensed and one security personnel? | Yes / No |
| **12374(b)(2)** | • Tier III - Are there two licensed/permitted personnel, who work in different departments, assigned to removing drop box from the tables? | Yes / No |
| **12384(b)(3)** | • Are employee names legible on the count sheet?  Signature? | Yes / No |
| **12384(b)(4)** | • Are any drop boxes stored on gambling tables under continuous video surveillance? | Yes / No |

| Authority | Description | Circle One |
|---|---|---|
| **Reg 12384(c)** | **Drop and Drop Collection - Tiers IV and V** (*in addition to above*) | |
| | • Is there one licensed or permitted personnel assigned to watch a video monitor during the entire drop box collection process? | Yes / No |
| | • Is the entire drop box collection process continuously video recorded? | Yes / No |

**EXHIBIT A**

## COUNT / COUNT ROOM FUNCTIONS

| Authority | Description | Circle One |
|---|---|---|
| **Reg 12385(a)** | **Count / Count Room Functions - All Tiers** | |
| 12385(a)(2) | • Is there a designated licensed/permitted employee to conduct the daily counts? | Yes / No |
| 12385(a)(3)(A) | • Do the drop box count sheets permanently display the following: | |
| | • Name of Gambling Establishment | Yes / No |
| | • Date and time of the count | Yes / No |
| | • Shift, individual box and table number | Yes / No |
| | • Amount collected from each individual box | Yes / No |
| | • Total number of boxes counted | Yes / No |
| | • Recorded name and/or signature of individual(s) counting contents of boxes? | Yes / No |
| 12385(a)(4) | • Is the entire box count continuously recorded? | Yes / No |
| 12385(a)(5) | • Are the drop box contents commingled prior to the count? | Yes / No |
| 12385(a)(6) | • Is the box emptied in a manner that will identify/record identification & contents? | Yes / No |
| **Reg 12385(b)** | **Count / Count Room Functions - Tiers II through V** (*in addition to above*) | |
| 12385(b)(1)(A) | • Is the count room designed/constructed to provide appropriate security? | Yes / No |
| 12385(b)(1)(B) | • Is the count room used for storage or have any removable containers? | Yes / No |
| 12385(b)(2) | • Does the count room store chips, cash, drop boxes, or any items associated with the count? | Yes / No |
| | If yes, are the interior count room views under constant video surveillance? | Yes / No |
| **Reg 12385(c)** | **Count / Count Room Functions - Tiers III through V** (*in addition to above*) | |
| 12385(c)(1) | • Is the count conducted by one person using an automated counter? | Yes / No |
| | • If not, is the count conducted by two or more people? | Yes / No |
| 12385(c)(2) | • Do the designated counters wear a smock type garment without pockets? | Yes / No |
| 12385(c)(3) | • Does a cage or vault cashier verify the accuracy of the count and count sheets? | Yes / No |
| 12385(c)(4) | • Are the count sheets locked in a box in a secure area until retrieved by the acct dept? | Yes / No |
| **Reg 12385(d)** | **Count / Count Room Functions - Tiers IV through V** (*in addition to above*) | |
| 12385(d)(1) | • Does the count room have an alarm system which signals the surveillance room? | Yes / No |
| 12385(d)(2) | • Is the entire count process video monitored by a licensed/permitted employee? | Yes / No |
| | • Is the entire count process continuously recorded by video surveillance? | Yes / No |
| 12385(d)(3) | • During the count process, is entry/exit of the room prohibited? (except emergencies) | Yes / No |
| **12385(e)** | **Count / Count Room Functions - Tier V** (*in addition to above*) | |
| 12385(e) | • Is the count conducted by two people using an automated counter? | Yes / No |
| | • If not, is the count conducted by three or more people? | Yes / No |

**EXHIBIT A**

## CAGE FUNCTIONS

| Authority | Description | Circle One |
|---|---|---|
| **Reg 12386(a)** | **Cage Functions - All Tiers** | |
| **12386(a)(1)** | • Is the cashier's cage separate and secure? | Yes / No |
| **12386(a)(2)** | • Is the employee assigned to the cage listed on the organizational chart? | Yes / No |
| **12386(a)(3)** | • Who has access to the cage? _____  _____ | |
| **12386(a)(4)** | • Is there a log that records entry into the cage area by unauthorized persons? | Yes / No |
| **12386(a)(5)** | • Is the cage monetary activity reconciled after each shift/per person? | Yes / No |
| **12385(a)(2)(F)** | • Does the GE designate at least one employee to report and maintain information pertaining to Title 31, submittal of CTRs over $10,000? | Yes / No |
| **31/Sec 103.64** | • Does the GE have a compliance program for Title 31, Section 103.64(a)? | Yes / No |

| Authority | Description | Circle One |
|---|---|---|
| **Reg 12386(b)** | **Cage Functions - Tiers III through V** *(in addition to above)* | |
| **12386(b)(1)** | • Is the cage and cage activity under continuous recorded video surveillance? | Yes / No |
| **12386(b)(2)** | • Does the cage reconciliation/accountability from include the following: | |
| **12386(b)(2)(A)** | • Date of reconciliation | Yes / No |
| **12386(b)(2)(B)** | • Designation of the shift being reconciled | Yes / No |
| **12386(b)(2)(C)** | • Do the records for cage inventory (cash, coin, chip, players/dealers banks) include the following: | |
| | Beginning shift balance | Yes / No |
| | All credits | Yes / No |
| | Ending shift balance | Yes / No |
| | Identification of overage or shortage with explanation | Yes / No |

| Authority | Description | Circle One |
|---|---|---|
| **Reg 12386(c)** | **Cage Functions - Tiers IV through V** *(in addition to above)* | |
| **12386(c)(1)(A)** | • Does the cage have a manually triggered silent alarm? | Yes / No |
| **12386(c)(1)(B)** | • Are all access doors secured, and under constant recorded video surveillance? | Yes / No |
| **12386(c)(2)** | • In addition to above cage inventory, are the following items indicated: | |
| **12386(c)(2)(A)** | Cash and coin by denomination | Yes / No |
| **12386(c)(2)(B)** | Chips by denomination | Yes / No |
| **12386(c)(2)(C)** | A list all other items of monetary value (markers, patron checks, players' banks, etc) | Yes / No |
| **12386(c)(3)** | • Is there a list of all persons authorized to have access to the cage? | Yes / No |

| Authority | Description | Circle One |
|---|---|---|
| **12386(d)** | **Cage Functions - Tier V** *(in addition to above)* | |
| | • Is the cage continuously monitored and have recorded video surveillance? | Yes / No |
| | • Are the exterior cage access doors monitored and have recorded video surveillance? | Yes / No |

**EXHIBIT A**

## CHIPS / CREDIT / CHECK CASHING / TITLE 31

| Authority | Description | Circle One |
|---|---|---|
| **Reg 2051** | **Gambling Chips** | |
| | • Does the GE have chips with special features? | Yes / No |
| | If yes, explain: _____ | |
| | | |
| | • Are there special chips used for the collection fee and/or jackpot collection? | Yes / No |
| | If yes, explain: _____ | |
| | | |
| **Reg 12388** | **Extension of Credit and Check Cashing** | |
| **12388(a)** | • Does the GE offer credit to a Gambling Business/Third Party/GE Employee | Yes / No |
| | If yes, explain: (12388 does not permit extension of credit to GB/TP) | |
| | | |
| **12388(a)** | • Does the GE offer credit to patrons: | Yes / No |
| | • If so, are there written policies and procedures? | Yes / No |
| **12388(a)(3)(A)** | • Does the GE use credit application forms? | Yes / No |
| **12388(a)(3)(B)** | • Does patron authorize access to their credit history? | Yes / No |
| **12388(a)(5)** | • Does the GE offer credit to self-exclusion/self-restricted patrons? | Yes / No |
| **12388(a)(8)** | • Are written or electronic records maintained on attempts to collect delinquent credit account? | Yes / No |
| **12388(d)** | • Does the GE cash checks from patrons? (payroll, personal, etc.) | Yes / No |
| | If yes, what type of check are cashed? **(Cashing Government Checks Prohibited)** | |
| | | |
| **12388(g)** | • Are there written check cashing policies and procedures? | Yes / No |
| **12388(g)(1)(A)** | • Does the GE determine if the patron has a self-excluded/restricted form on file? | Yes / No |
| | **Player's Bank** | |
| | • Does the GE offer a Player's Bank to their patrons? | Yes / No |
| **Reg 12410** | **Unclaimed or Abandoned Property** | |
| | • Does the GE have written policies and procedures regarding unclaimed or abandoned property? | Yes / No |
| **Reg 12404** | **Title 31 - Reports of Monetary Transactions** | |
| **12404(a)** | • Does the GE submit Currency Transaction Reports (CTR) over $10,000? | Yes / No |
| **12404(b)** | • Does the GE comply with Title 31 Regulations? | Yes / No |
| **12404(c)** | • Are Title 31 (CTR, SAR) records available upon request? | Yes / No |
| | Do they show the following: | |
| | Patron's Name | Yes / No |
| | Patron's Address | Yes / No |
| | Patron's identification | Yes / No |
| | Amount of transaction | Yes / No |
| | Type of transaction | Yes / No |
| | Date of Transaction | Yes / No |

EXHIBIT A

## GAMBLING FLOOR

| Authority | Description | Circle One |
|---|---|---|
| | **\*\*No Later Than May 1, 2013\*\*** | |
| Reg 12391 | **Gambling Floor Operation - All Tiers** | |
| 12391(a) | ● Are there Policies and Procedures (P&P's) in Place? | Yes / No |
| 12391(a)(1) | ● Are all areas where games are being played open to the public? | Yes / No |
| | (Excluding B&P sections 19844, 19845, 19861, and 19921) | |
| 12391(a)(2) | ● Do employees' job duties include playing controlled games | Yes / No |
| 12391(a)(2) | ● If no, is an employee's job affected if they refuse to play a game? | Yes / No |
| 12391(a)(3) | ● Are there more tables in the GE than authorized to operated? | Yes / No |
| 12391(a)(3) | ● *If yes, are they covered or labeled as non-operational? | Yes / No |
| 12391(a)(3) | ● If yes, are they under continuous recorded video surveillance? | Yes / No |
| 12391(a)(4) | ● Do employees who sell or redeem chips receive training required by Chapter X of Title 31? | Yes / No |
| 12391(a)(4) | ● If yes, are there policies and procedures in place? | Yes / No |
| | | |
| | **Tiers III through V** (in addition to above) | |
| 12391(a)(4)(b) | ● Is one key employee present at all times during business hours? | Yes / No |
| | **\*\*(a) and (b) No Later Than May 1, 2013\*\*** | |
| | | |
| 12392 | **House Rules - All Tiers** | |
| 12392(a) | ● Are house rules written in English? | Yes / No |
| 12392(a) | ● Do the house rules promote fair and honest play? | Yes / No |
| 12392(a) | Do the house rules: | |
| 12392(a)(1) | ● Allow only approved games by local, Sate, and Federal laws? | Yes / No |
| 12392(a)(2) | ● Have provisions to deter collusion? | Yes / No |
| 12392(a)(3) | Do the house rules address the following when applicable: | |
| 12392(a)(3)(A) | ● Player Conduct | Yes / No |
| 12392(a)(3)(B) | ● Table Policies | Yes / No |
| 12392(a)(3)(C) | ● Betting and Raising | Yes / No |
| 12392(a)(3)(D) | ● Misdeals | Yes / No |
| 12392(a)(3)(E) | ● *Irregularities | Yes / No |
| 12392(a)(3)(F) | ● "The Buy-In" | Yes / No |
| 12392(a)(3)(G) | ● *"Tied Hands" | Yes / No |
| 12392(a)(3)(H) | ● "The Showdown" | Yes / No |
| 12392(a)(3)(I) | ● "House Way" | Yes / No |
| 12392(a)(3)(J) | ● Player Seating and Seat Holding | Yes / No |
| 12392(a)(3)(K) | ● Player Disputes | Yes / No |
| 12392(b) | ● Do house rules conflict with game rules approved by the Bureau? | Yes / No |
| 12392(c) | ● Are house rules readily available to the Bureau and patrons | Yes / No |

**EXHIBIT A**

## GAMES / GAMING ACTIVITY

| Authority | Description | Circle One |
|---|---|---|
| **Reg 2070** | **Gaming Activities (Unsuitable)** | |
| | • What games are currently offered at the GE? _____ _____ | |
| **2070(b)** | • Is the GE offering any gaming activity not authorized by the Bureau? | Yes / No |
| | • If yes, explain: _____ _____ | |
| **2070(c)** | • Is the specific name of the game, or variation, properly displayed at each table? | Yes / No |
| **2070(d)** | • Are the patrons given ample notice of the fee collection rates for each table? | Yes / No |
| | • If no, explain: _____ _____ | |
| **2070(e)** | • Does the dealer collect fees from all players prior to start of play? | Yes / No |
| | • If no, explain: _____ _____ | |
| **2070(f)** | • Are printed rules of play posted in a conspicuous place or readily available? | Yes / No |
| | • If no, explain: _____ _____ | |
| | • Is the GEGA# displayed on any advertisement of the games? | Yes / No |
| | • Is the player-dealer position continuously and systematically routed amongst each player during the play of CA/Asian games? | Yes / No |
| | • If no, explain: _____ | |
| | • Are any jackpots, tournaments and/or promotions being offered? | Yes / No |
| | • If yes, list: _____ _____ | |
| | Obtain copies of all promotion/tournament flyers being offered | |
| | • Are they BGC approved? | Yes / No |
| | • Is the GEGA# displayed? | Yes / No |
| | • Is a tournament log available for review? | Yes / No |
| **BGC Advisory #7** | • Does the GE meet the requirement regarding no purchase necessary table? | Yes / No |
| | • If no, explain: _____ _____ | |
| **B&P 19843** | • Can a patron place a wager on a controlled game while that person is absent from the gambling table and is not actively participating in the hand? | Yes / No |
| | • If yes, explain: _____ _____ | |

EXHIBIT A

## SECURITY

| Authority | Description | Circle One |
|---|---|---|
| **Reg 12395** | **Security - All Tiers** | |
| 12395(a) | Does the GE's written Policies and Procedures meet or exceed the following: | |
| 12395(a)(1) | ● Controlled access to restricted areas? (cage, security offices, surveillance rooms?) | Yes / No |
| 12395(a)(2) | ● Adequate lighting in all public areas and entrances/exits? (for video surveillance) | Yes / No |
| 12395(a)(3)(A) | ● Does the GE file an incident report with the Bureau within five business days after an owner or key employee contacts a local law enforcement agency? (loan sharking, theft, narcotics, money laundering, counterfeiting, etc.) | Yes / No |
| or (B) | ● Does the GE file an incident report with the Bureau within five business days when an owner or key employee obtains knowledge or notices any reasonably suspected violation (such as above)? | Yes / No |
| 12395(a)(5) | ● Does the GE maintain a list of all keys, or electronic key cards for locking devices used in the GE? | Yes / No |
| | If so, does the list include: | |
| | ● Name of employee that is issued, possesses, or has access to the keys? | Yes / No |
| | ● The location where un-issued keys are stored? | Yes / No |
| | ● If applicable, access codes and combinations? | Yes / No |
| | ● Names of employees that are issued, possess, or have access to codes/combos? | Yes / No |

| Authority | Description | Circle One |
|---|---|---|
| **Reg 12395** | **Security -Tiers III through V** *(in addition to above)* | |
| 12395(b) | Does the GE's written Policies and Procedures meet or exceed the following: | |
| 12395(b)(1) | ● Does the GE maintain a secure key control box? | Yes / No |
| 12395(b)(2)(D) | ● Is the access to the box limited to the owners(s), key employee(s), or other designated employees? | Yes / No |
| 12395(b)(3) | ● Does the GE maintain a key control log for each key control box? | Yes / No |
| 12395(b)(4) | ● Does the GE have at least one uniformed security officer outside the GE at night? | Yes / No |

| Authority | Description | Circle One |
|---|---|---|
| **Reg 12395** | **Security - Tier IV and V** *(in addition to above)* | |
| 12395(c) | Does the GE's written Policies and Procedures meet or exceed the following: | |
| 12395(c)(1) | ● Does the GE maintain a secure key control box? | Yes / No |
| 12395(c)(2) | ● If the GE elects to continue gambling operations, has the GE installed and maintained a backup generator full & continued operation of critical systems (lights, surveillance, recording, etc.)? | Yes / No |
| 12395(d) | ● Does the GE have at least two uniformed security offices on duty? (one officer periodically patrols the exterior of the GE) | Yes / No |

| Authority | Description | Circle One |
|---|---|---|
| **Reg 12395** | **Security - Tier V** *(in addition to above)* | |
| 12395(c) | Does the GE's written Policies and Procedures meet or exceed the following: | |
| 12395(c)(1) | ● Has the GE installed and maintained a backup generator? | Yes / No |
| 12395(e) | ● Does the GE have at least two uniformed security officers on duty? (one officer continuously patrols the exterior of the GE) | Yes / No |

EXHIBIT A

## SURVEILLANCE

| Authority | Description | Circle One |
|---|---|---|
| **Reg 12396** | **Surveillance - All Tiers** | |
| | Does the GE's Written Policies and Procedures meet or exceed the following: | |
| **12396(a)(1)** | ● Install and maintain a surveillance system with video recording and monitoring capabilities. | |
| | The surveillance system must record date, time, and "reasonable coverage and clarity" for: | |
| | ___Gambling Operation          ___Drop Count Process     ___Interior Entrances/Exits | |
| | ___Player Drop Fees               ___Storage Area               ___Cage & Cashier Activities | |
| | ___Collection & Drop Boxes    ___Other | |
| **12396(a)(2)** | ● Do all surveillance recordings capture and record with "reasonable completeness the actions of all individuals being observed"? | Yes / No |
| **12396(a)(3)** | ● Is all recording and monitoring equipment located in a secure area with controlled access? | Yes / No |
| **12396(a)(4)** | ● Is surveillance equipment checked daily to ensure it is functioning properly? | Yes / No |
| **12396(a)(5)** | ● If a DVR system is used, does the system meet the following: | |
| **12396(a)(5)(A)** | ● Does it have a failure notification system? | Yes / No |
| **12396(a)(5)(B)** | ● Does it have a media storage system that prevents loss of data? | Yes / No |
| **12396(a)(5)(C)** | ● Does it have the capability to reproduce all or any portion of stored data to a DVD? | Yes / No |
| **12396(a)(5)(D)** | ● Are there eight or less cameras assigned to each single DVR system? | Yes / No |
| | If no, does it have a back up system? | Yes / No |
| **12396(a)(7)** | ● Are all recordings (unless otherwise requested by the Bureau) retained for at least seven complete days of operation? | Yes / No |
| **12396(a)(7)(B)** | **\*\*AFTER JUNE 1, 2013\*\*** Are all recordings (unless otherwise requested by the Bureau) kept for at least fourteen days of operation? | Yes / No |
| **12396(a)(8)** | ● Does Bureau staff have immediate access to surveillance rooms or any areas where equipment is maintained and recordings are stored? | Yes / No |
| **12396(a)(9)** | ● Does the GE prominently display at all entrances/exits a sign that boldly reads, **"All public area, entrances and exits of this establishment are subject to surveillance and video recording?"** | Yes / No |

| Authority | Description | Circle One |
|---|---|---|
| **Reg 12396** | **Surveillance - Tiers II through V** *(in addition to above)* | |
| **12396(b)** | Does the GE's written Policies and Procedures meet or exceed the following: | |
| **12396(b)(1)** | ● Does the surveillance system record both the interior and the exterior of the GE's entrances and exits? | Yes / No |
| **12396(b)(2)** | ● Does the surveillance system have cameras dedicated to gambling tables to view and record patrons, dealers, wagers, cards, and game outcome at each table? | Yes / No |
| **12396(b)(3)** | ● Does the surveillance system have audio recording for the vault/count room? | Yes / No |

| Authority | Description | Circle One |
|---|---|---|
| **Reg 12396** | **Surveillance - Tiers III through V** *(in addition to above)* | |
| **12396(c)** | ● Does surveillance cover and record all adjoining parking areas, owned, operated or controlled by the GE? | Yes / No |

**EXHIBIT A**

## SURVEILLANCE, CONT

| Authority | Description | Circle One |
|---|---|---|
| **Reg 12396** | **Surveillance - Tiers IV** *(in addition to above)* | |
| **12396(d)** | ● Is a key employee or GE owner always on duty during operating hours who has access to live video and previous video recordings? | Yes / No |

| Authority | Description | Circle One |
|---|---|---|
| **Reg 12396** | **Surveillance - Tier V** *(in addition to above)* | |
| **12396(e)** | Does the GE's written Policies and Procedures meet or exceed the following: | |
| **12396(e)(1)** | ● Does the GE have a separate surveillance unit that is apart from the security unit? | Yes / No |
| **12396(e)(2)** | Does the separate surveillance room meet or exceed the following: | |
| **12396(e)(2)(A)** | ● Does the surveillance room have controlled access through a secure door? | Yes / No |
| | ● Is the surveillance room under constant video surveillance? | Yes / No |
| **12396(e)(3)** | ● Is routine entry to the surveillance room limited to on-duty employees? | Yes / No |
| | ● Is there limited access to all others and are they accompanied at all times by a surveillance employee? | Yes / No |
| **12396(e)(4)** | ● Is at least one surveillance employee present and actively monitoring gambling activities during all hours of operation? | Yes / No |
| **12396(e)(5)** | ● Does count room surveillance include closed circuit television (CCTV)? | Yes / No |
| **12396(e)(6)** | ● Are records of all surveillance activity: | |
| | Maintained in a surveillance activity log? | Yes / No |
| | If yes, are all log entries made by on-duty surveillance personnel? | Yes / No |
| **12396(7)** | ● Does each gambling table have a dedicated camera for all hours of operations? | Yes / No |
| | ● Is there a Pan/Tilt/Zoom camera for every ten (or fewer) tables? | Yes / No |

**EXHIBIT A**

## SECURITY AND SURVEILLANCE PLAN

| Authority | Description | Circle One |
|---|---|---|
| **Reg 12372** | **Security and Surveillance Plan - Tiers I and II** | |
| **12372(a)** | • Does the GE have a written Security and Surveillance Plan? | Yes / No |
| | Does the Written Plan include the following: | |
| **12372(a)(1)** | • Close monitoring and control of all gaming activity? | Yes / No |
| **12372(a)(2)** | • Close monitoring and control of access to restricted areas?  (cage, security offices, surveillance rooms, etc.) | Yes / No |
| **12372(a)(3)** | • Surveillance procedures, including video recording requirements? | Yes / No |
| **12372(a)(4)** | • Lighting in and around the gambling establishment? | Yes / No |
| **12372(a)(5)** | • Procedures for reporting suspected criminal activity or incidents to state and local law enforcement agencies? | Yes / No |
| **12372(a)(6)** | • Procedures for protecting persons, property, assets, and records? | Yes / No |

| Authority | Description | Circle One |
|---|---|---|
| **12372(b)** | **Security and Surveillance Plan - Tiers III through V** *(in addition to above)* | |
| | Does the written Plan include the following: | Yes / No |
| **12372(b)(1)** | • List of names/job titles of employees responsible for making decisions involving the security of patrons employees, property, and cash, assets, and records? | Yes / No |
| **12372(b)(2)** | • The duties of uniformed security personnel? | Yes / No |
| **12372(b)(3)** | • Surveillance procedures, including video recording requirements? | Yes / No |
| **12372(b)(4)** | • Specific conditions, procedures, and instructions for stopping controlled gambling and gaming activities? | Yes / No |
| **12372(b)(5)** | • Employee training relating to the GE's security and surveillance plan? | Yes / No |

## EMERGENCY PREPAREDNESS AND EVACUATION PLAN

| Authority | Description | Circle One |
|---|---|---|
| **Reg 12370** | **Emergency Preparedness and Evacuation Plan - All tiers** | |
| **12370(a)** | • Has the GE prepared and maintained a fire safety and evacuation plan? | Yes / No |
| **12370(f)** | • Does the GE conduct emergency evacuation drills? | Yes / No |
| | • Does the GE conduct employee training on fire and safety? | Yes / No |

**EXHIBIT A**

## THIRD PARTY PROVIDERS OF PROPOSITION PLAYER SERVICES

| Authority | Description | Circle One |
|---|---|---|
| Reg 12200 | **Third Party Providers of Proposition Player Services (TPPPPS)** | |
| | ● Does the GE have an approved contact with the TPPPPS? | Yes / No |
| | If yes, Name of TPPPPS: _____ | |
| 12200.3(a) | ● Are the TPPPPS employees wearing their Commission issued badges? | Yes / No |
| 12200.7(b)(18) | ● Does the TPPPPS report cheating to the House/GE? | Yes / No |
| | ● Does the TPPPPS report cheating to the CGCC and Bureau within five days? | Yes / No |
| Reg 12386(a)(6) | ● Does the TPPPPS buy, sell, or lend chips to the players? | Yes / No |
| | If yes, under what circumstances (Not permitted under 12386) _____ | |
| | _____ | |
| | _____ | |
| 12200.7(b)(10) | ● Is a copy of the Bureau approved contract available for review? | Yes / No |
| | ● Is the Licence Certificate available for review? | Yes / No |
| 12200.13 | ● Are the playing books available for review? | |
| | (Obtain copies of previous days to TP Unit) | Yes / No |
| | ● Is the playing book automated via an electronic system? | Yes / No |
| | If yes, what kind? _____ | |
| 12200.13(b)(2) | Does the playing book include the following: | |
| | ___Filled out in Ink     ___Sequential #s     ___Name of TPPPPS Company | |
| | ___Name of GE          ___Table #       ___Date/time play occurred | |
| | ___Name of Game     ___Fills and credits   ___Begin/End Balance | |
| | ___GEGA Number     ___Player name       ___Player badge number | |
| 12200.13(b)(3) | ___Time stamped, dated and signed "under penalty of perjury: | |

| | | |
|---|---|---|
| | ● Does the GE provide a dedicated podium/storage area/player's bank for the TP? | Yes / No |
| | If yes: | |
| | Where is it located? _____ | |
| | Who has access to it? _____ | |
| | How is TP money replenished? _____ | |
| | Who replenishes it? _____ | |
| | How is TP money removed? _____ | |
| | Who removes the money? _____ | |
| | How much TP chips/cash is at the GE? (on average) _____ | |

**Additional Notes:**

**EXHIBIT A**

## GAMBLING BUSINESS

| Authority | Description | Circle One |
|---|---|---|
| **Reg 12220** | **Gambling Business** | |
| | Is there a Gambling Business present at the GE? | Yes / No |
| | If yes, name of Business: _____ | |
| **12220.3(a)** | ● Are the Gambling Business employees wearing their Commission issued badges? | Yes / No |
| | ● How many Gambling Business employees (owner/supervisor/player) are present? | |
| | ● Does the GE have a schedule indicating when the Gambling Business will provide banking services and/or a person to contact if player does not arrive? | Yes / No |
| **12220.13** | ● Are the playing books available for review? (Obtain copies of previous days for TP Unit) | Yes / No |
| | ● Is the playing book automated via an electronic system? | Yes / No |
| | If yes, what kind? _____ | |
| | ● Does the playing book include the following: | |
| **12220.13(b)(2)** | ___Filled out in ink    ___Sequential #s    ___Name of Gambling Business | |
| | ___Name of GE    ___Table #    ___Date/time play occurred | |
| | ___Name of Game    ___Fills and credits    ___Begin/End Balance | |
| | ___GB Owner    ___Player name    ___Player badge number | |
| **12220.13(b)(3)** | ___Time stamped, dated and signed "under penalty of perjury" | |

| | | |
|---|---|---|
| | ● Does the GE provide a dedicated podium/storage area for the Gambling Business?   Yes / No | |
| | If yes: | |
| | Where is it located? _____ | |
| | Who has access to it? _____ | |
| | How is GB money replenished? _____ | |
| | Who replenishes it? _____ | |
| | How is GB money removed? _____ | |
| | Who removes the money? _____ | |
| | How much GB chips/cash is at the GE? (On average) _____ | |

**Additional Notes:**

Revised: March 2014

EXHIBIT A

# EXHIBIT B

EDMUND G. BROWN JR.
Attorney General

*Lytle Letter*

State of California
DEPARTMENT OF JUSTICE
BUREAU OF GAMBLING CONTROL
P.O. Box 168024
Sacramento, CA 95816
Public: (916) 263-1408

Facsimile: (916) 263-0839
(916) 263-5778

December 20, 2007

Mr. Haig Kelegian, President
Southern California Cardroom Association
7301 Eastern Avenue
Bell Gardens, CA 95816

Mr. Kermit Schayltz, President
Golden State Gaming Association
7433-C Greenback Lane
Citrus Heights, CA 95841

RE:   Penal Code Section 330 and 330.11 in Player-Dealer Style Games

Dear Messrs. Kelegian and Schayltz:

You have inquired, with respect to compliance with Penal Code sections 330 and 330.11 in player-dealer style games, what the inspection practice of the Bureau of Gambling Control is in circumstances where, in the course of a given player-dealer style game, all players but one decline to occupy the player-dealer position. As you are aware, Penal Code section 330 prohibits banking games, and Penal Code section 330.11 provides, in relevant part:

> Banking game or banked game does not include a controlled game if the published rules of the game feature a player-dealer position and provide that this position must be continuously and systematically rotated amongst each of the participants during the play of the game, ensure that the player-dealer is able to win or lose only a fixed and limited wager during the play of the game, and preclude the house, another entity, a player, or an observer from maintaining or operating as a bank during the course of the game. For purposes of this section it is not the intent of the Legislature to mandate acceptance of the deal by every player if the division finds that the rules of the game render the maintenance of or operation of a bank impossible by other means.

It is the view of the Bureau of Gambling Control that by enacting section 330.11, the Legislature intended to insure that in player-dealer style games, all seated players must be afforded the temporary opportunity to wager against multiple players at the table. To fulfill this legislative intent the Bureau of Gambling Control has mandated that all game rules include a provision that the player-dealer position must continuously and systematically be offered to all seated players. Generally, acceptable rules require that each seated player have the opportunity to

**EXHIBIT B**

Mears, Kelegian and Schayltz
December 20, 2007
Page 2

act as player-dealer for two consecutive hands before the opportunity is rotated to the next player.

The Bureau of Gambling Control inspects licensed card room casinos to observe whether the opportunity to act as the player-dealer is continuously and systematically offered to all seated players must be required by the rules of all approved player-dealer style games. If, after a player acts as the player-dealer for two consecutive hands, the casino offers this opportunity to all other seated players in a manner that is verifiable by observers and surveillance cameras the requirement that the opportunity to act as the player-dealer be continuously and systematically offered to all seated players has been satisfied.

It is the view of the Bureau of Gambling Control that as long as the opportunity to act as the player-dealer is continuously and systematically offered to all seated players, in accordance with the approved rules of the game, the fact that, at times, all players but one may decline the player-dealer position, does not render the game an illegal banking game as long as the game procedures, described above, are properly followed.

I hope that this letter addresses your question.

Sincerely,

ROBERT E. LYTLE
Bureau Chief

For    EDMUND G. BROWN JR
       Attorney General

cc:    Robert Mukai, Sr. Assistant Attorney General, Department of Justice
       Mathew J. Campoy, Assistant Bureau Chief, Bureau of Gambling Control

**EXHIBIT B**

# EXHIBIT C

CALIFORNIA GAMBLING
CONTROL COMMISSION

2014 DEC 23  PM 2: 51

1    KAMALA D. HARRIS
     Attorney General of California
2    SARA J. DRAKE
     Senior Assistant Attorney General
3    WILLIAM P. TORNGREN
     Deputy Attorney General
4    State Bar No. 58493
      1300 I Street, Suite 125
5     P.O. Box 944255
      Sacramento, CA 94244-2550
6     Telephone: (916) 323-3033
      Fax: (916) 327-2319
7     E-mail: William.Torngren@doj.ca.gov
     *Attorneys for the Complainant*

8

9                              BEFORE THE

10          CALIFORNIA GAMBLING CONTROL COMMISSION

11                      STATE OF CALIFORNIA

12

13

14   | In the Matter of the Accusation Against:        BGC Case No. HQ2014-00005AL

15   | ROBERT E. LYTLE                                  OAH No.

16   | 9360 Blue Oak Drive                              **ACCUSATION**
     | Orangevale, CA 95662
17

18   | LICENSE NUMBERS:

19   | GEKE-001373
     | GEOW-003415
20   | GEOW-003416

21

22       Complainant alleges as follows:

23                              **PARTIES**

24       1.    Wayne J. Quint, Jr. (Complainant) brings this Accusation solely in his official

25   capacity as the Chief of the California Department of Justice, Bureau of Gambling Control

26   (Bureau).

27

28

                                     1
                                 Accusation

EXHIBIT C

2.   Robert E. Lytle (Respondent) is a Gambling Establishment Key Employee with License Number GEKE-001373.  That license will expire on February 29, 2016, unless sooner revoked or extended.  Respondent also holds a temporary state gambling license (GEOW-003415) arising from his ownership interest in The Tavern at Stones Gambling Hall, which formerly was Phoenix Casino and Lounge (GEGE-001337).  That license will expire on February 28, 2015, unless extended.  Respondent further holds a temporary state gambling license (GEOW-3416) arising from his ownership interest in The Saloon at Stones Gambling Hall, which formerly was Lucky Derby Casino (GEGE-001336).  That license will expire on February 28, 2015, unless extended.  In November 2014, Respondent applied for licensing under the Gambling Control Act (Act) in connection with Stones South Bay Corp., which seeks to acquire an ownership interest in the Village Club (GEGE-000466).  That application is pending.

3.   The California Gambling Control Commission (Commission) issued each of Respondent's licenses.

**STATEMENT OF THE CASE**

4.   This case seeks to discipline Respondent's licenses – by revocation, suspension, and/or fine as appropriate – for his violations of, and lack suitability for continued licensing under, the Act, the regulations adopted pursuant to the Act, and other laws of the State of California.  Until December 30, 2007, Respondent was a sworn law enforcement officer and the Director, Division of Gambling Control (Division), which was the Bureau's predecessor.  In those capacities, he had overall responsibility for the Division's performance of its duties under the Act.  He was familiar with the need for full and true disclosure of information necessary to carry out the State's policies relating to the licensing, registration, and control of gambling.  He also was familiar with the importance of confidentiality to the Division's investigations and licensing activities, the attorney-client privilege as it relates to the open communication between the Division and its attorneys, and the privacy rights of licensees, applicants, and others.

2

**Accusation**

EXHIBIT C

5.   Respondent's acts and omissions, including without limitation those alleged in this Accusation, show that for personal gain and the gain of those whom he came to represent, he abandoned the basic principles of the state agency, and the general public, that he served. Many of those acts and omissions were in derogation of the State's conflict of interest and revolving door provisions. Respondent's acts and omissions, including without limitation those alleged in this Accusation, were inimical to public health, safety, and welfare and demonstrate that Respondent is not a person of good character, honesty, and integrity. His acts and omissions, including those alleged in this Accusation, pose a threat to the effective regulation and control of controlled gambling, and create or enhance the dangers of unsuitable, unfair, or illegal practices, methods, and activities in carrying on the business and financial arrangements incidental to the conduct of controlled gambling. Respondent is not suitable or qualified for continued licensure; therefore, each of his licenses should be disciplined.

### FACTS UNDERLYING CAUSES FOR DISCIPLINE

6.   Complainant is informed and believes and, therefore, alleges that, as a sworn law enforcement officer and Director of the Division, Respondent was familiar with the Act's provisions protecting information from disclosure and the need for licensing and investigatory agencies to maintain the confidentiality of information. Complainant further is informed and believes and, therefore, alleges that, as Director of the Division and a senior official in the California Department of Justice, Respondent knew that communications with attorneys were privileged from disclosure. Complainant also is informed and believes and, therefore, alleges that, as Director of the Division and a senior official in the California Department of Justice, Respondent was familiar with, and received education regarding, the State's revolving door and conflict of interest provisions.

7.   In the fall of 2007, as the Division's Director, Respondent oversaw the regulation of gambling establishments and the Act's enforcement. As part of his duties and responsibilities, Respondent undertook to decide regulatory matters relating to, and directly participate in the regulation of, Garden City Casino (Garden City), which was located in San Jose, California. Among other things, he met with the Garden City's owners and others with respect to

3

**Accusation**

EXHIBIT C

1    outstanding notices of violation served on Garden City by the San Jose Police Department and

2    the Division.  He also decided, and directed the Division's employees and others, to cut back

3    ongoing investigatory activities regarding Garden City.

4        8.    During its investigation into Respondent's suitability for a state gambling license, the

5    Bureau learned that prior to December 4, 2007, Respondent entered into negotiations with

6    Garden City concerning prospective engagement as its compliance director.  Those negotiations

7    led to Garden City's attorney preparing a draft independent contractor agreement that was

8    emailed to Respondent on or about December 4, 2007.  Thereafter, Garden City's attorney

9    revised the prospective agreement and emailed another draft to Respondent on or about

10   December 24, 2007.

11       9.    On December 30, 2007, Respondent retired from state service.  On or about

12   December 31, 2007, Respondent and Garden City entered into the agreement that had been in

13   negotiation since before December 4, 2007.

14       10.   Thereafter, Respondent acted as an agent for, or otherwise represented, Garden City.

15   He made formal and informal appearances before, as well as written and oral communications

16   to, the Bureau and its employees for the purpose of influencing administrative action.  For

17   example, in January 2008, Respondent complained to the Acting Bureau Chief that Bureau

18   investigators were recommencing investigatory activities regarding, and conducted an

19   unannounced visit of, Garden City.

20       11.   After his retirement, Respondent acted as an agent for, or otherwise represented, other

21   persons and entities regulated by the Bureau or under its jurisdiction.  In many instances, he

22   made formal and informal appearances before, as well as written and oral communications to,

23   the Bureau, the Commission, and their employees for the purpose of influencing administrative

24   action.  Respondent offered his services as a designated agent, or consultant, to persons and

25   entities in the gambling business.  Not surprisingly, Respondent's past employment as the

26   Division's Director, and in the California Department of Justice, is prominent in promoting his

27   business.

28

4

**Accusation**

EXHIBIT C

12. During its investigation into Respondent's suitability for a state gambling license, the Bureau learned that between 2012 and 2013, Respondent solicited and received confidential information from the Bureau's Special Agent-in-Charge (SAC).  Between December 27, 2012, and December 31, 2013, Respondent and the SAC contacted each other by telephone no less than 180 times.[1]  They also communicated by text and email.  The confidential information requested or provided included, among other things:

   a) Respondent requested that the SAC determine whether a certain person had a criminal history.  The SAC instructed Bureau employees to gather the information.  The SAC then reported back to Respondent.  That was a misdemeanor.

   b) Respondent received copies of privileged, confidential communications between the Bureau and its attorneys with respect to entities for whom he served as designated agent.  Sharing confidential information was a misdemeanor.

   c) Respondent received confidential information gathered and documents prepared during the course of the Bureau's investigation with respect to persons and entities for which he served as designated agent and for Garden City.  Sharing such confidential information was a misdemeanor.

   d) Respondent's receipt of such information and documents potentially compromised the effectiveness, and undermined the integrity, of the Bureau's investigations.

13. In connection with licensing for, and investigations of, himself and others, Respondent submitted, or advised others to submit, inaccurate and misleading information to the Bureau and/or the Commission.  This included, among other things:

   a) In June 2011, Respondent advised the prospective food and beverage director for Garden City to submit a key employee application to the Commission.  In that application, the applicant designated Respondent as his agent.  Respondent signed the application.  The applicant misrepresented to the Commission that his job title

---

[1] As part of its investigation into Respondent's suitability for a state gambling license, the Bureau requested that he provide all phone records, emails, or other written communications with the SAC from March 2012 to May 31, 2014.  Respondent, however, did not provide any phone records for communications before December 27, 2012.

**Accusation**

EXHIBIT C

1    was "casino shift manager" and that his duties were: "assist in oversight of casino

2    operation; monitor activities for compliance; other related duties." Respondent

3    knew that the applicant intended to perform only food and beverage duties.

4          1)  On July 1, 2011, after the Commission issued an interim key employee

5               license to the applicant, Respondent requested that the San Jose Police

6               Department "change the acknowledgement for a city key employee license

7               – Casino Shift Manager, to Director of Food and Bev" at Garden City.

8               Respondent, however, did not notify the Bureau or the Commission of this

9               change. Instead, with Respondent as his designated agent, the applicant

10               continued to represent that he was a casino shift manager.

11          2)  On February 23, 2012, in an open meeting attended by the applicant and

12               Respondent, the applicant represented to the Commission that he was a

13               casino shift manager for Garden City, and not performing as food and

14               beverage manager.

15     b)  Beginning in approximately July 2012, in connection with state gambling license

16        applications from LAX, LLC and its owner, as well as Garden City's license

17        renewal application, and as part of the Bureau's investigation, Respondent

18        provided the Bureau with inaccurate, incomplete, or misleading information as to,

19        among other things, the owner's marital status, the ownership of related and

20        affiliated entities including Garden City, payments and transactions between

21        related and affiliated entities, the valuation of certain games and licenses,

22        transactions with lenders, and contracts that Garden City had.

23     c)  During the Bureau's investigation into Respondent's suitability for a state

24        gambling license, Respondent provided inaccurate, incomplete, or misleading

25        information. He also failed to provide all information and documents that the

26        Bureau requested. During an interview by Bureau agents, Respondent failed to

27        disclose any information regarding the receipt of confidential information and

28        documents from the SAC.

6

**Accusation**

**EXHIBIT C**

1       14.  Between May 1, 2010, and July 6, 2014, Team View Player Services, LLC (Team

2   View) provided third-party proposition player services to Garden City.  During that time,

3   Respondent was a key employee of Garden City.  Respondent received monthly payments from

4   Team View.  The Bureau first learned of these payments in connection with its investigation

5   into Team View during 2013.

6       15.  Since August 3, 2012, PT Gaming LLC (PT Gaming) has had a contract to provide

7   third-party proposition player services to Lucky Derby, which is now The Saloon at Stones

8   Gambling Hall.  On May 23, 2013, Respondent became licensed as an owner of the Lucky

9   Derby.  Between May 23, 2013, and May 31, 2014, Respondent, through Lytle Consulting

10   Services, Inc., received payments from PT Gaming.

11                   **JURISDICTION**

12       16.  Business and Professions Code, section 19811 provides, in part:

13        (b)  Jurisdiction, including jurisdiction over operation and
concentration, and supervision over gambling establishments in this state

14      and over all persons or things having to do with the operations of

15      gambling establishments is vested in the commission.

16       17.  Business and Professions Code, section 19823 provides:

17        (a)  The responsibilities of the commission include, without

18      limitation, all of the following:

19        (1)  Assuring that licenses, approvals, and permits are not
issued to, or held by, unqualified or disqualified persons, or by

20      persons whose operations are conducted in a manner that is

21      inimical to the public health, safety, or welfare.

22        (2)  Assuring that there is no material involvement, directly
or indirectly, with a licensed gambling operation, or the

23      ownership or management thereof, by unqualified or disqualified

24      persons, or by persons whose operations are conducted in a
manner that is inimical to the public health, safety, or welfare.

25        (b)  For the purposes of this section, "unqualified person" means a

26      person who is found to be unqualified pursuant to the criteria set forth in
Section 19857, and "disqualified person" means a person who is found

27      to be disqualified pursuant to the criteria set forth in Section 19859.

28

7

**Accusation**

**EXHIBIT C**

18.  Business and Professions Code, section 19824 provides, in part:

The commission shall have all powers necessary and proper to enable it fully and effectually to carry out the policies and purposes of this chapter, including, without limitation, the power to do all of the following:

* * *

(b)  For any cause deemed reasonable . . . limit, condition, or restrict any license, permit, or approval, or impose any fine upon any person licensed or approved. . . .

* * *

(d)  Take actions deemed to be reasonable to ensure that no ineligible, unqualified, disqualified, or unsuitable persons are associated with controlled gambling activities.

19.  Business and Professions Code, section 19826 provides, in part:

The department[2] . . . shall have all of the following responsibilities:

* * *

(c)  To investigate suspected violations of this chapter or laws of this state relating to gambling . . . .

* * *

(e)  To initiate, where appropriate, disciplinary actions as provided in this chapter.  In connection with any disciplinary action, the department may seek restriction, limitation, suspension, or revocation of any license or approval, or the imposition of any fine upon any person licensed or approved.

20.  California Code of Regulations, title 4, section 12554 provides, in part:

(a)  Upon the filing with the Commission of an accusation by the Bureau recommending revocation, suspension, or other discipline of a holder of a license, registration, permit, finding of suitability, or approval,

---

[2] "Department" refers to the Department of Justice.  (Bus. & Prof. Code, § 19805, subd. (h).)  Business and Professions Code section 19810 provides, in part, that "any power or authority of the department described in this chapter may be exercised by the Attorney General or any other person as the Attorney General may delegate."  Effective January 1, 2008, amendments to the Act replaced all references to the Division with references to the Department.  Following those amendments, the Bureau assumed the Division's powers to perform the Department's responsibilities and duties under the Act.

8

**Accusation**

EXHIBIT C

the Commission shall proceed under Chapter 5 (commencing with section 11500) of Part 1 of Division 3 of Title 2 of the Government Code.

\* \* \*

(d)   Upon a finding of a violation of the Act, any regulations adopted pursuant thereto, any law related to gambling or gambling establishments, violation of a previously imposed disciplinary or license condition, or laws whose violation is materially related to suitability for a license, registration, permit, or approval, the Commission may do any one or more of the following:

(1)   Revoke the license, registration, permit, finding of suitability, or approval;

(2)   Suspend the license, registration, or permit;

\* \* \*

(5)   Impose any fine or monetary penalty consistent with Business and Professions Code sections 19930, subdivision (c), and 19943, subdivision (b)

## COST RECOVERY

21.   Business and Professions Code, section 19930 provides, in part:

(b)   If, after any investigation, the department is satisfied that a license, permit, finding of suitability, or approval should be suspended or revoked, it shall file an accusation with the commission in accordance with Chapter 5 (commencing with Section 11500) of Part 1 of Division 3 of Title 2 of the Government Code.

\* \* \*

(d)   In any case in which the administrative law judge recommends that the commission revoke, suspend, or deny a license, the administrative law judge may, upon presentation of suitable proof, order the licensee or applicant for a license to pay the department the reasonable costs of the investigation and prosecution of the case.

(1)   The costs assessed pursuant to this subdivision shall be fixed by the administrative law judge and may not be increased by the commission.  When the commission does not adopt a proposed decision and remands the case to the administrative law judge, the administrative law judge may not increase the amount of any costs assessed in the proposed decision.

9

**Accusation**

**EXHIBIT C**

1       (2)  The department may enforce the order for payment in
2   the superior court in the county in which the administrative
    hearing was held.  The right of enforcement shall be in addition
3   to any other rights that the division may have as to any licensee
    to pay costs.
4
5       (3)  In any judicial action for the recovery of costs, proof of
    the commission's decision shall be conclusive proof of the
6   validity of the order of payment and the terms for payment.

7                          * * *

8       (f)  For purposes of this section, "costs" include costs incurred for
    any of the following:
9
10      (1)  The investigation of the case by the department.

11      (2)  The preparation and prosecution of the case by the
    Office of the Attorney General.
12

13  **GAMBLING LICENSING AND PENALTY PROVISIONS**

14  22.  Business and Professions Code section 19850 provides, in part:

15      Every person . . . who receives, directly or indirectly, any
    compensation or reward, or any percentage or share of the money or
16  property played, for keeping, running, or carrying on any controlled
    game in this state, shall apply for and obtain from the commission, and
17  shall thereafter maintain, a valid state gambling license, key employee
    license, or work permit . . . .  In any criminal prosecution for violation of
18  this section, the punishment shall be as provided in Section 337j of the
    Penal Code.
19

20  23.  Business and Professions Code section 19854, subdivision (b), provides:

21      No person may be issued a key employee license unless the person
    would qualify for a state gambling license.
22

23  24.  Business and Professions Code section 19855 provides, in part:

24      [E]very person who, by statute or regulation, is required to hold a state
    license shall obtain the license prior to engaging in the activity or
25  occupying the position with respect to which the license is required.

26  25.  Business and Professions Code section 19856 provides, in part:

27      (a)  . . . . The burden of proving his or her qualifications to receive
    any license is on the applicant.
28

10

---

**Accusation**

**EXHIBIT C**

(b)   An application to receive a license constitutes a request for a determination of the applicant's general character, integrity, and ability to participate in, engage in, or be associated with, controlled gambling.

26.   Business and Professions Code, section 19857 provides:

No gambling license shall be issued unless, based on all the information and documents submitted, the commission is satisfied that the applicant is all of the following:

(a)   A person of good character, honesty and integrity.

(b)   A person whose prior activities, criminal record, if any, reputation, habits, and associations do not pose a threat to the public interest of this state, or to the effective regulation and control of controlled gambling, or create or enhance the dangers of unsuitable, unfair, or illegal practices, methods, and activities in the conduct of controlled gambling or in the carrying on of the business and financial arrangements incidental thereto.

(c)   A person that is in all other respects qualified to be licensed as provided in this chapter.

27.   Business and Professions Code, section 19859 provides, in part:

The commission shall deny a license to any applicant who is disqualified for any of the following reasons:

(a)   Failure of the applicant to clearly establish eligibility and qualification in accordance with this chapter.

(b)   Failure of the applicant to provide information, documentation, and assurances required by the Chief, or failure of the applicant to reveal any fact material to qualification, or the supplying of information that is untrue or misleading as to a material fact pertaining to the qualification criteria.

28.   Business and Professions Code section 19866 provides:

An applicant for licensing or for any approval or consent required by this chapter, shall make full and true disclosure of all information to the department and the commission as necessary to carry out the policies of this state relating to licensing, registration, and control of gambling.

29.   Business and Professions Code section 19984, subdivision (a) provides:

Notwithstanding any other provision of law, a licensed gambling enterprise may contract with a third party for the purpose of providing proposition player services at a gambling establishment, subject to the following conditions:

11

**Accusation**

EXHIBIT C

1      (a)  Any agreement, contract, or arrangement between a
2 gambling enterprise and a third-party provider of proposition
player services shall be approved in advance by the department,
3 and in no event shall a gambling enterprise or the house have any
interest, whether direct or indirect, in funds wagered, lost, or won.

4

5 30.  Business and Professions Code section 19942, subdivision (b) provides:

6      Any person who willfully violates any of the provisions of this
chapter for which a penalty is not expressly provided, is guilty of a
7 misdemeanor.

8 **INFORMATION PROTECTION PROVISIONS**

9 31.  Business and Professions Code section 19821 provides, in part:

10      (c)  . . . . Except as provided in this chapter, the records of the
department and the commission are exempt from disclosure under
11 Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1
of the Government Code [the Public Records Act].
12
     (d)  Except as necessary for the administration of this chapter, . . .
13 no official, employee, or agent of the commission or the department,
having obtained access to confidential records or information in the
14 performance of duties pursuant to this chapter, shall knowingly disclose
or furnish the records or information, or any part thereof, to any person
15 who is not authorized by law to receive it.  A violation of this
subdivision is a misdemeanor.
16

17 **REVOLVING DOOR AND CONFLICT OF INTEREST PROVISIONS**

18 32.  Business and Professions Code section 19981, subdivision (a) presently provides, in

19 part:

20      [T]he chief, and any employee of the . . . department designated by
regulation, shall not, for a period of three years after leaving office or
21 terminating employment, for compensation, act as agent . . . for, or
otherwise represent, any other person by making any formal or informal
22 appearance, or by making any oral or written communication, before the
commission or the department, or any officer or employee thereof, if the
23 appearance or communication is for the purpose of influencing
administrative action, or influencing any action or proceeding involving
24 the issuance, amendment, awarding, or revocation of a permit, license, or
approval.
25

26 33.  On December 31, 2007, Business and Professions Code section 19981, subdivision

27 (a) provided, in part:

28

---

12

**Accusation**

**EXHIBIT C**

[T]he director, and any employee of the . . . division designated by regulation, shall not, for a period of three years after leaving office or terminating employment, for compensation, act as agent . . . for, or otherwise represent, any other person by making any formal or informal appearance, or by making any oral or written communication, before the commission or the department, or any officer or employee thereof, if the appearance or communication is for the purpose of influencing administrative action, or influencing any action or proceeding involving the issuance, amendment, awarding, or revocation of a permit, license, or approval.

34.   Government Code section 87100 provides:

No public official at any level of state or local government shall make, participate in making or in any way attempt to use his official position to influence a government decision in which he knows or has reason to know he has a financial interest.

35.   Government Code section 87406, subdivision (d)(1) provides, in part:

No designated employee of a state administrative agency, any officer, employee, or consultant of a state administrative agency who holds a position which entails the making, or participation in making, of decisions which may foreseeably have a material effect on any financial interest, . . . for a period of one year after leaving office or employment, shall, for compensation, act as agent . . . for, or otherwise represent, any other person by making any formal or informal appearance, or by making any oral or written communication, before any state administrative agency, or officer or employee thereof, for which he or she worked or represented in the 12 months before leaving office or employment, if the appearance or communication is made for the purpose of influencing administrative or legislative action, or influencing any action or proceeding involving the issuance, amendment, awarding, or revocation of a permit, license, grant, or contract . . . .

36.   Government Code section 87407 provides:

No public official shall make, participate in making, or use his or her official position to influence, any governmental decision relating to any person with whom he or she is negotiating, or has any arrangement concerning, prospective employment.

37.   Government Code section 91000, subdivision (a) provides:

Any person who knowingly or willfully violates any provision of this title is guilty of a misdemeanor.

13

**Accusation**

**EXHIBIT C**

1

## FIRST CAUSE FOR DISCIPLINE
### (Unqualified for Continued Licensure)

3  38.  Respondent's licenses are subject to discipline, pursuant to Business and Professions

4  Code sections 19823 and 19857, subdivisions (a) and (b).  Respondent's continued licensure is

5  inimical to public health, safety, and welfare.  Respondent is not a person of good character,

6  honesty, and integrity.  His prior activities pose a threat to the effective regulation and control of

7  controlled gambling, and create or enhance the dangers of unsuitable, unfair, or illegal practices,

8  methods, and activities in carrying on the business and financial arrangements incidental to the

9  conduct of controlled gambling.  Respondent's conduct in his affairs demonstrates that he is

10  unqualified for licensure.  That conduct includes the acts and omissions alleged above.

11

## SECOND CAUSE FOR DISCIPLINE
### (Providing Untrue or Misleading Information to the Bureau)

13  39.  Respondent's license is subject to discipline, pursuant to Business and Professions

14  Code sections 19823, 19857, subdivisions (a) and (b), and 19859, subdivisions (a) and (b).

15  Respondent's continued licensure is inimical to public health, safety, and welfare.  Respondent

16  is not a person of good character, honesty, and integrity.  His prior activities pose a threat to the

17  effective regulation and control of controlled gambling, and create or enhance the dangers of

18  unsuitable, unfair, or illegal practices, methods, and activities in carrying on the business and

19  financial arrangements incidental to the conduct of controlled gambling.  Respondent supplied

20  untrue or misleading information as to material facts pertaining to his qualification criteria.

21  Additionally, he assisted others in supplying untrue or misleading information as to material

22  facts pertaining to the qualification criteria of others.

23

## THIRD CAUSE FOR DISCIPLINE
### (Failure To Provide Information and Documentation Requested by the Chief)

25  40.  Respondent's license is subject to discipline, pursuant to Business and Professions

26  Code sections 19823, 19857, subdivisions (a) and (b), and 19859, subdivisions (a) and (b).

27  Respondent's continued licensure is inimical to public health, safety, and welfare.  Respondent

28  is not a person of good character, honesty, and integrity.  His prior activities pose a threat to the

14

Accusation

**EXHIBIT C**

1  effective regulation and control of controlled gambling, and create or enhance the dangers of

2  unsuitable, unfair, or illegal practices, methods, and activities in carrying on the business and

3  financial arrangements incidental to the conduct of controlled gambling.  Respondent failed to

4  provide information and documents requested by the Bureau acting on the Complainant's

5  behalf.  Additionally, Respondent assisted others in failing to provide information and

6  documents requested by the Bureau acting on the Complainant's behalf.

7                               **FOURTH CAUSE FOR DISCIPLINE**

8      **(Prohibited Interests in the Funds Wagered, Lost, or Won by a Third-Party Provider)**

9       41.  Respondent's licenses are subject to discipline, pursuant to Business and Professions

10  Code sections 19823, 19857, subdivisions (a) and (b), and 19859, subdivisions (a) and (b).

11  Respondent's continued licensure is inimical to public health, safety, and welfare.  Respondent

12  is not a person of good character, honesty, and integrity.  His prior activities pose a threat to the

13  effective regulation and control of controlled gambling, and create or enhance the dangers of

14  unsuitable, unfair, or illegal practices, methods, and activities in carrying on the business and

15  financial arrangements incidental to the conduct of controlled gambling.  Through wholly

16  owned entities, Respondent had an indirect interest in funds wagered, lost, or won by Team

17  View.  Respondent also had an indirect interest in funds wagered, lost, or won by PT Gaming.

18  Business and Professions Code section 19984, subdivision (a) prohibits the receipt of such

19  payments.

20                                            **PRAYER**

21       WHEREFORE, Complainant requests that a hearing be held on the matters herein alleged,

22  and that following the hearing, the Commission issue a decision:

23       1.   Revoking California State Gambling Establishment Key Employee License Number

24  GEKE-001373, temporary state gambling license (GEOW-003415), and temporary state

25  gambling license (GEOW-3416) issued to Robert E. Lytle;

26       2.   Fining Robert E. Lytle in an amount according to proof;

27

28

---

15

**Accusation**

1      3.   Awarding Complainant the costs of investigation and costs of bringing this

2   Accusation before the Commission, pursuant to Business and Professions Code section 19930,

3   subdivisions (d) and (f), in a sum according to proof; and

4      4.   Taking such other and further action as the Commission may deem appropriate.

5

6   Dated:  December 23, 2014

7                                                   WAYNE J. QUINT, JR., Chief
                                                    Bureau of Gambling Control
8                                                   California Department of Justice

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT C

# EXHIBIT D



October 25, 2012

Tribal Council

**Marshall McKay**
*Chairman*

**James Kinter**
*Secretary*

**Anthony Roberts**
*Treasurer*

**Mia Durham**
*Member*

**Matthew Lowell, Jr.**
*Member*

Lawrence Quint, Jr., Bureau Chief
Bureau of Gambling Control
Department of Justice
P.O. Box 168024
Sacramento, California 95816-8024

Stephanie Shimazu, Chairperson
California Gambling Control
Commission
2399 Gateway Oaks Drive, Suite 100
Sacramento, California 95833

### RE: YOCHA DEHE CONCERNS OVER ILLEGAL GAMING

Dear Mr. Quint and Commissioner Shimazu:

We write on behalf of the Yocha Dehe Wintun Nation and its Tribal Gaming
Agency to memorialize our Tribe's concerns regarding the play of illegal
gaming at internet sweepstakes cafés and California cardrooms and our
understanding of the status of each issue.

### 1. INTERNET SWEEPSTAKES CAFÉS

All parties appear to agree these establishments are playing what are
effectively illegal slot machines, and therefore must be stopped. To that end,
we understand that at the recent meetings between your agencies and
representatives from various tribes, the Bureau outlined the steps it and other
divisions of the Justice Department are taking to eradicate these cafés. These
steps include: (1) efforts to step-up enforcement together with local law
enforcement agencies, (2) issuing an advisory establishing the Justice
Department's view of the illegality of the games played at the cafés, (3)
obtaining a stipulated judgment in a civil action brought under California's
unfair competition laws against one of these cafés and then using that
judgment as a further tool in enforcement, and (4) evaluating the potential for
a legislative solution that would conclusively put the cafés out of business.

**Yocha Dehe Wintun Nation**
PO Box 18   Brooks, California 95606   p) 530.796.3400   f) 530.796.2143   www.yochadehe.org

**EXHIBIT D**

Lawrence Quint, Jr.
Stephanie Shimazu
October 25, 2012
Page 2

The Yocha Dehe representatives who attended the meetings with your agencies also explained to us that the Justice Department is exploring other measures to remedy the current situation, though it was not free to discuss the particulars of those measures. We heartily encourage the Bureau and the Justice Department generally to aggressively continue their enforcement efforts and to implement with all due haste any additional measures that would eliminate internet sweepstakes cafés. As you might imagine, the existence of these establishments poses a threat to Indian gaming and, to the extent the State tolerates them, violate our rights of exclusivity guaranteed by California's Constitution and for which we and other tribes negotiated in our compacts.

2.   CALIFORNIA CARDROOMS

A more serious issue is the play of illegal games at California cardrooms. We have reviewed the October 3, 2012 letters the Pala Band of Mission Indians and the United Auburn Indian Community sent to the Bureau regarding this subject. We agree with the content of those letters, but want to emphasize the problem is a pervasive one that spreads well beyond the two specific cardrooms which were the subjects of those letters.

From our perspective, this is a two-pronged problem. The first prong is that the State has allowed the cardrooms to play illegal games. Specifically, we now know many cardrooms are playing Blackjack and Baccarat. We believe the play of both games in cardrooms is Constitutionally impermissible, as they are games of the type played in Nevada and New Jersey casinos. Moreover, the California Penal Code expressly names "twenty-one" – that is, Blackjack – as a prohibited game. We understand that with respect to Blackjack, at least, the Bureau has previously asserted that the rules of the games it has permitted differ from those of the game traditionally played in casinos. There are at least two problems with this assertion. First and most obvious, the cardrooms expressly advertise both on billboards and on their websites that they play "Blackjack." If the cardrooms are not playing Blackjack, the state should not allow them to advertise that they are, and the games should not bear the word "Blackjack" in their title.

Another issue is that the distinction between the rules the Bureau has approved and those of traditional Blackjack is effectively non-existent. For example, the Bureau has approved a game known as Pure 21.5 Blackjack. It appears the primary difference between this game and standard Blackjack is that the face and ten cards have a value of

**EXHIBIT D**

Lawrence Quint, Jr.
Stephanie Shimazu
October 25, 2012
Page 3

10.5 when dealt with an ace, rather than the standard value of 10. Thus, when paired with an ace, these cards add up to 21.5, rather than 21. As United Auburn's October 3 letter noted, when cardroom guests ask how to play the game, they are told it plays just the same as regular Blackjack. That is exactly our point.

The second prong of the problem here concerns the so-called third-party proposition players, or TPPs. This is a multi-layered issue. One layer is, again, the illegality of the games as they have developed under the TPP system. As representatives from the Yocha Dehe Tribal Gaming Agency have explained to you during the recent meetings between the parties, on more than one occasion they have visited Sacramento area cardrooms and witnessed the games being banked by a single individual – the TPP sitting at each table. Whether the TPP ever offered the bank for rotation is irrelevant (and for the most part, the TPP did not offer to rotate the bank).[1] As our representatives explained at the October 9, 2012 meeting at Thunder Valley, we believe California law requires the continuous and systematic rotation of the bank, not the *offer* to rotate the bank. As a practical matter, offering to rotate the bank is an empty gesture, as, in our experience, virtually no player will want to take on the task. We note the Bureau appears to agree with our position. The rules for the game of EZ Baccarat posted on the Bureau's website explain that "a single player cannot repeatedly act as the player/dealer," and cite the relevant decisional and statutory law for that proposition. The failure to rotate the bank means the games played at the cardrooms are prohibited by the California Constitution, the Penal Code, and violate tribal exclusivity.

Not only are the cardrooms playing illegal banked games, they are effectively *house*-banked games. The Bureau will apparently not grant us access to the contracts between the TPP entities and the cardrooms. However, from the regulations the CGCC implemented, as well as from the recent meetings with Bureau and Commission representatives, we have learned that as part of their contracts, the TPPs are allowed to pay for equipment (such as surveillance cameras and monitors, cards, and shuffling machines), services, facilities and advertising. We trust all would agree those items are among the traditional incidents of running a business. It seems, then, that the TPPs become a form of partner with the cardroom and thus, to some extent, they become the house.

A related issue is the virtual disappearance of the player collection fee. Before the advent of the TPP, this fee was the method by which cardrooms made a profit. From

---

[1]      Any reluctance by the TPPs to rotate the bank is understandable. After all, it appears the TPP compensation is based on the number of hands banked, thereby creating an inherent financial disincentive to bank rotation.

**EXHIBIT D**

Lawrence Quint, Jr.
Stephanie Shimazu
October 25, 2012
Page 4

our representatives' recent visits at various cardrooms, the TPP paid a per-hand collection fee, but the other players did not. While the Bureau has explained that collection fees are not mandatory, it surely must recognize that the system the State has created allows the TPPs to compensate the cardrooms in other ways to make up for the loss of the collection fees. The net effect from the players' perspective is to create a no-collection game resembling in every respect the experience at a casino. Moreover, even if nothing prohibits a cardroom from eliminating a collection from all players, having a different collection for TPPs and other players *is* prohibited, and that appears to be the system in place.

Another pernicious outgrowth of the TPP system has been the "cross-banking" the Bureau and Commission have allowed to flourish. In effect, two cardrooms become licensed TPPs and then bank each other's games. This process not only appears improper, we believe it violates California law.

The point here is relatively simple. The cardrooms have, over time, manipulated the system the State put in place and have been allowed to advertise and play illegal games in a way that is indistinguishable from those played at Indian casinos. The effect of this manipulation has been a noticeable and measurable decline in the business at those casinos. While the cardrooms' ambitions are certainly understandable, they can no longer be tolerated.

This leaves us with the most important question: What does the State intend to do about this problem? We recognize this problem developed over a period of time and involves complex issues resistant to a quick solution. That said, we first addressed this issue at the April 12, 2012 Tribal-State Association meeting and now, after several months and meetings have passed, cannot yet point to concrete steps by the State marking progress toward a solution. We understand the Bureau has acknowledged that a problem exists (always the first step toward a solution), and has advised our representatives that it is evaluating a number of the issues raised at the meetings, but could commit to no particular action or timeline. Nevertheless, the Bureau did say at the October 9 meeting that it would begin a review of the rules of the games it has approved, and that such review might result in changes to the collection fee and game-rotation issues addressed above. From the Commission's perspective, we understand it has acknowledged the need to "clean-up" the TPP regulations and, to that end, to schedule workshops to begin the process.

It is important to understand that the cardrooms' actions, which the state has either tacitly or expressly allowed, daily affect both our business and the exclusivity to which

Lawrence Quint, Jr.
Stephanie Shimazu
October 25, 2012
Page 5

we are entitled by virtue of California's Constitution and the compact we negotiated with the State. We therefore would greatly appreciate it if the State could answer the question posed above, with as much specificity as possible, as well as provide us some idea of the timeframe involved. We simply cannot allow the current situation to continue indefinitely.

Thank you, and we look forward to hearing from you.

Sincerely,

Marshall McKay
Chairman
Yocha Dehe Wintun Nation

Leland Kinter
Chairman
Yocha Dehe Tribal Gaming Agency

cc:    Martin Horan, Assistant Bureau Chief, Bureau of Gambling Control
       Tiffany Conklin, Commissioner, California Gambling Control Commission
       Lauren Hammond, Commissioner, California Gambling Control Commission
       Richard Schuetz, Commissioner, California Gambling Control Commission
       Joe Dhillon, General Counsel, California Gambling Control Commission

**EXHIBIT D**

# EXHIBIT E



**TRIBAL GOVERNMENT**

P.O. Box 908
Alpine, CA 91903
#1 Viejas Grade Road
Alpine, CA 91901

Anthony R. Pico, Chairman
Robert Cita Welch, Vice Chairman
Anita R. Uqualla, Tribal Secretary
Samuel Q. Brown, Tribal Treasurer
Greybuck S. Espinoza, Councilman
Victor E. Woods, Councilman
Raymond "Bear" Cuero, Councilman

Phone: 619.445.3810
Fax: 619.445.5337
viejas.com

December 10, 2012

Lawrence Quint, Jr.
Bureau of Gambling Control
Department of Justice
P.O. Box 168024
Sacramento, CA 95816

Stephanie K. Shimazu, Chairperson
California Gambling Control Commission
2399 Gateway Oaks Drive, Suite 100
Sacramento, CA 95833

Re:  **Illegal Gaming in Internet Sweepstakes Cafes and California Card Rooms**

Dear Mr. Quint and Chairperson Shimazu:

On October 9, 2012, representatives from certain California Tribes, the Bureau of Gambling Control (the "Bureau"), and the California Gaming Control Commission (the "CGCC") met to discuss the problem of illegal gaming currently taking place in the State of California at certain "Internet Sweepstakes Cafes" and state-licensed Card Rooms (collectively the "Illegal Gaming"). This letter memorializes the concerns raised by the Viejas Band of Kumeyaay Indians during the October 9 meeting and confirms the commitments made by the Bureau and the CGCC to combat the Illegal Gaming.

### ILLEGAL SLOT MACHINES AT INTERNET SWEEPSTAKES CAFES

There is no reasonable disagreement related to the legality of Internet Sweepstakes Cafes in the State of California. Internet Sweepstakes Cafes are akin to the telephone card vending machine sweepstakes that proliferated in California over a decade ago. And as the Bureau correctly noted in its May 17, 1999 law enforcement advisory, such sweepstakes machines are illegal slot machines under California Penal Code sections 330a, 330b and 330.1, and are also illegal lotteries under California Penal Code sections 319 and 321. The same reasoning applies to the slot machine style games offered in Internet Sweepstakes Cafes, which are virtually impossible to distinguish from Las Vegas style slot machines. Viejas applauds the Bureau for issuing a law enforcement advisory on December 5, 2012 recognizing the illegality of Internet Sweepstakes Cafes.

While the December 5, 2012 advisory is an important step toward confronting illegal gaming at Internet Sweepstakes Cafes, Viejas believes that swift and decisive enforcement action is of paramount importance. To that end, Viejas supports and encourages efforts by the Bureau to coordinate with local law enforcement agencies to shut down Internet Sweepstakes Cafes, seize assets of Internet Sweepstakes Cafes, and prosecute, to the full extent of the law, any persons that operating or affiliated with such illegal gaming operations.

**EXHIBIT E**

Lawrence Quint, Jr.
Stephanie K. Shimazu
December 10, 2012
Page 2 of 3

During the October 9 meeting, there was also some discussion about a potential legislative solution to put Internet Sweepstakes Cafes out of business for good. Viejas believes that such a solution is also worthy of exploration.

**ILLEGAL CARD GAMES AT CERTAIN LICENSED CALIFORNIA CARD ROOMS**

Viejas is informed that certain California-licensed Card Rooms are offering certain "banking or percentage" card games, including Blackjack (i.e., the game "twenty-one") and Baccarat, in violation of California Penal Code section 330. These games are also constitutionally impermissible, as they are games of the type played in Nevada and New Jersey casinos.

On October 3, 2012, the Pala Band of Mission Indians and the United Auburn Indian Community sent detailed letters to the Bureau exposing two examples of card rooms carrying out this form of illegal gaming. Viejas believes that the prevalence of illegal gaming at card rooms extends beyond those two specific card rooms and that the Bureau and CGCC should immediately take the following action.

First, the Bureau should reverse its approval of certain card games, such as Pure 21.5 Blackjack. The primary difference between Pure 21.5 Blackjack and the game of Blackjack is that the face and ten cards carry a value of 10.5 when paired with an ace, rather than the typical value of 10. Consequently, when those cards are paired with an ace, the score adds up to 21.5 (a "blackjack of 21.5"), rather than 21 (a typical blackjack). It is difficult to reconcile how this game is different from the game of 21; it is not. Indeed, as the October 3 letters noted, when guests ask how to play the game, they are told it plays just the same as regular blackjack. Disapproving card games such as this is a critical initial step to confronting the problem.

Second, the Bureau and CGCC should ban, through enforcement or licensing action, the clever scheme employed by card rooms of using third-party proposition players ("TPPs") to disguise the "house-banking" nature of these illegal card games. California law requires the continuous and systematic rotation of the bank. Card rooms that contract with TPPs, however, do not continuously and systematically rotate the bank. They sometimes "offer" to rotate the bank, but actual rotation does not occur, as virtually no player is financially equipped to take on the task. This failure to rotate the bank renders these card games as illegal house banked games.

Furthermore, the purported arms-length contractual relationship between a card room and a TPP is illusory at best. According to Bureau and CGCC representatives, a typical TPP contract with a card room permits the TPP to pay for card room equipment (such as surveillance cameras and monitors, cards, and shuffling machines), services, facilities and advertising. The payment of these core operating expenses of the card room confirms that a TPP is a co-venturer in the banking card game operation, rather than an independent third party provider. And the payment of such expenses is simply a subterfuge to funnel TPP banked card game profits back to card room owners. Card rooms are also engaging in "cross-banking", whereby one card room becomes a licensed TPP to bank games at another card room, and vice a versa.

These relationships also explain the removal and/or reduction of the player collection fee for certain games. Before the advent of the TPP, card rooms chiefly relied upon the player collection fee to generate revenue. Now, the player collection fees are often paid solely by the TPP, allowing the other players to spend solely on game wagers, just like in a casino.

**EXHIBIT E**

Lawrence Quint, Jr.
Stephanie K. Shimazu
December 10, 2012
Page 3 of 3

Internet Sweepstakes Cafes and illegal banked card games at California-licensed card rooms violate the law, threaten California Tribal Gaming, infringe upon the gaming exclusivity afforded by the California Constitution, and jeopardize State revenue under Tribal-State gaming compacts. Viejas urges the Bureau and CGCC to take immediate and multi-faceted action to combat illegal Internet Sweepstakes Cafes and ensure that all California-licensed card rooms comply with applicable law.

Sincerely,

Viejas Tribal Council

**EXHIBIT E**

# EXHIBIT F



TRIBAL GAMING AGENCY

November 6, 2013

**VIA ELECTRONIC AND U.S. MAIL**

Attorney General Kamala D. Harris
California Department of Justice
P.O. Box 944255
Sacramento, CA 94244-2550

RE: **YOCHA DEHE CONCERNS OVER ILLEGAL GAMING AT CARD ROOMS**

Dear Attorney General Harris:

We write on behalf of the Yocha Dehe Wintun Nation to formally request a meeting with you to discuss the status of the Department of Justice's investigation into illegal gaming practices at California card rooms. Our request for a meeting with you results from our frustration with the Bureau of Gambling Control's failure to address these issues, which we have raised with Bureau representatives multiple times over the past eighteen months.

The history of this issue is straightforward. On April 12, 2012, at a meeting of the Tribal-State Association, Ray Patterson, the Executive Director of our Tribe's gaming agency, for the first time advised Bureau and Gambling Control Commission representatives that card rooms were engaging in what we believe to be illegal gaming practices. Several meetings between representatives of various tribes and the Bureau and Commission followed. While Bureau representatives acknowledged at those meetings that a problem exists, they steadfastly refused to commit to any action or timeline to remedy the situation.

Thus, on October 25, 2012, we wrote a detailed letter to the Bureau's Chief and to the Commission's then-Chairperson, memorializing our concerns and requesting that the State respond with specificity to the single question of what the State intended to do about the problem of illegal gaming at card rooms. A copy of that letter is enclosed for your convenience. As we explained, the card rooms' activities daily affect our business and violate the exclusivity to which we are entitled under California's Constitution and the compact we negotiated with the State. We also requested some idea of the time frame for instituting a solution.

**EXHIBIT F**

Attorney General Kamala D. Harris
November 6, 2013
Page 2

The Commission responded with a commitment – with which they are now following through – to conduct workshops designed to revise Commission regulations addressing third-party proposition play at card rooms.

The Bureau, in contrast, provided us no information of any kind.  On December 27, 2012, two months after receiving our letter, the Bureau's Chief wrote stating nothing more than the Bureau's appreciation for us bringing these "serious issues" to the Bureau's attention and that they were "investigating and evaluating these allegations as appropriate." Though we have followed up with the Bureau requesting a substantive response to our concerns, to date we still have nothing in the way of a substantive response.

Thus, we now believe it is necessary to meet with you to address our concerns.  We therefore ask that your staff contact Ray Patterson at (530) 796-5208 to schedule the meeting.  We understand other tribes involved in this process may also have requested to meet with you.  In the interests of efficiency and convenience, we would be pleased to meet as a group.

Sincerely,

Marshall McKay
Chairman
Yocha Dehe Wintun Nation

Leland Kinter
Chairman
Yocha Dehe Tribal Gaming Agency

**EXHIBIT F**

# EXHIBIT G



# California Nations
# Indian Gaming Association

2150 River Plaza Drive, Suite 1080
Sacramento, CA 95833
Tel: 916-448-8706   Fax: 916-448-8758

October 18, 2013

Attorney General Kamala D. Harris
Department of Justice
P.O. Box 944255
Sacramento, CA 94244

Dear Attorney General Harris,

On behalf of the 35 member tribes of the California Nations Indian Gaming Association, I am writing to express our concerns regarding gaming practices at cardrooms that are violating the California Constitution, the Penal Code, and the Gambling Control Act, as well as its implementing regulations, to the detriment of our tribal gaming business. These gaming practices also violate the tribal exclusivity provisions of the Tribe's Compact with the State of California.

We are aware that detailed complaint letters were filed with the Bureau of Gambling Control over one year ago but to date no significant action has been taken. We are urging you at this time to act to stop these clear violations of California gaming laws and regulations.

California law prohibits banking games in cardrooms, and any player-dealer position must continuously and systematically rotate. However, it is prevalent throughout the industry that this position does not rotate and is instead dominated by one entity, the Third Party Proposition Player service (TPP). These banking practices are indisputable violations of the law.

It is the hallmark of California cardroom gaming that the house generates revenue from a collection fee charged to patrons for the opportunity to play the game. However, it has become prevalent throughout the industry for many cardrooms not to charge any collection fee, except for the TPP. Collection fees must be charged to all players for the opportunity to play the game; otherwise, what type of gaming is being conducted? It calls into question how the cardrooms are making their money.

Because of the current banking practices and waiver of collection fees for players, cardrooms are advertising "Vegas style" games like blackjack and baccarat. Such games in California cardclubs are prohibited by the California Constitution. Blackjack is specifically prohibited by

EXHIBIT G

name in Penal Code Section 330, as the courts have explained blackjack is another name for the game of 21.

The California Nations Indian Gaming Association urges you to take action to enforce the state gaming laws and regulations and put an end to these unlawful gaming practices at California cardrooms.

Sincerely,

Daniel J. Tucker
Chairman

**EXHIBIT G**

# EXHIBIT H



TRIBAL GAMING AGENCY

March 25, 2014

**VIA ELECTRONIC AND U.S. MAIL**

Attorney General Kamala D. Harris
Office of the Attorney General
California Department of Justice
P.O. Box 944255
Sacramento, CA 94244-2550

RE: YOCHA DEHE CONCERNS OVER ILLEGAL GAMING AT CARD ROOMS

Dear Attorney General Harris:

On November 6, 2013, we wrote to you on behalf of the Yocha Dehe Wintun Nation requesting a meeting to discuss the status of the Department of Justice's investigation into illegal gaming practices at California card rooms. As we explained in that letter, our request resulted from our frustration with the Bureau of Gambling Control's failure to address these issues. Enclosed for your convenience are copies of our November 2013 letter to you, as well as our October 25, 2012 letter to the Bureau of Gambling Control and the California Gambling Control Commission.

To date, we have not had the courtesy of a reply from your office, or even an acknowledgment of our November 2013 letter. Further, we know the leaders of a number of other tribes have written to you requesting you to take action to stop the illegal gaming at card rooms, and some have, like us, requested to meet with you. We understand your office has also neither acknowledged nor responded to these other tribal leaders' requests.

You must understand that this issue will not disappear by ignoring it. Our Tribe, as a sovereign nation, negotiated a compact with the State of California for exclusive gaming rights. The State, however, has eroded those rights by enabling card rooms to violate the State's statutory and Constitutional law. The State's actions have directly affected not only our Tribe's sovereignty (as well as that of other California gaming tribes), but also our financial bottom line. This we cannot permit.

**EXHIBIT H**

Attorney General Kamala D. Harris
March 25, 2014
Page 2

As we explained in our October 2012 letter, we understand the State has created a problem which is complex and therefore not given to an easy or quick solution. We are willing to work with the State toward a resolution that works for all parties. Doing so, however, will necessarily require open dialogue and cooperation of the type the Department of Justice (unlike the Gambling Control Commission) has so far been demonstratively unwilling to engage in.

We urge you to change this situation. The alternative to the State working with us cooperatively to solve what State representatives have acknowledged is a State-created problem is likely to be costly and distasteful for all. Again, we request to meet with you to address our concerns. We therefore ask that your staff contact Ray Patterson, the Executive Director of our Tribal Gaming Agency, at (530) 796-5208 to schedule the meeting. As we mentioned before, we are willing to meet with you as a group with other tribes involved in this process who have also requested a meeting.

Sincerely,

Marshall McKay
Chairman
Yocha Dehe Wintun Nation

Leland Kinter
Chairman
Yocha Dehe Tribal Gaming Agency


cc:  Wayne J. Quint, Jr., Chief, Bureau of Gambling Control

Enclosures

**EXHIBIT H**

# EXHIBIT I



February 20, 2015

Attorney General
Kamala D. Harris
California Department of Justice
P.O. Box 944255
Sacramento, CA 94244-2550

Re:   *Request for Meeting Concerning Enforcement Against Illegal Cardroom Activity*

Dear Attorney General Harris,

We, the elected leaders of the undersigned federally-recognized Indian tribes, write to express our grave concern about the Department of Justice's failure to enforce existing California law to stop the play of illegal house-banked games in California cardrooms.  We request a meeting with you to discuss when, and how, your office plans to address the three aspects of widespread illegal activity identified below.

### *Collection Fees*

Tribal representatives recently attended a Bureau of Gambling Control workshop in Sacramento.  The workshop invitation indicated the meeting's purpose was to discuss and debate the proposed changes to the Bureau's Gaming Activity Authorization regulation.  Those changes would establish standards for the collection of cardroom fees (including setting appropriate fee rates) and clarify, as established by legislative intent, the limited circumstances under which cardrooms may waive the collection fee charged to each patron.  To our disappointment there was no discussion of <u>regulations</u>.  Rather, the Bureau "workshop" became a platform for cardroom operators and their employees to essentially filibuster and make economic policy arguments for several hours to justify what we believe to clearly be illegal activity.

1

EXHIBIT I

During the workshop, cardroom representatives pleaded with the Bureau to leave the *status quo* alone and let the illegal games operate because "no one is complaining loudly" about the collection fee waiver. Others expressly acknowledged that before the wholesale waiver of collection fees began, some cardrooms were unsuccessful because players preferred to play at tribal casinos which do not charge such fees. Still others stated that every cardroom in California operates "no collection" games in some form.

Our position is straightforward: It is the Bureau's duty, as an arm of the Department of Justice, to enforce laws as written, not to consider economic policy arguments seeking to justify the play of illegal games in California cardrooms. And, there can be no doubt that the wholesale waiver of collection fees in cardrooms is unlawful. Penal Code section 337j(f) "is intended to be dispositive of the law relating to the collection of player fees in gambling establishments." Prior to 2003, section 337j(f) allowed no waiver of cardroom collection fees. That year, the Legislature passed AB 278 (Bermudez), which allowed for the underlined waiver of player fees. As the legislative history for that bill unambiguously explains:

> The bill also will clarify the law relating to the collection of fees in card clubs by allowing the club to waive specified fees, a "player-friendly" change benefiting those players who do not receive action on their wagers, or where a hand folds and there is no betting. . . . The Attorney General has advised the clubs that this change will clarify this section of law relating to these circumstances.

Thus, as amended, the statute allows for the waiver of collection fees, but only "after the hand or round has begun" (that is, on a hand-by-hand, not on a wholesale, basis) and only where a player received no action on his wager or where the entire hand folds. We appreciate the Bureau undertaking a lengthy regulatory review process to ensure its regulations address these issues. We believe, however, that existing law is sufficiently clear and the Bureau is required to enforce it.

### Player-Dealer Rotation

The law is equally clear on the point of bank rotation. The California Constitution prohibits "casinos of the type currently operating in Nevada and New Jersey." Consistent with that prohibition, Penal Code section 330 forbids, among other things, the play of "any banking or percentage game." However, a later code section, 330.11, removes from the definition of "banking game" any game featuring a "player-dealer position" which is "continuously and systematically rotated amongst each of the [players]."

This required continuous rotation of the player bank does not occur in the games cardrooms now offer. The cardrooms readily admit this lack of rotation. They claim they are only required to offer the rotation of the player-dealer position. Setting aside that even the offer of the player-dealer position does not always happen, there is no mystery about the cardrooms' reluctance to rotate the bank in a game. Traditionally, cardrooms

2

EXHIBIT I

made their money by charging the collection fees referenced above.  To make their games more like those played at Indian casinos, they eliminated the collections and now make their money through their contracts with so-called third party proposition players (TPPs).  These TPPs in turn make the money necessary to pay under the contracts by not relinquishing the bank – that is, they keep the "house advantage" to themselves.   Thus, the TPPs (and the cardrooms) have a direct financial disincentive to allow the bank to rotate and they know no other player will take the bank if they offer it, because the other players lack the funds to cover bets in the case of losing hands.

The problem with the argument the cardrooms (and TPPs) advance is the plain language of section 330.11, which unequivocally states that the bank position "must" rotate among the players, not that it must be offered for rotation.  We note the Bureau appears to agree with our position.  The rules for the game of EZ Baccarat posted on the Bureau's website explain that "a single player cannot repeatedly act as the player/dealer," and cite the relevant decisional and statutory law for that proposition.  The failure to rotate the bank means the games played at the cardrooms are prohibited by the California Constitution and the Penal Code.

### *Play of Illegal Games*

Perhaps the most galling aspect of what the Department of Justice has allowed to proliferate at California cardrooms is the play of patently illegal games.  On billboards along freeways and on their websites, cardrooms boldly advertise the play of "Las Vegas-style Blackjack."  As we all know, Blackjack is played in Nevada and New Jersey and therefore Constitutionally banned.  Moreover, Penal Code section 330 expressly names "twenty-one" – that is, Blackjack – as a prohibited game.  In discussions over the last three years between representatives of the tribes and the Bureau, the Bureau has asserted that the rules of the games it has approved differ from those of the game traditionally played in casinos.  There are at least two problems with this assertion.  First and most obvious, the cardrooms expressly advertise that they play "Blackjack," not some other game.  If the cardrooms are not playing Blackjack, the state should not allow them to advertise that they are, and the games should not bear the word "Blackjack" in their title.

A second problem is that the distinction between the rules the Bureau has approved and those of traditional Blackjack is effectively non-existent.  For example, the Bureau has approved a game known as Pure 21.5 Blackjack.  It appears the primary difference between this game and standard Blackjack is that the face and ten cards have a value of 10.5 when dealt with an ace, rather than the standard value of 10.  Thus, when paired with an ace, these cards add up to 21.5, rather than 21.  Not surprisingly, when cardroom guests ask how to play the game, they are told it plays just the same as regular Blackjack.  That is exactly our point.

And then there are the games of Baccarat and Party Craps, both games the Bureau has approved for play in cardrooms.  Tribal representatives have previously explained to the Bureau that Baccarat <u>cannot</u> be played as anything but a banked game, because it

3

**EXHIBIT I**

does not feature a player-dealer position such that it can come under the exception created by Penal Code section 330.11 – there is simply no such position to rotate. The Bureau representatives seem to disagree, but we are confident they are incorrect.

More recently, we learned that some cardrooms are playing Party Craps, a game which plays just like (and has the same odds as) the game played in Nevada and New Jersey casinos, except that instead of using dice, it uses cards. We think it obvious that the game of craps does not have a player-dealer position that can be rotated. We therefore think it equally obvious that the game is illegal for play in cardrooms, yet the Bureau has approved it.

While tribal representatives have raised all of these issues with the Bureau (except for Party Craps, which we only recently learned about), they have been told the Bureau will first address the collections issue through the regulatory review process described above and only then will move on to our other concerns. We see no reason why the Bureau should shrug off its obligation to enforce the law until it is convenient for the Bureau to do so, particularly where the problem is of the Bureau's own making.

In closing, we would appreciate if you could meet with us at a mutually convenient time to discuss these matters. We therefore ask that your staff contact Alva Johnson at (760) 699-6800 to schedule such a meeting.

Sincerely,

Jeff Grubbe
Tribal Chairman
Agua Caliente Band of
Cahuilla Indians

Mark Macarro
Tribal Chairman
Pechanga Band of
Luiseño Indians

Cody J. Martinez
Tribal Chairman
Sycuan Band of
Kumeyaay Indians

Leann Walker Grant
Tribal Chairperson
Table Mountain Rancheria

Robert J. Welch, Jr.
Viejas Band of
Kumeyaay Indians

Leland Kinter
Yocha Dehe Band of
Wintun Indians

4

**EXHIBIT I**

# EXHIBIT J



TRIBAL GAMING AGENCY

September 16, 2013

Richard J. Lopes
Chairman
California Gambling Control Commission
2399 Gateway Oaks Drive, Suite 100
Sacramento, California 95833

### RE: YOCHA DEHE COMMENTS ON THIRD PARTY PROPOSITION PLAYER REGULATIONS

Dear Commissioner Lopes:

We write on behalf of the Yocha Dehe Wintun Nation Tribal Gaming Agency to provide comments following the August 27, 2013 workshop addressing revisions to the Commission's regulations on Third Party Proposition Player ("TPPP") contracts.

There is no dispute that card rooms are entitled under Business & Professions Code section 19984 to contract for the provision of third party proposition services. The problem here is that the Commission's regulations with respect to those contracts (specifically, 12200.7 and its subsections) have unintentionally expanded and morphed the relationship between the two entities into something which California law neither envisions nor allows. This problem evinces itself in several ways.

### 1. HOUSE BANKING

We believe card rooms are effectively playing house-banked games through the use of TPPPs, in violation of California law. Under regulation 12200.7(b)(21), (c)(1) and (c)(2), the TPPPs are allowed to pay for equipment (such as surveillance cameras and monitors, cards, and shuffling machines), services, facilities and advertising. Those items, however, are among the traditional incidents of running a business. The TPPPs have therefore become a form of partner with the card room and thus, to some extent, they become the house.

A related problem is the growth of "cross-banking," through which two card rooms become licensed TPPPs and then bank each other's games. This pernicious outgrowth of the TPPP system violates (if not in the letter, certainly in spirit) California law and various regulations such as 12200.7(8) (providing that TPPP services must comply with

EXHIBIT J

Richard J. Lopes
September 16, 2013
Page 2

laws and regulations), 12200.7(c)(1) and (e), and 12200.9(a)(1)(D) (providing that TPPP contracts must not allow the "existence or perception of any collusive arrangement").

Thus, we believe the Commission should revise, at a minimum, regulations 12200.7(b)21, (c)(1), (c)(2), (c)(3) and (e) to eliminate or severely limit the reimbursement scheme and prohibit cross-banking.

A related concern is that no one, other than the Bureau of Gambling Control and the contracting parties, have any idea what the contracts actually look like or what they contain. We urge the Commission to implement regulations that provide greater (if not complete) transparency with respect to these contracts and what goes into them. This is a critically important issue. As matters stand now, the TPPPs and card rooms have been allowed to engage in practices that are, at best, inconsistent with California law and appear decidedly contrary to the intentions of the Commission's regulations. We believe the Commission, and to the extent possible interested third parties and other regulatory agencies, should have access to the information in those contracts to ensure the current situation does not occur in the future.

## 2.   BANK ROTATION

The simple fact is that TPPPs at card rooms do not rotate the bank. Even if there are some TPPPs who have a practice of *offering* the bank for rotation, Penal Code section 330.11 specifically requires that the bank *actually* rotate "continuously and systematically . . . amongst each of the participants during the play of the game."[1]  Thus, we believe regulation 12200.7(8), which provides that TPPP services must comply with California law, could be enhanced (perhaps with subsections) to specify the rotation of the bank. We also suggest this regulation is an appropriate place to place additional provisions specifying *how* the TPPPs must comply with California law.

## 3.   PLAYER COLLECTION FEE

In many card rooms, the player collection fee – the traditional method by which card rooms made money – has virtually disappeared. Though, again, we have no access to the contracts between TPPPs and card rooms, the reason for the disappearance seems straightforward:  The card rooms are making their money from their partners, the TPPPs.

While Bureau representatives have previously explained that collection fees are not mandatory, they surely must recognize that the system the State has created allows the TPPPs to compensate the card rooms in other ways to make up for the loss of the collection fees. Moreover, even if nothing prohibits a card room from eliminating a

---

[1]      Understandably, the TPPPs prefer not to rotate the bank, considering their compensation appears to be based on the number of hands banked, thereby creating an inherent financial disincentive to bank rotation.

**EXHIBIT J**

Richard J. Lopes
September 16, 2013
Page 3

collection from all players, having a different collection for TPPPs and other players *is* prohibited (see regulation 12200.7(12)), and that appears to be the system in place in many, if not most, card rooms.  Thus, we believe the Commission's regulations must be refined and enhanced to ensure this situation does not occur.  Stated succinctly, the TPPPs must (1) play as participants in the games, (2) pay the same collection fee for the same wager level as other players, and (3) pay a collection fee for every wager, including bonus bets.

In closing, we very much appreciate the Commission's efforts to address the inadequacies in the regulations and to revise them to ensure compliance with California law.  We look forward to participating in future workshops.

Sincerely,

Ray Patterson
Executive Director
Yocha Dehe Tribal Gaming Agency

cc:     Tiffany Conklin, Commissioner, California Gambling Control Commission
        Lauren Hammond, Commissioner, California Gambling Control Commission
        Richard Schuetz, Commissioner, California Gambling Control Commission
        Tina Littleton, Executive Director, California Gambling Control Commission
        Wayne J. Quint, Jr., Bureau Chief, Bureau of Gambling Control

80949736\V-1

**EXHIBIT J**

# EXHIBIT K

*KAMALA D. HARRIS*
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**



BUREAU OF GAMBLING CONTROL
P. O. Box 168024
Sacramento, CA  95816-8024

September 25, 2015

Tina Littleton, Manager
California Gambling Control Commission
Regulatory Actions Unit
2399 Gateway Oaks Drive, Suite 220
Sacramento, CA  95833

RE:   <u>Third-Party Provider of Proposition Player Services Contract Regulations –
August 18, 2015 Hearing Follow Up</u>

Dear Ms. Littleton:

At the Commission's third-party provider of proposition player services (TPPPS) contract regulations hearing on August 18, 2015, Chairman Evans requested that the Bureau of Gambling Control (Bureau) provide information to the Commission concerning the Bureau's review of TPPPS contracts.  In addition, in a follow up email on the same date, Commission Analyst Joshua Rosenstein provided a bulleted list of what was requested.  The following information is in response to this request.

- *What items are being included in the contracts, broken down by the four categories (facilities, services, advertising, and equipment)?*

  **<u>Services</u>**
  o   Wages/Payroll of Positions that Benefit TP
  o   Security
  o   Cage
  o   Surveillance
  o   Food and Beverage
  o   Accounting

  **<u>Facilities</u>**
  o   Parking
  o   Internet
  o   Repairs and Maintenance
  o   Office and Operating Supplies for Casino, Security, etc.
  o   Alarm Monitoring
  o   Cleaning/Janitorial/Housekeeping/Maintenance
  o   Podiums
  o   TP Office/Workspace

**EXHIBIT K**

Tina Littleton, Manager
September 25, 2015
Page 2

- o Rent
- o Utilities/Telephone

**Advertising**
- o Player Vouchers
- o Food/Beverage Promotions
- o Billboards
- o Signage
- o Flyers
- o Radio and Print Advertisements
- o Giveaways
- o Internet/Social Media Advertisements

**Equipment**
- o Cards
- o Shuffle Machines Leases
- o Surveillance Equipment (e.g. Cameras, etc.)

- *What, if any, justification is being provided by the TPPPS/Cardroom to currently justify those items?  What are the Bureau's processes for verifying the included items to make sure they are not "substantially disproportionate?"*

  Currently, virtually no documentation is initially submitted to the Bureau to justify the fees included in these contracts.  The Bureau requests information from the TPPPS or Cardroom as necessary to substantiate the fees proposed in the contract.  If the requested information does not provide enough detail, the Bureau works with the TPPPS company or the Cardroom to provide invoices and additional expense/financial information.  In addition, we may do the following:

**Services and Facilities**
- o Request the square footage of any TPPPS specific workspace.  If necessary, the Bureau will also request supporting documentation (e.g., leases, floor plans, etc.).
- o Review contracts for outside services if applicable (e.g., security, consultants, etc.).
- o Use the internet to attempt to find comparable commercial property rents.

**Advertising**
- o Depending on what the fees are determined to be, the Bureau may request samples of the advertisements, invoices, and receipts to ensure the advertising is related to the games in which the TPPPS company provides services.

**EXHIBIT K**

Tina Littleton, Manager
September 25, 2015
Page 3

### Equipment
- ○ Request statements, invoices, and receipts and verify that the equipment is used for California games.
- ○ Compare the costs to other Cardrooms.

- *Identify or comment on any specific items currently allowed that provide the highest level of concern.*

  There are currently no specific expenses that are prohibited. As currently written, the regulations allow for nearly all expenses that can be categorized as services, facilities, advertising, or equipment to be paid for by the TPPPS company. The largest issue for the Bureau is the debate with the industry as to what can be placed in these categories. If the Bureau determines that an item is of no value to the TPPPS company, the Bureau believes that any payment for the item is disproportionate. The Bureau may also determine that an item is not requested by or provided to the TPPPS company. However, there are arguments from the industry about whether or not the Bureau has the authority to make these determinations.

  Advertising is another issue. The industry has argued that any advertisement of the Cardroom benefits the TPPPS company and they should therefore share that expense (this would include poker advertisements). The Bureau believes, as per the regulations, that the TPPPS company should only share in the cost of advertisements for games in which the TPPPS company participates. However, Cardrooms rarely separate this expense and the Bureau has a difficult time discerning the TPPPS company's reasonable share.

- There are several types of items that the Bureau does not feel have a value to the TPPPS company or create a conflict that the Bureau believes enhances the dangers of unsuitable practices. The Bureau cannot approve a contract if the Bureau is not satisfied that the contract will not create or enhance the dangers of unsuitable, unfair or illegal practices in the conduct of controlled gambling or in the carrying on of the business and related financial relationships and that the contract does not undermine public trust that gambling will be conducted honestly, by reason or existence or perception of collusion. Following are examples of categories that have not been justified by the industry. However, the industry believes that payments for these types of items should be allowed.

  - ○ Game Royalties/Game Licensing Agreements
  - ○ Legal Fees
  - ○ Cardroom Regulatory Compliance Fees
  - ○ Poker Advertising/Promotions
  - ○ Uniforms

**EXHIBIT K**

Tina Littleton, Manager
September 25, 2015
Page 4

- o Payroll Processing Fees
- o Membership/Dues
- o Subscriptions
- o Commission/Bureau Licensing Fees (e.g., Annual Fees, Background Fees, etc.)
- o Taxes (e.g., Property, City, etc.)
- o Insurance Related Expenses
- o Hotel Promotions
- o Cardroom Charitable Donations
- o Cardroom Employee Recruiting and Hiring
- o Other Expenses Relating Specifically to Poker

The Bureau appreciates the opportunity to provide additional information for the revision of these regulations. If you have any questions or need additional information, please contact me at (916) 227-2651 or by email at yolanda.morrow@doj.ca.gov.

Sincerely,

YOLANDA MORROW, Sr. Manager
Licensing Section

For    KAMALA D. HARRIS
       Attorney General

cc: Stacey Luna Baxter, Assistant Bureau Chief

**EXHIBIT K**

# EXHIBIT L



TRIBAL GAMING AGENCY

May 15, 2014

<u>VIA ELECTRONIC AND U.S. MAIL</u>

Wayne J. Quint, Jr.
Bureau Chief
Bureau of Gambling Control
Department of Justice
P.O. Box 168024
Sacramento, California 95816-8024

RE: <u>CARD ROOM COLLECTIONS – PENAL CODE SECTION 337j(f)</u>

Dear Mr. Quint:

I write on behalf of the Yocha Dehe Wintun Nation's Tribal Gaming Agency (the "TGA") to thank you for holding the May 6, 2014 roundtable to discuss the potential amendment to the Bureau of Gambling Control's regulations regarding gaming activity authorization. The TGA representatives who attended the roundtable (Ray Patterson, the TGA's Executive Director, and Jeff Butler, the TGA's attorney) found the roundtable discussion very enlightening.

I also want to provide the Bureau with the TGA's written comments in light of the discussion at the roundtable. As the Bureau's April 21, 2014 notice made clear, the roundtable had a sole focus – the parameters under which California card rooms "may waive the collection fee, pursuant to Penal Code section 337j(f)." We write to advise you of our conclusion that allowing card rooms to waive collections the way they currently do is inconsistent with both that statute, and also violates applicable regulations.

The starting point for the analysis are the collection rates for card room games where only the "player-dealer" is required to pay a fee to play, but all other players at the table are not. Contrary to comments from card room representatives at the roundtable, nothing in California law permits this practice. Section 337j(f) expressly provides that it is "intended to be dispositive of the law relating to the collection of player fees in gambling establishments." While that "dispositive" statute does have collection fee waiver

EXHIBIT L

Wayne J. Quint, Jr.
May 15, 2014
Page 2

language, it *does not* allow the ***wholesale waiver*** of collection fees for all but one player at the table.  As the statute explains:

> the gambling establishment may waive collection of the fee
> or portion of the fee in any hand or round of play after the
> hand or round has begun pursuant to the published rules of
> the game . . .

Thus, the statute envisions the waiver of the fee, but only for a particular ***"hand or round of play"*** in a game, where the game rules so permit.  It is important to understand the history of section 337j(f) with respect to the waiver language.  As Keith Sharp, an attorney representing card rooms, explained at the roundtable meeting, the collection fee waiver language was added to section 337j(f) in 2003 as a result of Assembly Bill 278. The legislative history of that bill explained the desire for the collection fee waiver in particular hands or rounds of play:

> The bill also will clarify the law relating to the collection of
> fees in in card clubs by allowing the club to waive specified
> fees, a "player-friendly" change benefiting those players
> who do not receive action on their wager, or where a hand
> folds and there is no betting.

Thus, there are only two circumstances where the legislature envisioned allowing a card room to waive the collection fee – where a player received no action on his wager or where the entire hand folds with no betting at all (for your convenience, we enclose a copy of the legislative history of AB 278).  Common sense justifies these two exceptions. After all, it is understandable that a player should not have to pay a collection where no other player took him up on his bet (and he thus has no potential for winning anything), or where all players in the hand fold without betting.  What is not understandable, and what the law does not allow, is card rooms having game rules providing for zero collections for all players but one, regardless of the circumstances.  That is, however, exactly the situation the card rooms currently enjoy.

There is also a specific regulation applying to this circumstance and which is consistent with our reading of section 337j(f) and the Legislature's intention regarding that statute. As you know, the California Gambling Control Commission has regulations addressing so-called third party proposition players ("TPPs") in card rooms.  Regulation 12200.7 sets forth requirements for contracts between card rooms and TPPs.  With respect to collections, subsection (b)(12) of the regulation requires that all contracts contain a provision ensuring that "collection fees charged by the house for participation in any controlled game shall be the same as those charged to other participants during the play of the game."  Thus, the CGCC's regulations do not allow the card rooms to charge the TPPs (who act only as player-dealers in card rooms) a different rate than the rest of the players in the game, though that is just what they are doing.

**EXHIBIT L**

Wayne J. Quint, Jr.
May 15, 2014
Page 3

We heartily encourage the Bureau to do whatever is necessary to ensure that card rooms comply with California law with respect to collections – if they charge one player a collection fee, they must charge all players the same collection fee.

Again, thank you for calling for and hosting the roundtable discussion.  We look forward to the next opportunity to meet with Bureau and gaming industry representatives to further this important discussion.

Sincerely,

Leland Kinter
Chairman
Yocha Dehe Wintun Nation Tribal Gaming Agency

Encl.

cc:  Susanne George, Research Analyst II (via email)

**EXHIBIT L**

BILL ANALYSIS

Bill No:  AB 278

SENATE COMMITTEE ON GOVERNMENTAL ORGANIZATION
Senator Edward Vincent, Chair
2003-2004 Regular Session
Staff Analysis

AB 278  Author:  Bermudez
As Amended:  July 2, 2003
Hearing Date:  July 8, 2003
Consultant:  Steve Hardy

SUBJECT
Gambling Control Act.

DESCRIPTION

1.  AB 278 would increase from 10 to 16, the membership of
    the Gaming Policy Advisory Committee (GPAC), which is
    appointed by the Gambling Control Commission (CGCC) as
    specified under present law.  Under provisions of this
    act, eight members must be from the general public, and
    eight must represent controlled gambling licensees.

2.  Would revise the definition of controlled game to
    clarify that games of "skill" (certain poker games), in
    addition to games of "chance" may be legally conducted in
    Card clubs.

3.  Allows a gambling establishment (card club), to waive
    the collection of described fees collected by the club
    for any hand or round of play, after the hand or round
    has begun, pursuant to the published rules of the game
    and notice provided to the public.  If the establishment
    waives this fee, the fee will not constitute one of the
    specified collection rates.

4.  Contains a "cost disclaimer" clause.

PRIOR/RELATED LEGISLATION

SB 8 (Lockyer) Chapter 867, Statutes of 1997.   Repealed the

**EXHIBIT L**

AB 278 (Bermudez) continued
Page 2

previous Gaming Registration Act, and re-enacted an updated
Gambling Control Act.

AB 2446 (Firebaugh) 2002 Session.   Contained similar
provisions to this measure.  (Held on Suspense File, Senate
Appropriations Committee)

### EXISTING LAW

Existing law provides that the CGCC is required to appoint
10 members to the GPAC, composed of equal numbers of
controlled gambling licensees and the general public as
specified.

Existing law makes it a misdemeanor to operate specified
controlled games, and to regulate the collection of player
fees in licensed gambling establishments as specified.

### BACKGROUND

The author indicates that this bill seeks to give a voice
on the GPAC to those cities and counties that have gambling
establishments in their jurisdictions.  There are currently
no specific provisions for representation of these local
agencies on the GPAC.  In addition the bill clarifies that
games of skill (certain poker games) may be played in
addition to games of chance.  Card clubs are currently
playing games, which under definition, would be considered
games of skill.  This change will provide clarity to allow
these games to be conducted.

The bill also will clarify the law relating to the
collection of fees in card clubs by allowing the club to
waive specified fees, a "player-friendly" change benefiting
those players who do not receive action on their wager, or
where a hand folds and there is no betting.  Currently,
clubs give a "free-play" token in when these instances
occur.  The Attorney General has advised the clubs that
this change will clarify this section of law relating to
these circumstances.

Supporters of this bill indicate that controlled gaming
establishments (i.e., card clubs) provide important
revenues to their local communities in the form of
licensing fees.  Small urban cities such as Commerce, Bell
Gardens and Hawaiian Gardens are dependent on these
revenues.  Supporters believe that the change proposed by

**EXHIBIT L**

AB 278 (Bermudez) continued
Page 3


this bill will give these cities and clubs fair
representation on the committee.

The author has previously amended the bill to address
concerns raised by the California Nations Indian Gaming
Association that delete their opposition.  There is no
known opposition to the bill.

SUPPORT:   Commerce Club of California
Los Angeles Casino Political Action
Committee
City of Commerce
Hawaiian Gardens Casino
OPPOSE:   None registered as of 7/5/03
FISCAL COMMITTEE:   Senate Appropriations Committee
**********
SMH:bkh

**EXHIBIT L**

# EXHIBIT M






April 15, 2016

**VIA ELECTRONIC AND U.S. MAIL**

Wayne J. Quint, Jr.
Bureau Chief
Bureau of Gambling Control
Department of Justice
P.O. Box 168024
Sacramento, California 95816-8024

**RE:  ROTATION OF BANKER POSITION IN CALIFORNIA CARDROOMS**

Dear Mr. Quint:

We write to thank you and your staff for meeting with us on March 21, 2016 to discuss the rotation of the "banker" position in California cardrooms.  This meeting resulted from the Bureau's February 19, 2016 notice to the cardrooms that it was suspending the so-called "Lytle letter" which allowed cardrooms to offer the rotation of the banker position, rather than insist on actual rotation as Penal Code section 330.11 requires.

We also want to provide the Bureau with written comments from the tribes we represent on the subject of game rotation and to respond to the inquiry at the meeting about the tribes' view of a "game break" should the banker position fail to rotate.

1.    **THE LEGAL FRAMEWORK**

We believe it important to first to set out the applicable legal framework.   The most elemental point is that Penal Code section 330 prohibits "banking . . . games played with cards."  As the California Supreme Court has explained, this prohibition is elevated

**EXHIBIT M**

Wayne J. Quint, Jr.
April 15, 2016
Page 2

to Constitutional status, because the type of games operating in Nevada and New Jersey include banked table games. *Hotel Empl. & Rest. Empl. Int'l. Union v. Davis*, 21 Cal. 4th 585, 605-06 (1999). The term "banking game," in turn, "has come to have a fixed and accepted meaning: the 'house' or 'bank' is a participant in the game, taking on all comers, paying all winners, and collecting from all losers." *Sullivan v. Fox*, 189 Cal. App. 3d 673, 678 (1987).

Under Penal Code section 330.11, games are "banked" unless the rules of the game feature a "player-dealer" – or banker – position that is "continuously and systematically rotated amongst each of the participants during the play of the game" and "preclude the house, another entity, a player or an observer from maintaining or operating as a bank during the course of the game." This means that even if someone *other* than the cardroom (such as a Third-Party Proposition Player ("TPP")) is operating as the "player-dealer" and the position does not rotate, the game is an illegal banked game. *Davis*, 21 Cal. 4th at 608 (an illegal banking game includes a game "banked by someone other than the owner of the gambling facility."); *Oliver v. County of Los Angeles*, 66 Cal. App. 4th 1397, 1408 (1998).

## 2.   AN "INDUSTRY STANDARD" FOR BANKER ROTATION ALREADY EXISTS

We understand the purpose of the Bureau's current effort is to devise a definition for the term "continuously and systematically rotated" in section 330.11 so the Bureau and industry will have guidelines to avoid the illegal play of games that is currently occurring. We fully support – indeed, believe it is critical to have – a single firm, inflexible standard for game rotation in cardrooms. That way, the Bureau's game approval staff will have no problem determining whether or not a set of rules submitted by a cardroom are legal – the rules either comply with the standard or they do not.

As we explained at our meeting, however, the Bureau can save itself the trouble of going through this definitional process, because that single, firm and inflexible standard already exists. To reach this conclusion, we examined *every* blackjack and baccarat rule on the Bureau's website. This was no minor task. The website contains 208 blackjack game rules for 72 cardrooms, 122 baccarat rules for 50 cardrooms, and 7 of the Bureau's own "Standard Game Rules" (3 blackjack, 4 baccarat).[1] The results of this review were highly instructive.

With respect to blackjack, *every single rule except for four* (that is, 204 out of 208, or 98 percent) provides that the player-dealer position must be offered or actually rotate every two hands. Here is a typical example of the rotation language (this from the Bicycle Casino's No Bust 21st Century Blackjack 5.0):

---

[1]    It appears there are actually 209 sets of blackjack rules. The Bureau's link to the rules for Casino Real in Manteca indicates that cardroom plays Pure 21.5 Blackjack, but the rules were incomplete.

EXHIBIT M

Wayne J. Quint, Jr.
April 15, 2016
Page 3

> **LEGAL**
>
> The Player-Dealer position must rotate in a continuous and systematic fashion, and cannot be occupied by one person for more than two consecutive hands. There must be an intervening player-dealer so that no single player can continually occupy the player-dealer position within the meaning of *Oliver v. County of Los Angeles* (1998) 66 Cal. App. 4th 1397, 1408-1409. If there is not an intervening person occupying the Player-Dealer's position, the game will be "broke" or stopped, as required by the California Penal Code.

Of the four blackjack rules that do not have the two hand rotation language, one (for Normandie Casino) is obviously an old and superseded version, and the other three (one for Lucky Lady and two for the Oaks) reference the *Oliver* decision, note that the banker position must rotate in a systematic and continuous fashion, and require that the game be "disbanded if at least one other intervening player at the table does not accept the deal when offered."

With respect to baccarat, the results are just as remarkable. Out of the 122 game rules, 104 (or 85 percent) explicitly require two hand rotation and the rest state that rotation of the banker position is "the same as industry standard games and complies with 330.11 of the California Penal Code." To ensure there is no doubt about what that standard is, a number of the 104 game rules requiring rotation every two hands *also* contain the "industry standard" provision. Moreover, it is evident the game rules tie the two hand industry standard to the *Oliver* decision and Penal Code section 330.11. Below is an example of the relevant language (from Artichoke Joe's EZ Baccarat):

> **Standards of Play**
>
> The game features a rotating player/dealer position that collects from all losers and pays all winners to the extent that their wager covers the action. The rotation of the Player/Dealer position is the same of industry standard games and complies with 330.11 of the California Penal Code. The object of the game is to form a hand that equals nine (9) or as close to it as possible. The player's hand is compared with the player/dealer's hand. The hand closest to "9" wins.
>
> \* \* \*
>
> **PLAYER-DEALER & DEAL**
>
>     The player/dealer position rotates in a systematic and continuous way so that the opportunity to act as the player/dealer does not constantly remain with a single person for many hands. The person in player/dealer position may not act as player/dealer position more than two consecutive hands or rounds of play. The opportunity to act as the player/dealer must be offered to all seated players after two hands or rounds of play so that a single player cannot repeatedly act as the player/dealer within the meaning of *Oliver v. County of Los Angeles*, (1998) 66 Cal.App.4th 1397, 1408-09 or section 330.11 of the California Penal Code, relating to gambling establishments and any future regulatory guideline from the California Bureau of Gambling Control or the California Gambling Control Commission with respect to the operation of controlled games featuring a player/dealer position.

Wayne J. Quint, Jr.
April 15, 2016
Page 4

The Bureau obviously agrees the "industry standard" for rotation of the banker position is two hands. *Every single one of the Bureau's Standard Game Rules* explicitly references two hand rotation, and, as is the case with many of the cardroom rules, the Bureau's EZ Baccarat rules tie that number to the "industry standard," the *Oliver* decision, and section 330.11.

We trust the point is by now obvious: The cardrooms and Bureau over the years have reached an agreement over the meaning of "continuously and systematically rotated" and that meaning is – unequivocally – two hands. Though, as explained below, the tribes believe the Penal Code should be read to require rotation *every hand*, they are willing to accept the standard the industry has reached. Thus, to return to the initial contention, the Bureau need take no further action with respect to the term the industry (with the Bureau's input) has already defined. The Bureau simply needs to fully withdraw the offending Lytle letter and let the games play by the rules already in force. Where a rule provides for the offer of the banker position, the parties simply need to read that out of the rule and require actual rotation. We note that Bureau representatives have explained on a number of occasions over the last few years (including during Gambling Control Commission hearings and in testimony before the Legislature) that the Bureau is severely underfunded and overburdened. We therefore think it ill advised and counterproductive for the Bureau to engage in a long, time-consuming and personnel intensive process to define a term that already benefits from a definition to which all stakeholders agree.

During our March 21 meeting, you suggested it would be unfair to force the cardrooms to adhere to a two hand rotation, because for nine years – that is, since the December 2007 Lytle "offer" letter was issued – they have been allowed to avoid that standard. There are two responses to your suggestion. First, the Bureau's failure to enforce Penal Code section 330.11 for almost nine years does not "grandfather" the cardrooms into a pass for violating that statute. We also need to keep in mind it has been four years now (April 12 is the anniversary date) since the tribes began formally complaining about the illegal conduct at the cardrooms and the Bureau's failure to stop it.

Second, the Lytle letter was, from the day it was issued, an obvious fraud. As the Bureau detailed in its December 2014 formal accusation against Lytle, "prior to December 4, 2007" – that is, a few days before he sent the "offer" letter to the presidents of two cardroom associations – he entered into "negotiations with [a San Jose cardroom] concerning prospective engagement as its compliance director." Then, "on December 30, 2007, [Lytle] retired from state service" and the next day "entered into the agreement that had been negotiated since before December 4, 2007." Thus, reduced to its essence, it appears Lytle negotiated for employment at a cardroom while still the Bureau Chief, then issued the letter providing cardrooms the ability to skirt the law on game rotation, and a few days later left to work at a cardroom. We think little more needs to be said about that situation.

**EXHIBIT M**

Wayne J. Quint, Jr.
April 15, 2016
Page 5

### 3. THE BANKER POSITION ROTATION CANNOT EXCEED TWO HANDS

Even if the industry standard did not exist, and the Bureau believes it must continue in its effort to define the term "continuously and systematically rotated" in section 330.11, the result must still be nothing *more* than two hands. An important point to keep in mind at the outset is that the Bureau has no authority to expand the realm of legal gaming in the state. As the Gambling Control Act explains (Bus. & Prof. Code § 19801(a)):

> State law prohibits commercially operated . . . banked . . . games . . . To the extent that state law categorically prohibits certain forms of gambling . . ., nothing herein shall be construed, in any manner, to reflect a legislative intent to relax those prohibitions.

Thus, because there is no express definition of the term "continuously and systematically rotated," the Bureau's interpretation must give full effect to the Legislature's intent to maintain the prohibition on banked games and must in no way relax that prohibition.

In trying to construe a statute, the "fundamental task is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute . . . We begin by examining the statutory language, giving the words their usual and ordinary meaning. . . If the terms of the statute are unambiguous, we presume the lawmakers meant what they said, and the plain meaning of the language governs." *Burquet v. Brumbaugh*, 223 Cal. App. 4th 1140, 1145-46 (2014). "When attempting to ascertain the ordinary, usual meaning of a word [in a statute], courts appropriately refer to the dictionary definition of that word." *Wasatch Prop. Mgmt. v. Degrate*, 35 Cal. 4th 1111, 1121-22 (2005) (relying on Oxford English Dictionary to define "terminate" in housing statute); *Burquet*, 223 Cal. App. 4th at 1146 (relying on Oxford English Dictionary to determine meaning of word "disturb" and "peace" in statute).

The Oxford English Dictionary defines the word "continuously" as: "In a continuous manner; uninterruptedly, without break; continually, constantly." As we explained at the March 21 meeting, we think this definition leaves room for only one interpretation – the banker position must rotate every hand. There simply is no rational basis for concluding that anything beyond rotation every hand qualifies as "continuous," "uninterrupted" or "without break." That said, we conceded at the meeting that the tribes could accept the two hand rotation standard, because we understand its origin. As we discussed, the two hand rotation standard emanates from the *Oliver* decision, though that case did not discuss section 330.11's "continuously and systematically" language. There, the court held that the game of Newjack was a prohibited banking game, because while its rules provided the option of rotating the banker position every two hands, it did not require that the rotation actually occur. The obvious logical inference is that, had the

Wayne J. Quint, Jr.
April 15, 2016
Page 6

game rules required the two hand rotation, the court would have found the game legal. Though we believe a court analyzing section 330.11's language would find that "continuous" rotation must mean every hand, no such decision yet exists. Thus, as a concession, the tribes are willing to accept the two hand standard. As the above demonstrates, rotation of the banker position every hand or every two hands are the *only* legally defensible and non-arbitrary standards. If the Bureau believes otherwise, we request that you provide us the legal basis for your position.

A less contentious issue is the definition of "systematically." The Oxford English Dictionary defines that term, in relevant part, as: "In a systematic manner; according to a system or organized plan; regularly and methodically." We take this to mean that the rotation of the banker position must follow a pre-established system, such as clockwise rotation from player to player. Please let us know if you believe the Bureau would benefit from additional input regarding this term.

### 4.   THE MEANING OF A "GAME BREAK"

We next address the question you and your staff raised at the March 21 meeting: What happens when the banker position fails to rotate? A related consideration, which your staff also raised, is how to apply the language from section 330.11 providing that the Legislature did not intend "to mandate acceptance of the deal by every player if the [Bureau] finds that the rules of the game render the maintenance of or operation of a bank impossible by other means."

We agree that every player at a cardroom gaming table need not take the banker position. If they do not, however, it is the *Bureau's responsibility* to ensure it is impossible for the current situation at cardrooms to exist, namely, where only one player, the TPP, engages in the "maintenance of or operation of a bank." With this in mind, we think the answer to the "game break" question is the following: After the TPP at a California cardroom has held the banker position for two hands, the game must stop, and cannot begin again, unless and until another player who has no business relationship with the cardroom or a TPP takes the banker position. The point here is that at least one regular customer – someone who does not work for a TPP or the cardroom – must take the banker position after the TPP has held it for two hands.

Thus, if there are seven individuals, including a TPP employee, playing at a table, the game would not be illegal if at least one regular customer takes the banker position every two hands. It bears stressing that this customer must have no business relationship with the prior banker or the cardroom. Otherwise, a creative cardroom owner might have two TPPs at each table and allow the bank to go between them. There would be, however, no substantive difference between that situation and what currently occurs at cardrooms. Moreover, whatever guidelines the Bureau devises must prohibit "back-banking" by TPPs. Again, there would be no substantive change from the current illegal

EXHIBIT M

Wayne J. Quint, Jr.
April 15, 2016
Page 7

situation if the TPP, rather than the customer, in effect "tak[es] on all comers, paying all winners, and collecting from all losers." *Sullivan*, 189 Cal. App. 3d at 678.

     Again, thank you for hosting the March 21 meeting. We heartily encourage the Bureau to do whatever is necessary to ensure cardrooms comply with California law with respect to game rotation. It is important to keep in mind the tribes' overarching point here: The tribes have the legal right to play banked games, the cardrooms do not. Thus, there must be a distinct difference between the play of games offered in tribal facilities compared to those offered in card rooms. That distinction, however, has not existed for a number of years. The outcome of Bureau's current process must be to restore that distinction. The current illegal situation has persisted far too long.

     We look forward to the next opportunity to meet with Bureau to further this important discussion. If you need any additional input from the tribes in the meantime, please let us know.

     Sincerely,

| | | |
|---|---|---|
| John T. Plata<br>General Counsel<br>Agua Caliente Band of<br>Cahuilla Indians | Kathryn Clenney<br>General Counsel<br>Barona Band of Mission<br>Indians | Steve M. Bodmer<br>General Counsel<br>Pechanga Indian<br>Reservation |
| Michelle Carr<br>Attorney General<br>Sycuan Band of Kumeyaay<br>Indians | Dan Casas<br>Legal Counsel<br>Table Mountain Rancheria | Tuari Bigknife<br>Attorney General<br>Viejas Band of Kumeyaay<br>Indians |
| Jeffry Butler<br>Attorney for the<br>Yocha Dehe Wintun Nation | | |

# EXHIBIT N

# SANTA YNEZ BAND OF CHUMASH INDIANS
## P.O. BOX 517 · SANTA YNEZ · CA · 93460
### Tel: 805.688.7997 · Fax: 805.686.9578
#### www.santaynezchumash.org

**BUSINESS COMMITTEE**
KENNETH KAHN, INTERIM CHAIRMAN
GARY PACE, SECRETARY-TREASURER
MAXINE LITTLEJOHN, COMMITTEE MEMBER
MIKE LOPEZ, COMMITTEE MEMBER

April 20, 2016

**VIA ELECTRONIC AND U.S. MAIL**

Wayne J. Quint, Jr.                    Stacey Luna Baxter
Bureau Chief                           Executive Director
Bureau of Gambling Control             California Gambling Control Commission
Department of Justice                  2399 Gateway Oaks Dr.
P.O. Box 168024                        Suite 220
Sacramento, California 95816-8024      Sacramento, California 95833-4231

RE: BANKED CARD GAMES OPERATING IN CALIFORNIA CARDROOMS

Dear Mr. Quint and Ms. Baxter:

The Santa Ynez Band of Chumash Indians, by this letter, expresses its position regarding the issue rotation of the "banker" position in California cardrooms. Chumash is aware of the efforts of the seven tribes that have formed a coalition to address this issue, and the greater issue of games being offered in California in violation of the State Constitutional prohibitions of banked card games on non-Indian lands, and Chumash supports those efforts. Specifically, Chumash is aware of the letter dated April 15, 2016 to the Bureau (copy attached) that is jointly submitted by the member tribes of the coalition, Agua Caliente, Barona, Pechanga, Sycuan, Table Mountain, Viejas, and Yocha Dehe and Chumash echoes both the legal analysis and policy analysis set forth therein. Chumash has watched the efforts of the coalition over the past several years and the responses from the Commission and the Bureau. Chumash is concerned that by getting into the weeds of statutory and regulatory language, including this most recent development regarding dealer rotation, the Commission and the Bureau have lost sight of the State Constitutional mandate the precludes any law that allows for banked card games to operate on non-Indian lands:

Article IV, Legislative, Sec. 19(e):

*(e) The Legislature has **no power** to authorize, and **shall prohibit, casinos of the type currently operating in Nevada and New Jersey**.*

*Article IV, Legislative, Sec. 19(f):*

*(f) **Notwithstanding subdivisions** (a) and (e), and any other provision of state law, the **Governor is authorized to negotiate and conclude compacts**, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and **banking and percentage card games** by federally*

**EXHIBIT N**

> *recognized Indian tribes on Indian lands in California in accordance with federal law. Accordingly, slot machines, lottery games, **and banking and percentage card games** are hereby permitted to be conducted and operated on tribal lands subject to those compacts.*

(emphasis added). Prior to the passage of Proposition 1A in 2000, which amended the State Constitution to provide for banked card games to be played exclusively on Indian lands, the People of the State of California overwhelmingly approved Proposition 5 in 1998, a statutory Initiative rather than a Constitutional Initiative, which provided for the Tribes to continue the operation of blackjack games whereby the Tribes maintained a "players' pool" of funds on behalf of the players:

> *Sec. 4.0. SCOPE OF CLASS III GAMING*
> *Sec. 4.1. Authorized and Permitted Class III Gaming. To the extent regarded as forms or types of class III gaming, the **Tribe is hereby authorized and permitted** to operate the following gaming activities under the terms and conditions set forth in this Gaming Compact:*
>
> (a) *The operation of Tribal gaming terminals, provided that such devices shall meet the technical standards adopted pursuant to Section 8.1.15 and shall pay prizes solely in accordance with a players' pool prize system.*
>
> (b) **The operation of any card games that were actually operated in any tribal gaming facility in California on or before January 1, 1998, and are not within class II of IGRA (which class II games are not affected by this Gaming Compact), provided that such non-class II card games shall pay prizes solely in accordance with a players' pool prize system.**

(emphasis added). Shortly after the passage of Proposition 5, a lawsuit was brought challenging that its provisions, including the express authorization of card games with a player's pool prize system, violate the State Constitution's then-stated prohibition of "casinos of the type currently operating in Nevada and New Jersey." The player pool was structured so that the house, the tribal-owned casino, did not have a stake in the outcome of the game. The California Supreme Court flatly rejected the argument:

> [A] casino of "the type ... operating in Nevada and New Jersey" may be understood, with reasonable specificity, as one or more buildings, rooms, or facilities, whether separate or connected, that offer gambling activities including those statutorily prohibited in California, **especially banked table games** and slot machines. . . **We conclude the card games in question are** not lotteries, **but banking games.** . . **Rather, as in other banking games, the tribe, through the prize pool, simply "pays off all winning wagers and keeps all losing wagers," which are variable "because the amount of money" it "will have to pay out," or be able to take in, "depends upon whether each of the individual bets is won or lost"**

*Hotel Employees and Restaurant Employees International Union v. Davis*, 88 Cal. Rptr.2d 56, 72 (1999) (emphasis added). The California Supreme Court was unimpressed by the Tribes' argument that an entity other than the house collected losses and paid out winnings:

2

**That the tribe must "pay all winners, and collect from all losers through a fund that is styled a "players' pool" is immaterial: the players' pool is a bank in nature if not in name.** It is a "fund against which everybody has a right to bet, the bank ... taking all that is won, and paying out all that is lost."

88 Cal. Rptr.2d at 73 (emphasis added).

Chumash, along with many California Tribes, can sympathize with the current efforts of the card rooms, because we tried similar ploys in the 1990s, and lost. The card rooms face the same fate, unless the State believes that *"casinos of the type currently operating in Nevada and New Jersey"* means one thing when dealing with Tribes in 1999 and another when dealing with card rooms in 2016. The logical application of the State Constitution and the State Supreme Court's interpretation, applied to the card rooms' efforts leads to the same result: That a person not directly employed by the house must "pay all winners and collect from all losers is immaterial; the player banker is a bank in nature if not in name." It is a "fund against which everybody has a right to bet, the bank taking all that is won, and paying out all that is lost."

Chumash agrees with the analysis set forth in the coalition's April 15, 2016 letter which reaches the conclusion that the dealer rotation as allowed by the Lytle letter was illegal and that going forward, allowing the banker to rotate on any basis other than a continuous and systematic rotation is unlawful under current statutes. The letter reaches that conclusion without needing to determine whether the game violates the prohibition in the State Constitution. It is disturbing, however, that the Commission's and Bureau's actions attempt to look to statute and regulation as authorization for it to interpret those statutes without regard to the constitutional framework. Chumash believes that this analysis should be part of and permeate any Commission and/or Bureau actions. If the Commission and Bureau were to do so, Chumash believes that many of the card room proposals and agenda before it would be quickly and properly terminated without further deliberation.

Chumash implores the Commission and Bureau to tread lightly as it proceeds in its deliberations. Whether a form of blackjack where there is true and systematic rotation of the deal (bank) can survive constitutional scrutiny is one question. Whether a form of blackjack where there is a clear bank or finite set of banks allowed by contract or house rules, is quite another question. It would be unfortunate if a possibly viable game to be offered at card rooms is lost because the Commission and/or Bureau and/or the card room industry got too ambitious in trying to blur clear Constitutional parameters. The Commission and Bureau are better advised to embrace a very strict interpretation of how the deal (bank) rotates. Chumash is watching closely and will take action, as and if needed, to protect the tribal exclusivity embodied in the State Constitution.

We would like the opportunity to discuss our concerns with both of you, either separately or together to continue this important discussion. If you need any additional input from Chumash, please let us know.

Sincerely,

Kenneth Kahn, Interim Tribal Chairman

3

EXHIBIT N

# EXHIBIT O

*KAMALA D. HARRIS*
*Attorney General*



*State of California*
**DEPARTMENT OF JUSTICE**

DIVISION OF LAW ENFORCEMENT
BUREAU OF GAMBLING CONTROL
4949 BROADWAY
SACRAMENTO, CA .95820
Telephone: 916 227-3021
E-Mail Address:  wayne.quint@doj.ca.gov

May 24, 2016

John T. Plata, General Counsel, Agua Caliente Band of Cahuilla Indians
Kathryn Clenney, General Counsel, Barona Band of Mission Indians
Steve M. Bodmer, General Counsel, Pechanga Indian Reservation
Michelle Carr, Attorney General, Sycuan Band of Kumeyaay Indians
Dan Casas, Legal Counsel, Table Mountain Rancheria
Tuari Bigknife, Attorney General, Viejas Band of Kumeyaay Indians
Jeffry Butler, Attorney, Yocha Dehe Wintun Nation

Re:   <u>Letter Regarding Rotation of Banker Position in California Cardrooms</u>

Dear All:

    We are in receipt of the letter dated April 15, 2016 regarding the Bureau of Gambling
Control's (Bureau) possible changes which feature a rotating player-dealer position as permitted
by Penal Code Section 330.11.

    The Bureau is taking every step to evaluate and address your various issues and
welcomes your input into this matter.  Thank you again for taking the time to complete all the
research you did and voicing your concerns.

Sincerely,

WAYNE J. QUINT, JR.
Bureau Chief

For    KAMALA D. HARRIS
       Attorney General

**EXHIBIT O**

# EXHIBIT P



June 21, 2016

**VIA ELECTRONIC AND U.S. MAIL**

Wayne J. Quint, Jr.
Bureau Chief
Bureau of Gambling Control
Department of Justice
P.O. Box 168024
Sacramento, California 95816-8024

<b>RE:  ROTATION OF BANKER POSITION IN CALIFORNIA CARDROOMS</b>

Dear Mr. Quint:

    We write to express our serious concerns about the Bureau of Gambling Control's efforts to change bank rotation practices at California cardrooms.

    As you know, on February 12, 2016, the leaders of the tribes we represent met with the Attorney General to discuss her plan to stop the illegal gaming in cardrooms which the so-called "Lytle letter" created.  The leaders understood from the Attorney General that the Bureau would begin a formal, detailed process which would, at a minimum, include multiple meetings with all stakeholders at which they could exchange their views (and provide the Bureau input) on the meaning of Penal Code section 330.11's term "continuously and systematically rotated" and what the effect should be of the failure of such rotation.  The leaders understood this would be a robust, open, transparent and participatory process.

<b>EXHIBIT P</b>

Wayne J. Quint, Jr.
June 21, 2016
Page 2

As far as the tribes can tell, however, the extent of this "process" to date (and we are now less than two weeks from the June 30 deadline) has been the single initial meeting we had with you on March 21, 2016. After we provided you the tribes' detailed input on April 15, 2016, we have heard *absolutely nothing* about the status of the Bureau's work. While we assume the Bureau has met with representatives of the cardrooms, we have no proof of that, and have no idea what positions the cardrooms have taken (if any) on these critical points.

Our lack of information does not result from an absence of trying. On more than one occasion, we have asked Deputy Chief Yolanda Morrow if the Bureau needed additional input from us, if further meetings would be scheduled and if there are any comments by the cardrooms to which we could respond. The sole response to date has been a June 1, 2016 email from Deputy Chief Morrow telling us that any comments the Bureau would share, it would do so "in person" at some future meeting. We also received a May 24, 2016 letter from you acknowledging our April 15 submission and stating that the "Bureau is taking every step to evaluate and address your various issues." The point is, we would like to know *what those steps are*. While it may indeed be that the Bureau's efforts to address the game rotation concerns have been robust, we have no basis to say that is the case. This tells us the Bureau's process – whatever it may be – has been something less than open, transparent or participatory.

We want to reiterate a simple and straightforward point here: The cardrooms should be required to comply with the law, and as things stand now, they do not. Thus, the guidelines the Bureau is planning to issue on June 30 are critically important, at least on the issue of banker position rotation. At this late date, however, the tribes have no idea what the Bureau is considering. We therefore request that the Bureau:

1. Please provide us as soon as possible a detailed update on the status of its efforts to define the term "continuously and systematically rotated" and to establish what a "game break" should be when the banker position is not rotated consistent with that definition.

2. If the Bureau disagrees with the position on these points set forth in the tribes' April 15 letter, please provide us the legal and factual basis for that disagreement.

**EXHIBIT P**

Wayne J. Quint, Jr.
June 21, 2016
Page 3

    3.   Please provide us any written comments submitted by the
cardrooms on the subject of banker position rotation.

Sincerely,


_____
John T. Plata
General Counsel
Agua Caliente Band of
Cahuilla Indians

_____
Kathryn Clenney
General Counsel
Barona Band of Mission
Indians

_____
Steve M. Bodmer
General Counsel
Pechanga Indian Reservation


_____
Michelle Carr
Attorney General
Sycuan Band of Kumeyaay
Indians

_____
Dan Casas
Legal Counsel
Table Mountain Rancheria

_____
Tuari Bigknife
Attorney General
Viejas Band of Kumeyaay
Indians


_____
Jeffry Butler
Attorney for the
Yocha Dehe Wintun Nation


**EXHIBIT P**

# EXHIBIT Q

*KAMALA D. HARRIS*
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**



BUREAU OF GAMBLING CONTROL
P.O. Box 168024
Sacramento, CA 95816
Phone: (916) 227-3584

June 30, 2016

TO:   ALL CALIFORNIA GAMBLING ESTABLISHMENTS

RE:   **NOTIFICATION REGARDING RULES OF GAMES FEATURING A PLAYER-DEALER POSITION**

Dear Gambling Establishment Representative:

A letter published February 19, 2016, notified all gambling establishments that a review of the Bureau of Gambling Control's (Bureau) inspection and game review process was being conducted with respect to the play of games featuring a rotating player-dealer position as permitted by Penal Code section 330.11. The February 19, 2016, letter informed all gambling establishments that a prior letter issued December 20, 2007, which had addressed the Bureau's inspection practice with respect to compliance with Penal Code section 330.11, was suspended pending this review, and stated that on or before June 30, 2016, a notification of the revised practice would be issued relating to the rotation of the player-dealer position in games permitted by Penal Code section 330.11.

The Bureau has now completed an extensive review of the play of games currently offered at gambling establishments throughout the State. A number of gambling industry stakeholders have provided input and all suggestions and comments received have been considered.

Penal Code section 330.11 provides in relevant part that acceptance of the deal by every player is not mandated if the Bureau finds that the rules of the game render the maintenance or operation of a bank impossible by other means. Accordingly, in considering rules for games featuring a player-dealer position that do not mandate acceptance of the deal by every player, the Bureau will deny approval to rules that do not do all of the following:

1.  Provide for an offer of the player-dealer position to each player seated at the table immediately upon completion of every second consecutive hand, or more frequently if desired. The offer must be clearly visible to surveillance cameras and audible, so that each player at the table is aware of the opportunity made available by the offer.

2.  Provide that no one person or entity may hold or otherwise be involved in the player-dealer position continuously for 60 minutes. The player-dealer position must rotate completely away from a person or entity within a 60-minute period, to a different

**EXHIBIT Q**

June 30, 2016
Page 2

person or entity from the one who occupied the position during the hand immediately preceding the rotation. The 60-minute period commences upon acceptance of the player-dealer position.

3. Provide that upon failure of fulfillment of any of the requirements of play identified in paragraph 2, the game must end, and that a new game cannot begin for at least two minutes.

4. Provide for immediate notification to all players that the game has ended, cards or tiles cannot be dealt, and wagers cannot be made. The dealer tray must be covered during this time to indicate the game has ended.

5. Provide for the shuffling of all cards or tiles upon the opening of a new game.

Enclosed is a list of games featuring a player-dealer position currently approved for play in your gambling establishment. Gambling establishments are encouraged to review current game rules for all listed games for compliance with this notification. If the rules of any listed game are not in compliance with paragraphs 1 through 5 of this notification, proposed modified rules for each game must be received by the Bureau or postmarked **no later than September 30, 2016**. Games for which proposed modified game rules are received by the deadline may continue to be offered by the gambling establishment under the currently approved rules until the Bureau makes a determination on the proposed modified game rules. No application fee or deposit will be required for submission of proposed modified game rules for the games on the enclosed list. The Bureau will exercise its authority to issue temporary approvals (Cal. Code Regs., tit. 11, § 2071, subd. (c)) for 12 months to continue to monitor game play to ensure that rotation is occurring and banking is precluded, as specified in the above items 1 through 5.

If the rules of any listed game are not in full compliance with paragraphs 1 through 5 of this notification, and the Bureau does not receive proposed modified game rules by the deadline, the current approval for that game will be withdrawn and the game may no longer be offered.

Submit proposed modified game rules to the address or email address below:

Bureau of Gambling Control
Attn: Game Review Unit
P.O. Box 168024
Sacramento, CA 95816
Email: BGCGames@doj.ca.gov

**EXHIBIT Q**

June 30, 2016
Page 3

      The Bureau will not approve any other game modifications, new game approvals, or gaming activities until further notice.

                    Sincerely,

                    WAYNE J. QUINT, JR.
                    Bureau Chief

                For     KAMALA D. HARRIS
                        Attorney General

Enclosure

cc:    Third-Party Providers of Proposition Player Services

# EXHIBIT R



December 7, 2016

V<small>IA</small> E<small>LECTRONIC</small> A<small>ND</small> U.S. M<small>AIL</small>

Wayne J. Quint, Jr.
Bureau Chief
Bureau of Gambling Control
Department of Justice
P.O. Box 168024
Sacramento, California 95816-8024

R<small>E</small>:   R<small>OTATION</small> O<small>F</small> B<small>ANKER</small> P<small>OSITION</small> I<small>N</small> C<small>ALIFORNIA</small> C<small>ARDROOMS</small>

Dear Chief Quint:

   We write to express our disappointment with the Bureau of Gambling Control's June 30, 2016 "guidelines" for the rotation of the banker position in California cardrooms.

   In April 2012, when tribal representatives first raised illegal gaming concerns with the State, a primary complaint was the cardrooms' violation of Penal Code section 330.11 by failing to rotate the banker position "continuously and systematically" as that statute requires.  The cardrooms' failure to rotate the banker position is a direct result of the Bureau's unwillingness or inability to enforce the very two-hand rotation rules it has approved.  Anything other than the continuous and systematic rotation of the banker position results in an illegal banked game.

   Throughout the last four years, we have emphatically reiterated this point.  We hoped progress was occurring when, during our February 12, 2016 face-to-face meeting, the Attorney General informed us the Department of Justice would suspend (rather than withdraw) the Lytle letter and the Bureau would begin a process that would lead to

Wayne J. Quint, Jr.
December 7, 2016
Page 2

banker rotation guidelines no later than June 30, 2016.  During that meeting the Attorney General confirmed this process was intended to: (1) define the meaning of the term "continuously and systematically rotated" in Penal Code section 330.11, and (2) definitively highlight the distinction between games offered in California cardrooms and those offered in tribal casinos.  Neither of these intended outcomes has occurred as of this date.

The June 30 rotation guidelines do not even mention the word "continuously."  Rather, the guidelines claim the "relevant part" of Penal Code section 330.11 is the one stating that "acceptance of the deal by every player is not mandated."  That is not the statute's "relevant part."  The principal issue is not who accepts the banker position, but rather how frequently that position must rotate.

Prior to the completion of the Bureau's new guideline process our representatives wrote to you on April 15, 2016 to explain in detail the tribes' position on game rotation (a copy of that letter is enclosed for your convenience).  We demonstrated that almost every blackjack and baccarat rule on the Bureau's website requires rotation (or the offer of rotation following the Lytle letter) every two hands.  That irrefutable fact establishes a Bureau-endorsed and long-accepted cardroom industry standard for the meaning of "continuous and systematic" rotation.  The Bureau's new guidelines, however, find that rotation of the banker position is appropriate if it occurs once every hour.  Between fifty and sixty hands of blackjack and forty and fifty hands of baccarat can be dealt per hour at a table.  Thus, the Bureau has effectively converted a long-standing cardroom industry standard of rotation every two hands into a new standard of rotation every fifty hands.  There is no justification for this radical change (other than to put the State's seal of approval on the cardrooms' continued violation of California law).  We are confident no reasonable person would argue that rotation of the banker position every fifty hands equals "continuous" rotation, especially given the well-established two-hand rotation standard.

Moreover, the "remedy" in the new guidelines for a cardrooms' failure to rotate the banker position once an hour is illusory.  As the guidelines teach, when a cardroom chooses to ignore the once-an-hour rotation, it must only stop the game for two minutes, during which it will shuffle the cards and cover the chips.  After the two minutes pass, the very same third party proposition player who held the banker position during the prior hour and violated the once-an-hour rotation requirement can go back to doing exactly that for the next hour, and so on indefinitely.  This is no remedy and these are still banked games.  It is hardly surprising, then, that Richard Schuetz, the former CGCC Commissioner, commented in an article that he was surprised the Bureau "didn't insist the players stand up at the game and spin around twice before sitting back down after the two-minute break."

That said, the cardrooms need not ignore the once-an-hour rotation requirement, because that requirement is no burden on them at all.  All the cardrooms have to do is hire a "roving" third party proposition player to sit at each table once an hour and accept a single hand as the banker, and then it is back to business as usual.  The most difficult

EXHIBIT R

Wayne J. Quint, Jr.
December 7, 2016
Page 3

thing for the cardrooms (and the Bureau) to track under the new regime will be to figure out when the hour expires at each table.

We strongly urge the Bureau – an arm of the Department of Justice – to not participate in a scheme by which the cardrooms evade what the law plainly requires. Here, what the Bureau is doing is even more egregious than that, because the Bureau actually created and is now perpetuating a system through which cardrooms engage in illegal gaming.  This began in December 2007 when the appalling Lytle letter provided cover for the cardrooms to illegally stop rotating the banker position in favor of just offering it.  With respect to that letter, the Bureau could deny it had knowledge of its less-than-respectable origin.  That defense is no longer available to the Bureau.  Now, the Bureau has officially enabled and sanctioned the cardrooms' play of plainly illegal banked games.

We again ask the Department of Justice, through the Bureau, to enforce the law and respect the tribes' exclusive right to offer these banked games.

_____
Jeff Grubbe
Tribal Chairman
Agua Caliente Band of
Cahuilla Indians

_____
Clifford M. LaChappa
Tribal Chairman
Barona Band of Mission
Indians

_____
Mark Macarro
Tribal Chairman
Pechanga Band of
Luiseno Indians

_____
Cody J. Martinez
Tribal Chairman
Sycuan Band of the
Kumeyaay Nation

_____
Leann Walker Grant
Tribal Chairperson
Table Mountain Rancheria

_____
Robert J. Welch, Jr.
Viejas Band of
Kumeyaay Indians

_____
Leland Kinter
Tribal Chairman
Yocha Dehe Wintun Nation

Enclosure

# EXHIBIT S



**CALIFORNIA NATIONS**
INDIAN GAMING ASSOCIATION

December 6, 2016

**VIA ELECTRONIC AND U.S. MAIL**

Attorney General Kamala D. Harris
California Department of Justice
P.O. Box 944255
Sacramento, CA 94244-2550

RE: ROTATION OF BANKER POSITION IN CALIFORNIA CARDROOMS

Dear Attorney General Harris:

I write on behalf of the California Nations Indian Gaming Association to express our disappointment with the Bureau of Gambling Control's June 30, 2016 "guidelines" for the rotation of the banker position in California cardrooms.

We understood the purpose of those guidelines was to define the meaning of the term "continuously and systematically rotated" in Penal Code section 330.11, and definitively highlight the distinction between games offered in California cardrooms and those offered in tribal casinos. The guidelines, however, do neither. In fact, the guidelines do not even mention the word "continuously."

The Bureau and cardrooms have a long-established industry standard for the meaning of "continuous and systematic" rotation – rotation every two hands. The Bureau's new guidelines, however, find that rotation of the banker position is appropriate if it occurs once every hour. Between fifty and sixty hands of blackjack and forty and fifty hands of baccarat can be dealt per hour at a table. Thus, the Bureau has effectively converted a long-standing cardroom industry standard of rotation every two hands into a new standard of rotation every fifty hands. There is no legal justification for this radical change. Simply stated, rotation of the banker position every fifty hands is decidedly not "continuous" rotation.

Moreover, the "remedy" in the new guidelines for a cardrooms' failure to rotate the banker position once an hour is a sham. Under the guidelines, when a cardroom chooses to ignore the once-an-hour rotation, it must only stop the game for two minutes, during which it will shuffle the cards and cover the chips. After the two minutes pass, the very same third party proposition player who held the banker position during the prior hour and violated the once-an-hour rotation requirement can go back to doing exactly that for the next hour, and so on indefinitely. These are still banked games.

Moreover, the cardrooms need not ignore the once-an-hour rotation requirement, because that requirement is no burden on them at all. All the cardrooms have to do is hire a "roving" third party proposition player to sit at each table once an hour and accept

Protecting the sovereign right of California tribes to operate gaming on their lands.

CNIGA.COM   |   916.448.8706
2150 RIVER PLAZA DRIVE, SUITE 120, SACRAMENTO, CA 95833

**EXHIBIT S**

Attorney General Kamala D. Harris
December 6, 2016
Page 2

a single hand as the banker, and then it is back to business as usual. The most difficult thing for the cardrooms (and the Bureau) to track under the new regime will be to figure out when the hour expires at each table.

The Bureau – an arm of the Department of Justice, the State's top law enforcement agency – should not participate in a scheme by which the cardrooms evade what the law plainly requires. Here, however, what the Bureau is doing is even more egregious than that, because the Bureau actually created and is now perpetuating this aspect of illegal gaming. This began in December 2007 when the appalling Lytle letter provided cover for the cardrooms to illegally stop rotating the banker position in favor of just offering it. With respect to that letter, the Bureau could deny it had knowledge of its less-than-respectable origin. That defense is no longer available to the Bureau. Now, the Bureau has officially enabled and sanctioned the cardrooms' play of plainly illegal banked games.

The California Nations Indian Gaming Association therefore asks the Department of Justice, through the Bureau, to enforce the law and respect the tribes' exclusive right to offer these banked games.

Sincerely,

Steve Stallings, Chairman

**EXHIBIT S**

# EXHIBIT T



September 12, 2018

Tribal Council

**Anthony Roberts**
*Chairman*

**James Kinter**
*Secretary*

**Matthew Lowell, Jr.**
*Treasurer*

**Mia Durham**
*Member*

**Burnam R. Lowell, Sr.**
*Member*

**VIA ELECTRONIC AND U.S. MAIL**
(stephanie.shimazu@doj.ca.gov)

Stephanie Shimazu, Bureau Chief
Bureau of Gambling Control
Department of Justice
P.O. Box 168024
Sacramento, CA  95816-8024

RE:  CARDROOM ILLEGAL GAMING/AUGUST 30, 2018 MEETING

Dear Ms. Shimazu:

As the Chairman of the Yocha Dehe Wintun Nation, I write to express our profound disappointment in the Bureau of Gambling Control's latest plan, announced at an August 30, 2018 meeting, to address the long-standing illegal gaming at California cardrooms.  Below I address Yocha Dehe's primary concerns with the Bureau's plan.

1.      THE CESSATION OF BLACKJACK

At the August 30 meeting, you advised the tribal representatives present that the Bureau would rescind the approvals for blackjack games the cardrooms currently play.  You specified that among those games are Pure 21.5 Blackjack and 21st Century Blackjack.

This appears, finally, to be an admission by the Bureau that it erred in approving and allowing the play in cardrooms of games California law plainly prohibits.  We have been making that very point for more than six years now.  Over that period, the Bureau specifically, and the Department of Justice generally, have taken various insupportable positions to justify the Bureau's approval of blackjack.  These positions have included the notion that the game prohibited by the Penal Code – "twenty one" – and blackjack are not the same (they of course are) and that the rules of blackjack and those of the games played in cardrooms are different (they of course are not).

While we applaud this tardy admission, we note that it is unclear *when* the Bureau will take the promised action.  We understand that during the meeting you said rescission of the game approvals would be delayed for several months to allow the cardrooms to rollout approved games to take the place of the illegal ones.

Yocha Dehe Wintun Nation

PO Box 18   Brooks, California 95606   p) 530.796.3400   f) 530.796.2143   www.yochadehe.org

**EXHIBIT T**

Stephanie Shimazu, Bureau Chief
September 12, 2018
Page 2 of 4

We fail to see why the agency in charge of enforcement should allow the cardrooms to continue playing games the agency has finally conceded are illegal. This appears to be yet another example of the State ignoring its own laws to accommodate the cardroom industry. History over the last six-plus years has taught us that urging the Bureau to take definitive action is a fruitless endeavor. Nevertheless, in light of the Bureau's admission that the cardrooms have been playing a constitutionally prohibited game with the State's approval, we have to request that the Bureau *immediately* stop this conduct, which daily harms tribes with the exclusive right to operate such games.

2.      ILLEGAL ADVERTISEMENT

At the August 30 meeting, you advised the tribal representatives that the Bureau had concluded the cardrooms are engaging in misleading advertising. This is another point we have made for several years now. Unfortunately, you also explained that the Bureau will take no action on this issue, and instead allow the cardrooms to come into voluntary compliance first. If the cardrooms do not cease this illegal conduct, then the Bureau will, at some point in the unspecified future, take action. Again, we fail to see why the cardrooms should get a pass on their illegal gaming and therefore urge you to bring the cardrooms into immediate compliance with California's false advertising laws.

We note, by the way, that the Bureau's realization that the cardrooms are engaging in misleading advertising is not actually new. I attended a February 2016 meeting with then-Attorney General Kamala Harris during which our representatives told her the cardrooms were either playing blackjack or falsely advertising they were. Attorney General Harris said the Bureau had analyzed the games and concluded the cardrooms were *not* playing blackjack, but that they *were* falsely advertising. She then told us false advertising was a concern for the Gambling Control Commission, not the Bureau and thereby effectively disposed of the matter. As it turns out, the Bureau's current plan proves the Attorney General was wrong with respect to the play of blackjack and in distancing her agency from the false advertising issue.

3.      PLAYER-DEALER ROTATION

After more than six years, the State will finally take some action regarding the cardrooms' flagrant play of constitutionally-prohibited banked games. Unfortunately, this will inevitably be a years-long process, as you stated at the August 30 meeting that it would involve three phases: (1) several months of workshops to take input from the industry, followed by (2) an economic impact study because the regulation resulting from the process will almost surely be a "major regulation," followed by (3) formal rule-making.

There are at least three problems with this proposal, setting aside the length of time it will take. First, and most important, our representatives were shocked to learn that during the course of this lengthy regulatory process, the Bureau is going to allow the cardrooms to go back to the "Lytle letter" standard where they needn't – as the law requires – rotate the player-dealer

**EXHIBIT T**

Stephanie Shimazu, Bureau Chief
September 12, 2018
Page 3 of 4

position at all.  We are confident we need not remind you of the unsavory genesis of the Lytle letter, which understandably led the Bureau and Department of Justice to expressly disavow it.  Because *no one* can argue the Lytle letter standard is proper or legal, it leaves us to wonder how the Bureau can justify returning to it and allowing the cardrooms to continue benefiting from the very conduct the Bureau now appears to admit is illegal.

Second, the process the Bureau is undertaking is unnecessary.  On more than one occasion we have explained to your predecessor and the Attorney General that the word "continuously" (referring to how frequently the player-dealer position must rotate) is not subject to much interpretation.  That word certainly cannot be interpreted as once per hour, as the Bureau concluded in its now-abandoned June 30, 2016 memorandum.  Moreover, we have also explained in great detail how the cardrooms and Bureau (with no input from the tribes) created a long-established industry standard of rotation every two hands.  Thus, the very industry the Bureau seeks to regulate has settled the definition of the word "continuously" for purposes of the player-dealer rotation of their games.  The cardrooms cannot complain about the industry standards they themselves created.  (As an aside, we suggest this standard is the one to which the Bureau must hold the cardrooms should the Bureau insist on proceeding with its rule-making process.)

Third, it is difficult to avoid the feeling that the Bureau is, to use a pun, playing games with the tribes.  The cardrooms' failure to rotate the player-dealer position was always the easiest legal violation to understand and fix.  Our representatives thus exhorted the Bureau from the beginning to take action on this issue.  Your predecessor, however, told us the Bureau could not address it, because it was going to focus all of its limited resources on the collections concern.  To that end, the Bureau held several workshops over a period of many months.  Our representatives attended these workshops and provided considerable input.  At the August 30 meeting, you told our representatives that the Bureau is now – after more than six years of the cardrooms' continued illegal gaming – going to scrap the collections initiative and focus on rotation.

4.    BACCARAT

At the August 30 meeting you also advised our representatives that the Bureau would take no action with respect to baccarat.  Stated otherwise, the cardrooms are free to continue breaking the law by playing that particular game.  This fact is particularly frustrating.  From the very beginning of this dispute, the tribes have explained to the Bureau that baccarat *has no player-dealer position* and thus can *only* be played as a banked game.  This is a point our representatives made again to you and your deputy chiefs, Yolanda Morrow and Nathan DaValle, when you visited our facility on June 1, 2018.  At that time, Ray Patterson and his team provided you a tutorial at an actual baccarat table.  That cardrooms should not be allowed to play baccarat should be clear and beyond dispute.  It appears the Bureau persists in refusing to acknowledge that truth.

**EXHIBIT T**

Stephanie Shimazu, Bureau Chief
September 12, 2018
Page 4 of 4

5.    COLLECTIONS ,

As noted above, at the August 30 meeting you advised the tribal representatives that the Bureau is abandoning the collections issue as to which it previously devoted all its time and resources (to the exclusion of other concerns).  We do not understand the Bureau's strategy, unless it is to continue allowing the cardrooms to violate the law with impunity for as long as possible.  As one of our representatives explained to you at the conclusion of the August 30 meeting, collections is the one issue where the State may be able to make some headway in defusing the current illegal gaming dispute.  If the Bureau is truly interested in working toward a resolution of that dispute, we urge you to re-direct the Bureau's efforts toward the issue of collections.

Sincerely,

Anthony Roberts
Tribal Chairman

**EXHIBIT T**